UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x

UNITED STATES OF AMERICA,                :
                                         :
            - v. -                       :    DECLARATION OF
                                         :    JAMES B. TUCKER
ROBERT COPLAN,                           :
MARTIN NISSENBAUM,                       :    (S-1) 07 Cr. 453 (SHS)
RICHARD SHAPIRO,                         :
BRIAN VAUGHN,                            :
DAVID SMITH, and                         :
CHARLES BOLTON,                          :
                                         :
            Defendants.                  :
------------------------------------- x

      JAMES B. TUCKER, pursuant to 28 U.S.C. §1746, under penalty of perjury, declares as follows:

      1.    I am a member of Butler, Snow, O'Mara, Stevens & Cannada, PLLC ("Butler Snow"). I and my firm are lead counsel for the defendant Brian Vaughn ("Vaughn").[1/] I make this declaration in support of the within Omnibus Pretrial Motion which seeks on Vaughn's behalf dismissal of Count Ten of the Superseding Indictment, a copy of which is annexed hereto as Exhibit A, or in the alternative, its transfer on venue grounds for trial in the Middle District of Tennessee. These requests involve Constitutional issues of both the authority of the Special Grand Jury to bring Count Ten against Vaughn, a false statement charge, 18 U.S.C. §1001, based upon an Internal Revenue Service ("IRS") deposition of Vaughn in Nashville, Tennessee, as well as proper Constitutional venue for the trial of that

---

[1/] Except where the context shows otherwise, the statements in this declaration are made on information and belief.

charge. We also seek, under Rule 21(b), Fed. R. Crim. P., a transfer of the trial of all the charges against Vaughn to the Middle District of Tennessee.[2/]  Relief is also sought with respect to matters involving discovery, particulars and other matters involving pretrial preparation, as set forth in our Omnibus Pretrial Motion, as is our request for leave of the Court to apply for additional relief, for good cause shown, and to join in the motions made by counsel for the co-defendants.

BACKGROUND

    2.    The first Indictment in this prosecution was returned on May 22, 2007, and, in broad terms, alleged that the four defendants, all employees and partners at one time or another of Ernst & Young ("E&Y"), had engaged in a conspiracy from early 1998 to 2003, to create, market and implement fraudulent tax shelters for its clients and, as a further part of the conspiracy, to obstruct the IRS's investigation of the shelters and lie about the shelters when and if they came under IRS scrutiny. See Exhibit B, original Indictment at ¶66, p.44, , copy annexed hereto.[3/]  Substantive Counts, including individual instances of alleged tax evasion by the defendants Coplan, Nissenbaum and Shapiro, and false statement charges against Coplan and Vaughn, were also included in the first Indictment.

    3.    Government scrutiny of the E&Y tax shelters began at least as early as April, 2002, when the IRS issued an information summons to E&Y calling for the production of a vast amount of documentary information, as well as the testimony of E&Y personnel who

---

[2/] A separate supporting declaration of my Butler Snow colleague, Peter H. Barrett, Esq., filed contemporaneously with this Omnibus Pretrial Motion, sets forth the facts which pertain to the discretionary change of venue application we have made under Rule 21(b).

[3/] The defendants in the first Indictment were Robert Coplan ("Coplan"), Martin Nissenbaum ("Nissenbaum"), Richard Shapiro ("Shapiro") and Vaughn.

had knowledge of the shelters. See Exhibit C, IRS Summons (cover sheet only) dated April 23, 2002, copy annexed hereto. This IRS investigation was known as and was often referred to as the "promoter penalty audit."

    4.    It appears that the first of the E&Y partners to testify pursuant to the summons was Vaughn, who was questioned at length in an office building located at 810 Broadway, Suite 400, Nashville, Tennessee on June 12, 2002 by several attorneys from the IRS. See Exhibit D, the face sheet of the Vaughn deposition, copy annexed hereto. Thereafter, the defendants Coplan, Nissenbaum and Shapiro also testified,[4]/ as did many other employees and partners of E&Y and other individuals, including Charles Bolton and David Smith who were recently named as defendants in the Superseding Indictment.[5]/

---

[4]/ Coplan's deposition was taken in Washington, D.C. on June 6, 2002; Nissenbaum's in New York City on August 20, 2002; and Shapiro's in New York City on August 21, 2002.

[5]/ According to the discovery thus far provided by the Government, it appears that there were nearly two dozen E&Y personnel, and others who provided testimony either in connection with the E&Y promoter penalty audit or other aspects of the IRS investigation of the E&Y tax shelters:

| | |
|---|---|
| Joyce E. Bauchner, May 16, 2002 | George Andrew Munn, February 2, 2004 |
| Charles Bolton, April 12, 2005 | Stephen Nardi, September 17, 2003 |
| Jeff Brodsky, September 23, 2003 | Martin Nissenbaum, August 20, 2002 |
| Robert Coplan, June 6, 2002 | David Risher, June 12, 2003 |
| Robert Cooper, September 23, 2003 | Jason Rydberg, March 3, 2004 |
| Greg Firtik, April 15, 2005 | Richard Shapiro, August 21, 2002 |
| Fred Goldman, August 26, 2003 | Belle Six, May 12, 2004 |
| Lee Harkleroad, September 16, 2003 | David Smith, December 9, 2003 |
| Robert Haynie, August 5, 2002, March 3, 2004 | Brian Vaughn, June 12, 2002 |
| Joel Leonard, December 15, 2003 | Benji Wolken, September 23, 2003 |
| Ralph Lovejoy, September 30, 2003, February 2, 2004 | Thomas Yorke, September 22, 2004 |

5.  The first Indictment was returned by a Special Grand Jury which was impaneled by the District Court in August, 2006 pursuant to 18 U.S.C. §§ 3331 and 3332. See Exhibit E, copy of Order dated August 11, 2006. The same Special Grand Jury, the 18-month term of which had been extended by Court Order, see Exhibit F, copy of Order dated January 11, 2008, returned the Superseding Indictment.

THE GRAND JURY AND VENUE ISSUES

6.  We argue in our accompanying memorandum, see Point I, Memorandum of Law in Support of Defendant Vaughn's Omnibus Pretrial Motion ("Memorandum"), that this Special Grand Jury could not indict for a crime committed outside the district of its impanelment, the Southern District of New York. Notwithstanding that limitation, it appears that it considered and acted upon the allegations of falsity which the Government maintained had characterized Vaughn's testimony at the June 12, 2002 Nashville deposition.[6]

7.  Count Ten, we respectfully submit, cannot be tried in the Southern District of New York for yet another reason: there is no venue in this district to try that charge. The apparent facial sufficiency of the charge in Count Ten, insofar as it alleges ". . . in the Southern District of New York," embraces a legal fiction; essentially, it is a legal theory of venue which has no factual support because Vaughn's testimony was incontrovertibly given in Nashville.

---

[6] The false statement charge against Vaughn was Count Three in the first Indictment, and that charge, a violation of 18 U.S.C. § 1001, is now Count Ten of the Superseding Indictment. See Exhibits A and B, respectively, at pp. 88-98 and pp. 55-65.

4

8. The Government's version of the proper venue in Count Ten stands in striking contrast to a prosecution by the Southern District U.S. Attorney's office for false statement charges in the very recent case of United States v. Kerik, 07 Cr. 1027 (S.D.N.Y.) (SCR). I employ this declaration in order to provide to the Court the relevant documents from that case.

9. In Kerik, the defendant has been indicted on multiple counts for crimes allegedly committed within the venue of the Southern District of New York. Among the charges are two counts alleging that Mr. Kerik violated 18 U.S.C. §1001 through an email sent to a "White House official," Count Fifteen, and by failing to disclose to a White House official his "relationship" to certain individuals, Count Sixteen. Those alleged crimes were committed in Washington, D.C. Accordingly, Counts Fifteen and Sixteen of the Kerik indictment charges Washington D.C. venue in this manner:

> On or about the dates set forth below, in the District of Columbia and elsewhere . . .

See Exhibit G, Kerik Indictment, excerpt, copy annexed hereto.

10. Consistent with its recognition that venue for Mr. Kerik's alleged Washington, D.C., false statements could not be laid in the Southern District of New York, the Government sought Mr. Kerik's waiver of his right to be tried on those two counts in Washington, D.C. Thus, at the first pretrial conference in Kerik, Government counsel sought the defendant Kerik's waiver, notwithstanding that the false statement charges in Count Fifteen and Sixteen were, as the Assistant U.S. Attorney stated, "of apiece [sic] with other false statements that are otherwise alleged where venue is laid in the Southern District of New York." See Exhibit H, transcript excerpt of November 9, 2007 at p. 15, copy

annexed hereto. At an appearance before the Court a month later, the Government reiterated its request for a venue waiver, employing similar language, describing the false statement charges as being "of a piece with other false statements that were made in other counts" but that, "at this point at least we can only properly venue them in the District of Columbia." See Exhibit I, transcript excerpt of December 6, 2007, at p. 37, copy annexed hereto.

11. Count Ten, then, if it is not dismissed outright, because the Special Grand Jury had no power to return that charge, must be transferred for trial in the Middle District of Tennessee, where Nashville is located, on Constitutional venue grounds. See Memorandum, at Point II. Under no circumstances, we maintain, should the more than two dozen false statement specifications in Count Ten be submitted for a verdict in the Southern District of New York. This is as it should be not only because the law with respect to venue requires this Court's intervention, but alternatively, because a trial of Vaughn in the Southern District of New York, on the charges in the Superseding Indictment would be unfair and work upon him a hardship which the discretionary change of venue provision in Rule 21(b), Fed. R. Crim. P., as we argue in Point IV of our Memorandum, was designed to alleviate.

12. We recognize that venue for the trial of Count One, the conspiracy charge, exists in this District and that, absent anything else, Vaughn could be tried here upon that, the main charge. There are, however, two plausible reasons why he should not be tried in the Southern District on the conspiracy charge and the other three counts against him in the

6

Superseding Indictment.[1/] First, if Count Ten is <u>not</u> dismissed for the failure of the Grand Jury's jurisdiction, but venue is found improper in the Southern District, it would be unfair to require that Vaughn, in order to vindicate his right to be tried in a lawful venue, should then be required to face two trials, instead of one. In that case, we believe, the burden of two trials should fall on the Government, not Vaughn.

13. The second reason, which complements the first, is that it would be a hardship for Vaughn to be tried in a district so far from his home in Monroe, Louisiana, as is the Southern District of New York. For the reasons which my Butler Snow colleague, Peter Barrett, has set forth in his declaration, there are significant hardships which Mr. Vaughn would be required to endure should the trial of Mr. Vaughn be held in the Southern District of New York.

14. Third, Vaughn is not alleged to have personally participated in the so-called "Tradehill" transaction, a separate tax strategy which the co-defendants Coplan, Nissenbaum and Shapiro are alleged, as part of the conspiracy charged in Count One, to have utilized for their own individual benefit. <u>See</u> Exhibit A, Superseding Indictment, at ¶'s 68-82, pp. 50-55. A trial of Vaughn in Tennessee would not, therefore, include the time consuming effort necessary to adduce evidence in support of those charges.

15. Vaughn's relative insignificance to the main conspiracy charge is also immediately apparent from the charge itself. Thus, while there are 63 separate overt acts alleged in the conspiracy charge, Vaughn is mentioned in fewer overt acts than any other

---

[1/] Mr. Vaughn is also indicted for having aided and abetted the attempted tax evasion of two entities and a married couple. <u>See</u> Exhibit A, Counts Two, Three and Four, at pp. 72-85.

7

defendant, the last one of which was his June 12, 2002 testimony in connection with the promoter penalty audit. See Exhibit A, ¶97(eee), at p. 71.[8/]  There is, among the 63 overt acts alleged, just two in which Vaughn's name is the only one stated, those being (rr) and (eee). Id. at pp. 69 and 71.

16.    Moreover, under the unusual circumstances of this case, a transfer of Vaughn's trial to Nashville would not be particularly burdensome to the Government which has only recently added new lead prosecutors, Ms. Goldberg and Mr. Camp. Ms. Landis and Mr. Sullivan, from the Department of Justice, have reduced their roles considerably; indeed, it appears that Mr. Sullivan may no longer have any active role in prosecuting the case. Therefore, it appears the Government believes it can bring in two new Assistant U.S. Attorneys who have no prior background in the case, put them in charge, and effectively prosecute this case.

17.    That could be done, as well, with a team of prosecutors assigned to handle the case in Tennessee. In fact, Mr. Sullivan, who is very familiar with the case, and who has traveled often enough to New York, could simply set up shop in Nashville with one or two other attorneys from the Department of Justice in Washington, or, a couple of Assistant U.S. Attorneys from the U.S. Attorney's office in Nashville.

18.    These factors illustrate that two trials, one in New York and a second one in Nashville, can be handled by the Government without, comparatively, that much disruption to it. On the other hand, Vaughn could hardly endure two trials; one is surely enough. The

---

[8/] Before then, the last overt act allegedly committed by Vaughn was on June 28, 2001, nearly a full year before his deposition was taken. Id., ¶ 97(rr), at p. 69.

argument in support of our Rule 21(b) venue change is made in our Memorandum, at Point IV.

CONFRONTATION ISSUES

19. The Superseding Indictment was drafted in a way which could arguably provide an opportunity for the Government to undermine Vaughn's 6th Amendment right of confrontation through the use of the conspiracy charge, particularly in conjunction with the false statement charge against him in Count Ten. If realized, that strategy would take the form of introducing at a joint trial, the deposition testimony of Vaughn's co-defendants, and other alleged co-conspirators which could then be used to establish that <u>Vaughn's</u> deposition answers were false, without allowing Vaughn's counsel the opportunity to cross-examine the co-defendant and alleged co-conspirator declarants.

20. We have addressed our concerns to the Government and have been assured that while it is not in a position at this early date to identify the specific statements it may want to use as co-conspirator statements, or as admissions against a particular defendant, it will, as the trial approaches, "attempt to resolve any potential <u>Bruton</u> issues in sufficient time for you to seek relief from the Court, if necessary." <u>See</u> Exhibit J, Government letter dated April 16, 2008, p. 2. This seems an appropriate way of dealing with the issue, although given the sheer volume of testimonial statements in the case, it is an issue which we hope will be resolved well in advance of the trial.

BILL OF PARTICULARS

21. We have separately addressed, on Vaughn's behalf, the need for the Government to identify and provide adequate notice of what the Government will claim at

9

trial. With respect to Count Ten, in the absence of the Government's agreement to submit the venue issue to the Court for pretrial resolution, we have made this one request:

> Specify the conduct of the defendant Vaughn which the Government will claim at trial supports the allegation that Vaughn committed the [alleged] crime in the Southern District of New York.

See Exhibit K, annexed hereto, copy of April 28, 2007 letter to Government counsel.

22. Our request of the Government for particulars concerning the three income tax charges are focused on whether the Government will be claiming that Vaughn actually participated in some of the post-filing conduct which each one of those tax evasion counts charge. See Exhibit L, annexed hereto, copy of letter dated March 26, 2008 to the Government, at pp. 2-5.

23. The structure of the tax evasion counts, we believe, warrants the modest but necessary particulars we have isolated in our letter. Exhibit L. Each of them is centered on the tax losses claimed by clients of E&Y, based upon one of the tax shelters which are the subject of the conspiracy charge in Count One. Count Two, involving the L. Trading Group, is the Add-On Strategy; see Count Two, ¶99. Count Three, involving the C. Partnership, is also the Add-On Strategy; see Count Three, ¶107. Count Four, which involves two individuals, T.M. and K.M., a married couple, deals with both the CDS strategy and the Add-On Strategy; see Count Four, ¶'s 115-118.

24. None of the particulars we have requested relate to the allegations of the tax evasion up and until the filing of the returns which employed the strategies. We do need, however, notice of what Vaughn is alleged to have done in connection with the post filing conduct. For example, in two of these counts it is alleged that sworn testimony was provided

by the taxpayers or their representatives, long after the returns were filed, i.e., L. Trading on August 26, 2003 (¶104); and C. Partnership on December 15, 2003 (¶112).[2/] Common, also, to each of the tax evasion counts, is that the principals had decided, with the assistance of E&Y, to participate in the IRS voluntary disclosure initiative and submit Amnesty letters in which they would disclose their tax shelter transaction but provide false and misleading information, e.g., Count Two, ¶103; Count Three, ¶'s 110-111; Count Four, ¶124. We have, therefore, restricted our request for particulars to the post-filing conduct which the Government claims were acts designed to aid and abet the tax evasion. The basic template which the Government has used to charge that post-filing conduct is based upon conduct which, by itself, could possibly be charged against Vaughn as a separate crime. The particulars we have requested are necessary, therefore, to provide notice to Vaughn of what conduct he is charged with in respect to those allegations.

---

[2/]  Paragraph 104 alleges:

> On August 26, 2003, a representative of the L. Trading Group appeared before the IRS to provide sworn testimony concerning the company's Add-On transaction. During that proceeding, the representative of L. Trading Group gave false, misleading and evasive testimony in order to conceal a number of facts from the IRS, including the fact that the transaction was tax-motivated.

Paragraph 112 alleges:

> On December 15, 2003, one of the partners of the C. Partnership appeared before the IRS to provide sworn testimony concerning the partnership's Add-On transaction. During that proceeding, the partner gave false, misleading and evasive testimony in order to conceal a number of facts from the IRS, including the fact that the transaction was tax-motivated.

11

<u>IRS – RETURN INFORMATION</u>

25. In July, 2007, my colleague, Mr. Barrett, requested Government counsel to provide to us certain information required to be maintained by the Government pursuant to statute, concerning the IRS referral, or Department of Justice ("DOJ") disclosure request to the IRS, for purposes of its criminal investigation in this matter. <u>See</u> Exhibit M, letter of Peter H. Barrett dated July 18, 2007, copy annexed hereto. Summarized, the letter requested the date on which the referral had been made and sought to learn whether, prior to that date there had been any communications between DOJ personnel and IRS personnel concerning the IRS investigation of the E&Y tax shelters.

26. The genesis for that request was twofold: first, by law there can be no exchange of tax "return information" between the IRS and DOJ until an IRS referral or DOJ request for disclosure is made; and two, the District Court in the companion KPMG tax shelter prosecution had just determined in that case, <u>United States</u> v. <u>Stein</u>, S1 05 Cr. 0888 (LAK), that a sufficient showing had been made by the defendants there so that he would treat, as the basis for a separate defense motion, the claim that the IRS and DOJ had "engaged in improper and possibly criminal misconduct by disclosing and receiving, respectively, tax return information in violation of 26 U.S.C. §6103."[10]/ Notably, in <u>Stein</u>, the

---

[10]/ Footnote 85 of Judge Kaplan's opinion in <u>United States</u> v. <u>Stein</u>, 495 F. Supp. 2d 390, 410 (S.D.N.Y. 2007) provides as follows:

> The KPMG Defendants, on the basis of documents that only recently have come to light, maintain also that the Internal Revenue Service and the Department of Justice engaged in improper and possibly criminal misconduct by disclosing and receiving, respectively, tax return information in violation of 26 U.S.C. § 6103. <u>See</u> Smith Reply [dkt. item 1075] 4-15. As this contention

12

defendants had already been provided with much of the preliminary information which Mr. Barrett requested in his July, 2007 letter. Exhibit M.

27. In August, 2007, the Government responded to Mr. Barrett's letter and declined to provide any of the information he had requested, stating that the Government had "responded to the motion filed by the defendants in *United States v. Stein, et al.*," and that, "[a]s detailed in our submission, there was no such violation." See Exhibit N, Government letter dated August 8, 2007, copy annexed hereto.

28. The application for relief in the Stein case has not been decided, so there has been no determination of the merits of that motion. Our examination, however, of the submission which the Government made in Stein, coupled with the information which exists within this prosecution, persuades us that the limited requests for information which Mr. Barrett made in his July 18, 2007 letter should be granted.

29. This is a complicated area governing the legal and administrative interaction between the ability of the IRS to conduct civil tax investigations and the DOJ to conduct criminal investigations. The issue in the Stein case, as here, concerns whether these two agencies of Government properly shared tax return information during the course of their respective investigations. The Stein case is at the point where that substantive issue has been joined; the issue here is whether the Government should be required to provide the defense the documentary information which would preliminarily establish whether it had adhered to

---

first was raised in their reply papers, the Court is treating that contention as a
separate motion and has established a separate briefing schedule

the disclosure requirement of 26 U.S.C. §6103. The requests which Mr. Barrett made last year, see Exhibit M, are as follows:

(1) The date on which the IRS referred this case to the DOJ for criminal investigation, and a copy of that referral.

(2) The date on which any written request from the Attorney General or other DOJ official specified in 26 U.S.C. §6103(h)(3)(B) was made to the IRS and, if such a request was made, provide a copy.

(3) Copies of all communications between DOJ attorneys with responsibility for the criminal enforcement of the tax law, and IRS personnel, or DOJ civil enforcement attorneys involved in the investigation of the so-called Ernst & Young tax shelters prior to the earliest date of (1) or (2) above.

(4) Identify all instances in which, prior to the earliest date of (1) or (2) above, Mr. Downing or anyone else in the Criminal Enforcement Section of the DOJ Tax Division received return information from the IRS which had been provided by Ernst & Young in connection with the IRS tax shelter investigation of Ernst & Young and Mr. Vaughn.[11]/

30. Having taken up the Government's invitation in its August 8, 2007 reply, Exhibit N, to examine its submission in Stein, we believe that there are more reasons to grant our requests for information than had already existed. They arise in the context of the chronology of the investigation of the E&Y tax shelters, both civil and criminal. In going through this, I ask the Court to bear in mind, not only the statutory stricture against the sharing of tax return information between IRS and DOJ, unless a "referral" or request for disclosure has been made, but also the stricture which exists within the IRS against pursuing a civil investigation while a DOJ criminal investigation is ongoing. Basically, if the IRS is

---

[11]/ The reference to "Mr. Downing was to Kevin M. Downing, a Senior Trial Attorney in the Criminal Enforcement Section of the DOJ Tax Division. See Exhibit M, Barrett Letter, at pp. 1-2

14

conducting a civil tax investigation, it is an indication that there has been no "referral" for criminal tax purpose. With these guideposts in mind, here is the chronology as best I understand it at this point.

31.     As I have stated earlier in this declaration, ¶'s 3 and 4, the IRS investigation of the E&Y tax shelters began in at least April, 2002 and continued through at least April 15, 2005, when the deposition of Greg Firtik was taken. Supra, ¶4, n. 5. There had been numerous IRS depositions throughout the period between April, 2002 and Firtik's deposition. Id.

32.     During this period of time, the DOJ was also conducting a Southern District of New York grand jury criminal investigation of E&Y tax shelters. We believe that the grand jury investigation began at least as early as May, 2004, and possibly before then. In our recent exchange of correspondence with the Government (with the Court as intermediary) concerning the impanelment and extension orders of the grand jury, we made the assertion: "We know that a Southern District Grand Jury began its investigation of the Ernst & Young tax shelters in this matter at least as early as May 19, 2004 . . . ." See Exhibit O, letter of April 14, 2997 at n. 1, copy annexed hereto. In its response, the Government did not deny that a grand jury had begun its investigation at that time, nor did it confirm it, stating simply that the Special Grand Jury which indicted the case "was first impaneled in 2006." See Exhibit P, letter of April 24, 2008, at p. 2, copy annexed hereto. But I believe that there is unquestionable confirmation of the existence of that grand jury investigation in a May 26, 2004 email which has been produced by the Government in

discovery from the files of E&Y. In it, Michael P. McSherry of E&Y, advised other E&Y personnel:

> On May 19, Ernst & Young was first notified by an Assistant United States Attorney (AUSA) that the Southern District of New York (Manhattan) had convened a grand jury investigation of Ernst & Young LLP. The AUSA advised the firm that the investigation would focus initially on one individual tax shelter, called COBRA, which was marketed to individuals from the fall of 1999 to January 2000.

See Exhibit Q, email of May 26, 2004, copy annexed hereto.

33.   But there is strong inferential evidence that the DOJ's criminal investigation of the E&Y tax shelters began even before the grand jury started its investigation in May, 2004, as far back as 2002, the year in which the IRS promoter penalty audit began. This inference arises from a statement submitted in Stein, in July, 2007, by the Chief Counsel to the United States Attorney for the Southern District, Shirah Neiman, in connection with the Stein defendants' claim that §6103 had been violated. See Exhibit R, declaration of Shirah Neiman, dated July 11, 2007, copy annexed hereto. Bearing in mind that the defendants in the Stein case knew when the KPMG matter had been referred by IRS to DOJ (it had been in December, 2003), Ms. Neiman sought to counter the Stein defendants' claim that DOJ, and the Southern District U.S. Attorney's Office, had been involved in the KPMG investigation and that they "clearly contemplated prosecution despite not having received an IRS referral." "That assertion," stated Ms. Neiman, "is inaccurate." Id., at ¶2.

34.   To disprove the Stein defendants' position, Ms. Neiman has, we believe, conclusively demonstrated why the defense in this case is entitled to all the information

requested by Mr. Barrett. Here is what Ms. Neiman stated in paragraph 4 of her declaration in Stein (Exhibit R):

> During 2002, 2003, and 2004, I was involved in efforts to open a tax grand jury investigation into the development, marketing and implementation of a particular tax shelter by a tax shelter promoter that was not KPMG, and involving a shelter not promoted by KPMG. The U.S. Attorney for the Southern District of New York made written requests to IRS CI to refer, and DOJ's Tax Division to approve and authorize, a tax grand jury investigation relating to that tax shelter. No KPMG tax shelters, partners, or employees would have been subjects of that proposed investigation. During this time period I had conversations with individuals at DOJ Tax Division's Criminal Enforcement Section and at the Internal Revenue Service about our requests to open this tax grand jury investigation. None of those communications related to KPMG. A tax grand jury investigation with respect to this other matter was eventually referred and authorized some time after the criminal referral of the KPMG matter (discussed below). Prior to the Tax Division's approval and authorization of the tax grand jury investigation, we did not conduct a tax grand jury investigation or any other tax investigation relating to this tax shelter or any of the individuals or entities involved in this promotion.

35.     While it is possible that Ms. Neiman was not referring to E&Y as "the tax shelter promoter that was not KPMG, . . .," it seems doubtful, particularly since there is no other possible tax shelter promoter to fill that bill. Thus, for example, the statement that the tax grand jury investigation for the unnamed "tax shelter promoter" was authorized by the DOJ's Tax Division, "sometime after the criminal referral of the KPMG matter," which was in December, 2003, can only mean this E&Y tax shelter case unless there is a long ago sealed indictment which has not surfaced against another tax shelter promoter which is unlikely.

36.     I am not sure how, as the Government has suggested in its August 8, 2007 letter, the Neiman declaration establishes that "there was no such violation" of §6103, see

17

Exhibit N, at p. 2, when it points so persuasively in the opposite direction. While the Neiman declaration hardly admits a violation, it certainly provides a basis upon which the defense can reasonably require the Government to provide the documentation which would support her conclusory and volunteered statement that, "[p]rior to the Tax Division's approval and authorization of the tax grand jury investigation [not involving KPMG], we did not conduct a tax grand jury investigation or any other tax investigation relating to this tax shelter or any of the individuals or entities involved in its promotion."

37. But there is more to justify our discovery requests. Ms. Neiman claims that the IRS referral on the other "tax shelter promoter" (read: E&Y) was made after the December 2003 referral in KPMG, which would be consistent with the commencement of the Southern District grand jury investigation in May, 2004 which the Government appears reluctant to confirm. If, as Ms. Neiman appears to state in her declaration, a grand jury investigation must be preceded by a referral under Section 6103(h)(2), that would also mean that the IRS, as a matter of its own internal procedures and statutory requirements, would have ceased conducting a parallel civil investigation.[12]/ But that did not happen here, as is evident from the four IRS depositions which were conducted after May 1, 2004, including the deposition of the defendant Bolton, which was taken on April 12, 2005. Supra, ¶4, n. 5.

---

[12]/ For example, 26 U.S.C. §7602(1) provides with respect to the issuance and enforcement of an IRS summons:

> (1) Limitation of authority.—No summons may be issued under this title, and the Secretary may not begin any action under section 7604 to enforce any summons, with respect to any person if a Justice Department referral is in effect with respect to such person.

38.  Something, therefore, is amiss.  Either there had been, in fact, no criminal referral, thereby allowing the IRS depositions to go forward after May, 2004, or there was a criminal referral in place, in which case the depositions would not have been conducted after the grand jury began its investigation.  That apparent anomaly, therefore, is a further reason why disclosure of the information we have requested should be required.

39.  The Court in the <u>Stein</u> case properly directed that the Government explain itself and establish its compliance with 26 U.S.C. §6103.  The difference between the <u>Stein</u> defendants and the defendants here is that the <u>Stein</u> defendants had been provided with the information upon which to assert their claim that the Government had unlawfully breached the "return information" non-disclosure wall in §6103.  Here, we simply seek to be placed in the same position as the <u>Stein</u> defendants.  The requests which Mr. Barrett made last year are reasonable and more than justified by the disclosures in <u>Stein</u>, particularly because of Ms. Neiman's assertion that during the period of time <u>before</u> the May, 2004 grand jury investigation began, she "had conversations with individuals at DOJ Tax Division's Criminal Enforcement Section and at the Internal Revenue Service about our requests to open this tax grand jury investigation."  <u>See</u> Exhibit R, Neiman declaration at para.4.  The unexplained, indeed adamantly unexplained response of the Government to our requests is not warranted.

WHEREFORE, your declarant requests that an Order be entered dismissing Count Ten as a nullity or, in the alternative, transferring the trial of the defendant Vaughn on all Counts in the Superseding Indictment to the Middle District of Tennessee, and such other relief as requested in the Notice of Omnibus Pretrial Motion, together with such other

applicable relief as co-counsel have requested, and for such other and further relief as the Court may deem just and proper.

THIS the 2nd day of May, 2008.

_____
JAMES B. TUCKER, Attorney for Brian Vaughn
**Butler, Snow, O'Mara, Stevens & Cannada, PLLC**
P.O. Box 22567
210 E. Capitol Street, 17th Floor
AmSouth Plaza Building
Jackson, MS 39225-2567
Telephone: 601-985-4544
Facsimile: 601-985-4500
E-mail: james.tucker@butlersnow.com