**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - --x

UNITED STATES OF AMERICA              :

           - v. -                      :              INDICTMENT

ROBERT COPLAN,                         :              07 Cr. 453
MARTIN NISSENBAUM,
RICHARD SHAPIRO, and                   :
BRIAN VAUGHN,

                                       :
           Defendants.
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## COUNT ONE

### (Conspiracy)

The Grand Jury charges:

### Background

1.      At all times relevant to this Indictment, Ernst & Young ("E&Y") was

one of the largest accounting firms in the world.  E&Y provided audit services to many of the

world's largest corporate clients, and provided tax services to corporate and individual clients,

including some of the wealthiest individuals in the United States.   Those tax services included

preparing tax returns, providing tax advice and tax planning advice, and representing clients in

audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court.

2.      At all times relevant to this Indictment, as part of its tax practice, E&Y had

a business unit that was responsible for providing tax advice, as well as financial planning

advice, to individuals.  That business unit was known as Personal Financial Counseling, or

"PFC."  E&Y had partners and other professionals throughout the country who were members of

the PFC practice.

       3.    At all times relevant to this Indictment, E&Y also had a department within its tax practice known as the National Tax Department ("National Tax"). The individuals assigned to National Tax were generally experts in particular areas of taxation, and they provided expert tax advice to E&Y professionals in the field. Within National Tax was a sub-group of experts whose particular areas of expertise related to E&Y's PFC practice.

       4.    In or about early 1998, the national leader of PFC formed a group that would devote itself to designing, marketing, and implementing high-fee tax strategies for individual clients. These strategies included tax shelters that could be used by high-net-worth clients to eliminate, reduce or defer taxes on significant income or gains. The group initially called itself the "VIPER Group" (an acronym for "Value Ideas Produce Extraordinary Results"), but changed its name to the "Strategic Individual Solutions Group," or "SISG," in or about early 2000.

       5.    Members of the VIPER/SISG group worked together with banks, other financial institutions, law firms and tax shelter promoters to design, market and implement tax strategies. Each of the defendants was a member of the VIPER/SISG group for all or a significant part of the period relevant to this Indictment.

       6.    The tax strategies developed by the VIPER/SISG group were marketed to clients and prospective clients by members of the group, as well as by PFC professionals located throughout the country, who had primary responsibility for client contact. In or about mid-1999, certain PFC professionals around the country were designated to be members of the "Quickstrike Team," a nationwide area-based network created to provide greater efficiency in the marketing

and execution of the VIPER/SISG strategies.

## The Defendants

7.     At all times relevant to this Indictment, defendant ROBERT COPLAN, a lawyer with a Master's Degree in tax law, was a partner located in E&Y's Washington, D.C. office.   COPLAN worked within the PFC section of National Tax, and was one of E&Y's "subject matter experts," or "SMEs,"  in the areas of personal income taxes, estate and gift taxes, and excise taxes.  COPLAN, who was the National Director of E&Y's Center For Family Wealth Planning, was a member of the VIPER/SISG group from its inception in or about early 1998. For most of the next several years, COPLAN supervised the activities of the group.  Among his other activities, COPLAN approved promotional materials, and ensured that essential information about the design and implementation of E&Y's tax shelters was shared throughout the PFC practice.  He consulted regularly with defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, and also participated in sales presentations to clients.  Before his employment at E&Y, COPLAN had worked for the IRS as a Branch Chief in the Legislation and Regulations Division.

8.     At all times relevant to this Indictment, defendant MARTIN NISSENBAUM, a lawyer with a Master's Degree in tax law, was a partner at E&Y.  Located in E&Y's New York office, NISSENBAUM was a member of the PFC group within National Tax, and was a subject matter expert in the areas of individual income taxation, retirement benefits and compensation.   NISSENBAUM was the National Director of E&Y's Personal Income Tax and Retirement Planning practice, and was a member of the VIPER/SISG group from its

-3-

inception. Among other things, NISSENBAUM worked closely with defendants ROBERT

COPLAN and RICHARD SHAPIRO in evaluating and developing the various tax shelters

marketed by the group, and participated in sales presentations to clients and prospective clients.

       9.     At all times relevant to this Indictment, defendant RICHARD SHAPIRO,

a lawyer with a Master's Degree in tax law, was a partner located in E&Y's New York office.

SHAPIRO was a subject matter expert in the taxation and structuring of financial products and

instruments. Although he was not a formal member of National Tax or the VIPER/SISG group

until 2000, SHAPIRO worked regularly with the group from its inception in or about early 1998.

SHAPIRO worked closely with defendants ROBERT COPLAN and MARTIN NISSENBAUM

in evaluating the strategies marketed by the group. Because of his background and expertise in

financial instruments, he played an essential role in the approval process of several of the group's

shelters. He also participated in sales presentations to clients and prospective clients. Before his

employment at E&Y, SHAPIRO had been the Director of Tax for the Financial Services Industry

Practice at another large accounting firm.

       10.    At all times relevant to this Indictment, defendant BRIAN VAUGHN –

who had a college degree in accounting – was a certified public accountant (CPA) and a certified

financial planner (CFP). After working at three other major accounting firms, VAUGHN joined

E&Y as a senior manager in 1998. As a member of the VIPER/SISG group from its inception

through at least 2001, VAUGHN led sales efforts for most of the SISG strategies, and also played

a development role. VAUGHN was promoted to partner in or about 2002, in large part based

upon his role in successfully developing and marketing E&Y's tax shelters.

**Tax Shelter Fraud**

11.     During the period from at least in or about 1998 through at least in or about 2004, the defendants, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, and others known and unknown to the Grand Jury (hereinafter "the co-conspirators"), participated in a scheme to defraud the IRS by designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the IRS about the bona fides of those shelters, and about the circumstances under which the shelters were marketed and sold to clients.

12.     The defendants and the co-conspirators designed and marketed the tax shelters as a means for wealthy individuals with taxable income generally in excess of $10 or $20 million to eliminate or reduce the individual income taxes they would have to pay to the IRS. As marketed and implemented, instead of wealthy clients paying U.S. individual income taxes that were legally owed (generally, between 20% and 40% of their taxable income), the clients could pay total costs calculated largely as a percentage of the desired tax loss or deduction generated by the tax shelter.  These costs included the fees payable to E&Y and to E&Y's co-promoters, which included the various law firms that supplied opinion letters to the clients, and the banks and other financial institutions that executed the transactions.  The costs also included an amount that would be used to execute purported "investments," which were designed, in part, to disguise and conceal the true nature and purpose of the tax shelters.

13.     The defendants and their co-conspirators understood that if the IRS were to detect their clients' use of these tax shelters, and learn the true facts and circumstances surrounding the design, marketing and implementation of these shelters, the IRS would

aggressively challenge the claimed tax benefits. In that event, the IRS would seek to collect the unpaid taxes plus interest, and might also seek to impose substantial penalties upon the clients. Accordingly, the defendants and their co-conspirators undertook to prevent the IRS from: a) detecting their clients' use of these shelters; b) understanding how the steps of the transactions operated to produce the tax results reported by the clients; c) learning that these shelters were marketed as cookie-cutter products that would eliminate, reduce or defer large tax liabilities; d) learning that the clients were not seeking profit-making investment opportunities, but were instead seeking huge tax benefits; and e) learning that, from the outset, all the clients intended to complete a pre-planned series of steps that had been designed by the conspirators to lead to the specific tax benefits sought by the clients.

14.    In order to maximize the appearance that the tax shelters were investments undertaken to generate profits, and to minimize the likelihood that the IRS would learn the transactions were actually designed to create tax losses and deductions, the defendants and their co-conspirators created, assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent descriptions of the clients' motivations for entering into the transactions, and for taking the various steps that would yield the tax benefits. They also carefully protected internal documents and promotional materials that set forth the tax benefits and pricing schedules of the various shelters against disclosure to the IRS.  The conspirators' goal of deceiving the IRS into believing that E&Y's tax shelters were driven by investment objectives rather than tax savings objectives was demonstrated in an email sent by defendant ROBERT COPLAN to a PFC professional in 2001.  That individual had prepared a proposed client solicitation letter, in which he provided short descriptions of various SISG

strategies and their accompanying tax benefits. COPLAN expressed reservations about sending

such a letter to clients, as the IRS would inevitably ask the clients for marketing and promotional

materials in the course of any audit. COPLAN explained, "Since our ultimate goal is to make

our strategies appear to be investment techniques that have advantageous tax consequences,

letters like this are not helpful to the client's case[.]"

        15.     The law in effect at all times relevant to this Indictment provided that if a

taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the

IRS could impose substantial penalties -- ranging from 20% to 40% of the underpayment

attributable to the shelter -- unless the claimed tax benefit was supported by an independent

opinion, reasonably relied upon by the taxpayer in good faith, that the tax benefit "more likely

than not" would survive IRS challenge. In order to encourage clients to participate in the

shelters, and to shield the clients from possible penalties, the defendants worked with law firms

to provide E&Y's clients with opinion letters that claimed the tax shelter losses or deductions

would "more likely than not" survive IRS challenge, or "should" survive IRS challenge.

However, the defendants knew those opinions were based upon false and fraudulent statements,

and omitted material facts. By helping their clients obtain false and fraudulent opinion letters,

with the understanding and intent that those opinion letters would be presented to the IRS if and

when the clients were audited, the defendants not only sought to undermine the ability of the IRS

to ascertain the clients' tax liabilities, but also sought to undermine the ability of the IRS to

determine whether penalties should be imposed.

        16.     The defendants and their co-conspirators undertook these actions so that

E&Y could participate in the highly lucrative tax shelter market in which other accounting firms

were already participating; so that E&Y could prevent its high-net-worth clients from taking their business (including, potentially, the highly-prized audit business associated with some of these individuals) to its competitors; so that PFC – a business unit that was not a substantial contributor to the firm's revenues – could grow and prosper within the firm; and so the individual defendants could enhance their own opportunities for professional recognition, advancement, job security, and remuneration.

17.    Among the fraudulent tax shelter transactions designed, marketed, implemented and defended by the defendants, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, and their co-conspirators, were CDS ("Contingent Deferred Swap"); COBRA ("Currency Options Bring Reward Alternatives"); CDS Add-On; and PICO ("Personal Investment Corporation").

18.    In addition to implementing fraudulent tax shelters for E&Y's clients, in 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO implemented a tax shelter to evade their own taxes, and arranged for eight of their E&Y partners to participate in the transaction with them. Use of that tax shelter enabled the group of eleven E&Y partners to eliminate a total of approximately $3.7 million in taxes.

### The Fraudulent CDS Shelters

19.    CDS (an abbreviation for "Contingent Deferred Swap") was marketed and sold from mid-1999 through in or about 2001. During that period, approximately 69 CDS transactions were implemented for approximately 140 wealthy individuals. As designed and marketed, the fee for CDS was approximately 1.25% of the tax deductions to be generated for

each client.   Various clients paid greater or lesser amounts, but ultimately the transaction

generated more than $27 million in fees for E&Y.   Clients who implemented CDS also paid fees

to other participants in the transaction, including a fee to Law Firm A for an opinion stating that

if the IRS were to disallow the CDS tax benefits, the client "should" ultimately prevail (a "should

opinion").   Typically, Law Firm A's fee was $50,000.

    20.  The objective of CDS was to convert a client's ordinary income into

capital gains, and defer the client's tax liability from the year in which the income was earned

("Year 1") to the following year ("Year 2").   During the period when CDS was sold, ordinary

income for very wealthy individuals was typically taxed at a rate of approximately 40%, while

long-term capital gains were taxed at approximately 20%.   Accordingly, the conversion of a

client's income from ordinary to capital resulted in tax savings to the client of approximately

20% of their income.   CDS was marketed to individuals who had at least $20 million in ordinary

income to shelter.

    21.  Although there were variations, in a typical CDS transaction, the client

sought to convert $20 million in ordinary income into capital gains.   CDS was designed and

implemented as a series of pre-determined steps intended to deceive the IRS by making it appear

that the client was engaged in the business of currency trading for profit, and that the various

component parts of the transaction were routine financial activities comprising a coherent

business philosophy.   The conspirators concealed the fact that CDS was mass-marketed to

clients who had no genuine interest in putting their money at risk by engaging in the business of

currency trading, but were instead merely carrying out steps they were told to carry out in order

to achieve CDS's tax benefits.   These steps, and the manner in which these steps were

manipulated to deceive the IRS, included the following:

      a)    The CDS strategy was implemented through the creation of a limited partnership in which an entity characterized as an investment advisor was the general partner and the client was the limited partner.   Although the main purpose of the limited partnership was for the client to obtain tax benefits, the documents created to execute the transaction described the entity as a "trading partnership," and made no mention of the tax benefits, but instead stated that the partnership was "organized to generate capital appreciation."

      b)    After determining how much ordinary income the client wished to shelter from taxes in Year 1, the co-conspirators would typically arrange for the client to contribute  approximately one-third of that amount ($6.6 million in the typical example) to the purported "trading partnership."

      c)    The success of the client's tax position with the IRS required that the partnership be characterized for tax purposes as a "trade or business," so that "business deductions" could be generated, and then used by the clients to offset their taxable income.   Accordingly, the conspirators arranged for approximately $1 million of the client's $6.6 million contribution to be placed in a trading account.   In order to make it appear that the "trading partnership" was genuinely engaged in the business of trading for profit, the funds in that trading account were used to carry out a high volume of short-term trades.   However, in reality, the activity in that account consisted of trades designed to preserve the client's capital, so the funds in the account could be returned to the client once the tax benefits of CDS had been obtained.   As described by an employee of Company X, one of the entities that served as the GP of the CDS partnerships, "Our true investment objective in the various trading accounts was

-10-

minimal gains and losses." The conspirators affirmatively sought to conceal the fact that no

trading profits were expected, as reflected in an email sent by a conspirator in February 2000,

asking that certain references be removed from CDS documents, and explaining, "We don't want

to highlight that we don't anticipate trading profits."

        d)      A portion of the client's cash contribution to the "trading

partnership" (approximately $5 million in the example) was put toward a $20 million swap

contract, which was entered into between the partnership and a bank or financial institution ("the

bank"). The swap contract called for the "trading partnership" to make periodic payments

totaling approximately $20 million to the bank over the life of the swap. Because the payments

made to the bank in Year 1 were made by an entity purportedly engaged in the "business" of

trading, those payments were claimed by the partnership as "business expenses." The purported

"business expenses" – which flowed through the "trading partnership" to the client -- would be

used to offset the $20 million in ordinary income earned by the client in Year 1, and thus would

eliminate the client's tax liability that year.

        e)      In order for a CDS client to shelter $20 million in income, it was

also necessary, under the tax code, for that client to have $20 million "at risk" in the CDS

transaction. Only $5 million of the client's money was put toward the swap; the additional $15

million was obtained by the partnership as a loan from the bank. However, the $15 million loan

proceeds were deposited in a collateral account at the bank, and at all times, the bank was fully

collateralized on the loan. In addition, there was no possibility of a default by the partnership

because the transaction was carefully designed to ensure that the bank would never need to seek

repayment of the loan from the individual client. Although prospective CDS clients were assured

that they would not have to contribute any additional money to the transaction, the defendants and their co-conspirators caused the clients to execute documents by which they agreed to accept personal liability on the loan.   In causing the clients to execute such documents, the conspirators sought to deceive the IRS into believing that the clients were actually "at risk" for the loan amounts, when in truth and in fact, they knew no such risk existed.

f)    The swap contract also provided for a "termination payment" to be paid by the bank to the "trading partnership" in Year 2, at the end of the swap.   For a $20 million swap, the termination payment was approximately $20 million, with some variation based on market fluctuation.   In order for the termination payment made to the "trading partnership" to qualify for long-term capital gains treatment, the swap termination in Year 2 had to occur more than a year after the swap was executed, and had to be characterized as an "early termination" of the swap contract.   Although prospective CDS clients were told by E&Y that the swaps would last for just over one year, the conspirators arranged for swap contracts to be drawn up with 18-month maturity dates.   This was done to mislead the IRS into believing that the parties actually contemplated an 18-month swap, and that "early termination" was an option, but not a foregone conclusion.   The conspirators sought to conceal this plan from the IRS, as reflected in an email sent by defendant BRIAN VAUGHN to a co-conspirator in June 2001.   In that email, VAUGHN suggested removing reference to "early termination" from a CDS economic model, explaining, "This could adversely affect our tax situation given the level of audits that are currently in progress. . . . Remember our goal is to convince the agents the client did not have a predisposition of early termination."   For a similar reason, defendant RICHARD SHAPIRO recommended against use of an internal E&Y document called a "CDS Action Plan," which set

-12-

forth all the steps of the transaction in advance, including early termination of the swap. In an

email SHAPIRO sent to defendants ROBERT COPLAN, MARTIN NISSENBAUM and BRIAN

VAUGHN, he explained:

> "[O]ne of the problems with tax advantaged transactions when they are viewed is
> that they are perceived (correctly I might add) as too scripted. While having a
> plan is important, should we have in writing 'before the fact' such things as the
> fact that our swap will be terminated early? Clearly, that is necessary for the flow
> of the transaction. But should there be a document in existence (such as this) that
> has all the chapters and verses laid out? I question that seriously."

Thus, by manipulating the terms of the swap and by concealing the genuine intentions of all the

parties, the conspirators concocted a scenario that enabled them fraudulently to characterize the

termination payments received by the CDS "trading partnerships" from the bank as long-term

capital gains. Those capital gains flowed through the partnerships to the clients, so they could be

taxed at the lower, capital gains rate.

     22.     As part of the scheme to defraud the IRS, the conspirators created

additional documents that purported to provide non-tax business motivations for steps that were

actually tax-motivated. For example, defendant ROBERT COPLAN drafted a letter to be signed

by clients who had decided to terminate their CDS partnerships after the tax benefits had been

obtained. In that letter, the clients falsely attributed their decision to discontinue their trading

activities to the September 11, 2001 terrorist attacks, and to "possible economic repercussions

resulting from such attacks." COPLAN explained that the letter could be used "as a means of

establishing a logical reason for winding down the trading account in the partnership. . . . This

could document for the file a logical non-tax rationale for ending the trading account – if that is

otherwise what the client wants to do."

23.     As part of executing the fraudulent CDS tax shelter, the conspirators arranged for CDS clients to sign false factual representations that could be, and were, incorporated into the CDS opinion letters prepared by Law Firm A.  For example, although the real purpose of CDS trading activity was to achieve a particular volume and frequency of trading so the conspirators could plausibly characterize the CDS partnership as a "trade or business," and could thereby assert that the swap payments made in Year 1 were "business deductions," the CDS clients were directed to sign, and did sign, a document stating, "I regard the various investments of the partnership -- including the swaps and the trading activities -- as comprising one coherent business philosophy, and this diversity of investments was an important element in my decision to invest in the partnership."   In truth, as the conspirators well knew, the diversity of investments was not an important element in the clients' decisions, and the only "coherent philosophy" reflected in the various components of the CDS transaction was a philosophy to reduce taxes.

24.     In addition to incorporating the false factual representations described in paragraph 23 above, the defendants and their co-conspirators caused Law Firm A to issue opinion letters which they knew contained false and fraudulent statements and omitted material facts, including but not limited to the following:

a)     The opinions stated that the objective of the partnership's trading activities was to "profit from short term market movements," when in reality, the objective of the trading activity was to achieve a particular volume and frequency of trades, while preserving the client's capital by minimizing trading losses.

b)     The opinions stated that because either party to the swap contract

-14-

could elect to terminate the swap early, the partnership was "not in control of that decision, should it occur," and therefore the partnership should not be viewed as "being able to manipulate the timing of income," when in reality, both parties to the swap contract planned to terminate the swap early from the outset, and the sole purpose of that plan was to manipulate the timing of income.

        c)      The opinions stated that the limited partner (the client) was "at risk" for an amount greater than the amount invested because the client had agreed to be personally liable for the debts of the partnership, when in reality, the clients had been assured that they would not be liable for any amount over their initial cash contribution, and the transaction was arranged so there would be no such liability.

        d)      The opinions stated that "[n]one of the business conducted by the Partnership [had] a predetermined outcome," when in reality, E&Y had marketed to its clients, and the clients had paid fees to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

        e)      The opinions did not disclose that the client's primary purpose for implementing the CDS transaction was to obtain the tax benefits, or that the fees associated with the transaction were calculated on the basis of the intended tax deduction to be generated.

        f)      The opinions did not disclose that they were rendered by an attorney who had assisted the defendants in structuring, marketing, and implementing the CDS transaction, and had been offered to the clients as part of a promotional package.

-15-

**The Fraudulent COBRA Shelters**

25.     COBRA (an acronym for "Currency Options Bring Reward Alternatives"),
was marketed and sold by E&Y during the last few months of 1999 to 51 wealthy taxpayers. Of
the 16 COBRA transactions, all but one were implemented in late 1999; the other was
implemented in 2000. As designed and marketed, the fee charged by E&Y was approximately
1.5% of the tax losses to be generated using the strategy.  Although some clients paid greater or
lesser amounts, COBRA generated approximately $14.7 million in fees for E&Y.  The fees paid
by COBRA clients amounted to approximately 4.5% of the losses to be generated, including a
fee of just under 3% charged by the law firm of Jenkens & Gilchrist ("J&G"). J&G  prepared
most of the transaction documents for the COBRA shelters, and implemented the COBRA
transactions for the clients.  J&G also issued "more likely than not" opinion letters to the
COBRA clients.  The defendants, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD
SHAPIRO and BRIAN VAUGHN, realized that because J&G was involved in structuring and
implementing the transaction, its clients would not be able to obtain penalty protection on the
basis of J&G's opinion letter.  Therefore, the defendants arranged for another attorney, a partner
at Law Firm B, to issue each of the COBRA clients a second "more-likely-than-not" opinion for
a fee of up to $150,000.

26.     The objective of COBRA was the complete and permanent elimination of
all tax liability on whatever amount of ordinary income or capital gain a client might choose.
COBRA, which involved the manipulation of basis in foreign currency options, was E&Y's
brand of a strategy also known as the "short option strategy."

-16-

27.    COBRA was designed, marketed and implemented as a series of pre-planned steps which, within a period of 30 to 45 days, would generate artificial losses sufficient to offset a client's income or gains completely.  COBRA was intended to deceive the IRS by making it appear that the client – together with other like-minded individuals – was "investing" in foreign currency options in order to make a profit, and that non-tax business reasons existed for the various steps of the transaction.   In reality, in exchange for substantial fees that were calculated as a percentage of the tax loss to be generated for E&Y's clients, the defendants and their co-conspirators provided the clients with a cookie-cutter transaction that utilized almost completely offsetting foreign currency options to generate huge artificial tax losses.  The options had little chance of earning the clients any significant profit after the fees were paid.  Indeed, although the conspirators repeatedly characterized COBRA as an "investment," the strategy was not offered through E&Y's Investment Advisory Service,  but was marketed to clients with more than $20 million in income or gains to offset.

28.    COBRA included the following key steps:

a)    The client would identify an amount of ordinary income or capital gains on which the client wished to eliminate taxes.  The client or E&Y would then identify other individuals who also wished to eliminate their taxes, with whom the client could participate in the transaction.

b)    Using J&G, each client would create a wholly-owned limited liability company ("LLC").  That LLC would purchase a digital foreign currency option (the "long option") from a bank, and would sell an almost completely off-setting digital foreign currency option ("the short option") to the same bank.  The LLC paid a net amount to the bank

-17-

for the pair of options; that amount equaled 5% of the tax loss the client wished to generate (that

is, 5% of the income the client wished to eliminate).

c)    The two offsetting options constituted a single financial bet

between the client and the bank that, at the end of 30 days, a particular foreign currency would

have gone up or down in value against another currency by a specific amount.    The off-setting

option position was priced and structured by arrangement between E&Y and the bank so that if

the client won the bet (or, was "in the money") at the end of the 30-day period, the bank would

pay the client an amount sufficient to yield a small profit over and above the client's initial 5%

contribution, plus the fees associated with the transaction. E&Y told its clients that the odds of

that happening were approximately 38%.    If the client's option pair was "out of the money" after

30 days, then the client would lose his 5% contribution and his fees.    E&Y told its clients that

the likelihood of that outcome was approximately 62%.    Thus, the defendants and the clients

knew from the outset that the clients would probably lose their 5% contribution and their fees.

d)    Almost immediately after purchasing the option pair from the

bank, each client – acting through his newly created LLC – would contribute the option position

to a newly created partnership, also formed by J&G, in which one or more other COBRA clients

were also partners.    After approximately 30 days, the options would expire.    Each client would

also contribute a low-value asset to the partnership – an ordinary asset or a capital asset

depending on whether the client desired ordinary or capital losses.

e)    Each client would then transfer his partnership interest to a new

S-Corporation, also formed by J&G.    When this occurred, the partnership would automatically

terminate.    According to the defendants and their co-conspirators, each client could then claim –

-18-

for tax purposes – that his tax basis in the partnership was equal to the cost of the long option

(which had been calculated intentionally to equal the income the client wished to eliminate),

rather than the net amount actually paid by the client to participate in the transaction (5% of the

price of the long option). The conspirators claimed that the low-value asset contributed by the

client to the partnership would take on that high tax basis when the partnership terminated, so

that when the S-Corporation sold the low-value asset at fair market value only days later, a huge

artificial loss – equal to almost twenty times the client's initial cash contribution – was created

for the client.

29.    The defendants and their co-conspirators were aware that if the IRS were

to discover all the facts surrounding the design, marketing and implementation of COBRA, and

that the COBRA clients were primarily or exclusively motivated by a desire to eliminate huge tax

liabilities, the IRS would aggressively challenge the claimed tax benefits. Accordingly, among

other steps they took to prevent the IRS from learning those facts, the conspirators: 1) falsely

and misleadingly represented the COBRA clients' motivations for entering into the transaction,

and for taking the various steps necessary to create the huge artificial losses; 2) encouraged

COBRA clients to engage in activities designed to disguise and conceal their tax motivations for

entering into the transaction; 3) falsely represented to the IRS the likelihood that clients could

earn a profit from COBRA; 4) directed the destruction of documents which would reveal the true

facts surrounding the design, marketing and implementation of COBRA; 5) caused and approved

the issuance of false and fraudulent opinion letters; and 6) misled the IRS during audits of the

COBRA transaction.

-19-

30.    Among the ways in which the conspirators sought to conceal the fact that

COBRA was tax-motivated, and was designed and implemented as a pre-planned series of steps,

were the following:

a)    Defendant ROBERT COPLAN directed that client engagement

letters make no reference to tax losses, or to the fact that fees were calculated as a percentage of

the tax losses the clients sought to generate.

b)    Defendant ROBERT COPLAN directed that PowerPoint

presentations which laid out all the steps of the COBRA transaction not be left with clients.

c)    In addition to having clients contribute 5% of the desired loss

amount to the transaction, the defendants directed clients to contribute an additional 2% of the

desired loss amount to the COBRA partnerships, and recommended using that additional cash to

engage in trading activity.  The sole purpose of that trading activity was to deceive the IRS into

believing that the COBRA partnerships had been formed to conduct investment activities, and

not merely to generate tax losses.  The defendants' intent to deceive the IRS in this regard was

reflected in a series of emails sent by defendant ROBERT COPLAN to various PFC members

whose clients had initiated COBRA transactions, as well as to defendants RICHARD SHAPIRO,

MARTIN NISSENBAUM and BRIAN VAUGHN.  COPLAN explained in the first email,

"[T]he more trading activity the better [because] the trading activity is important to the

maintenance of a business purpose for the partnership."  In a later email he advised, "Trades

should occur weekly in the partnership, with weekly turnover of positions at or near 100% . . . .

The tax position will be aided if there is at least some type of trading activity[.]"

d)    Defendant ROBERT COPLAN sent an email to PFC professionals,

with a copy to defendants RICHARD SHAPIRO, MARTIN NISSENBAUM and BRIAN

VAUGHN, suggesting that their COBRA clients download foreign currency trading information

from a website, and explaining that such material could be useful "as file material to evidence

investigation into currency trading."

        e)      After the COBRA partnerships terminated in late 1999, and after

the artificial losses had been generated, the defendants recommended that clients maintain the

2% cash in their S-Corporations, and continue to engage in trading activities. This step was

designed to deceive the IRS into believing that the S-Corporations had been created for some

actual business purpose, instead of simply to achieve COBRA's tax benefits.  In an email to PFC

professionals in January 2000, defendant ROBERT COPLAN stated that he, together with

defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, were "providing guidance . . .

as to what is recommended to strengthen the client's tax position[.]"  COPLAN  continued:

> "It is preferable to leave the S Corp in place through the end of the year 2000 to
> enhance the substance of the transaction – i.e., so that the entire structure is not
> closed down within two months. . . . As for activity in the account we believe
> 'The more the better' [because] the tax position will be strengthened by
> significant trading activity . . . ."

With respect to the S-Corporation, COPLAN explained to another PFC member, "The longer it

runs, the better it looks from a business standpoint as to why the thing was formed."

        f)      After the IRS began auditing COBRA clients, defendant ROBERT

COPLAN sent an email to PFC professionals throughout the country, directing that they destroy

COBRA documents. The email was titled "Important - Purge Of All Key COBRA Documents,"

and it instructed that recipients "immediately delete and dispose of" COBRA documents such as

PowerPoint slides and work plans.

-21-

31.    As part of the COBRA client's fees, the client received two "more-likely-than-not" opinion letters, one from J&G, and the second from Law Firm B. The defendants and their co-conspirators knew that these opinion letters contained false and fraudulent statements, and omitted material facts.

a)    J&G's opinions were false and fraudulent for the following reasons, among others:  i) they stated that the clients had made factual representations to J&G concerning their reasons for entering into the transaction, when in reality, no such factual representations had been made to J&G; ii) they stated that the clients had contributed their foreign currency options to the COBRA partnerships for "substantial non-tax business reasons," when in reality, there were no substantial non-tax business reasons for that step, and the clients took that step because the conspirators directed them to do so; and iii) they stated that the clients had contributed their partnership interests to the S Corporations for "substantial non-tax business reasons," when in reality, there were no substantial non-tax business reasons for that step, and the clients took that step because the conspirators directed them to do so.

b)    Law Firm B's opinions were false and fraudulent for the following reasons, among others: i) they stated that the clients had contributed their foreign currency options to the COBRA partnerships for "substantial non-tax business reasons," when in reality, there were no "substantial non-tax business reasons"  for that step, and the clients took that step because the conspirators directed them to do so; ii) they stated that the clients had contributed their partnership interests to the S Corporations for "substantial non-tax business reasons," when in reality, there were no "substantial non-tax business reasons" for that step, and the clients took that step because the conspirators directed them to do so; and iii) they stated  that "there existed

-22-

no understanding, obligation or agreement" under which the clients committed to undertake the various steps in the COBRA transaction, when in reality, the COBRA clients had been told they could obtain the promised tax benefits only if all the steps were completed, and therefore the clients intended to complete them.

c)      The J&G opinions purported to be based upon "all the facts and circumstances necessary" for J&G to form its opinion, and Law Firm B's opinions purported to be based upon all "pertinent facts."   However, the J&G opinions failed to disclose that J&G had implemented the COBRA transaction on behalf of the clients, and that J&G had collected as its fee a percentage of the loss amount generated.   In addition, neither opinion disclosed the following material facts, among others: i) that most of the COBRA clients responded to a promotional pitch that emphasized COBRA's tax benefits, and they entered into the transaction primarily or exclusively to obtain those tax benefits; ii) that the clients knew from the outset that a particular series of steps would be undertaken, for a given fee, leading ultimately to a specific tax result; iii) that COBRA was structured so that each client would probably lose his entire cash contribution plus fees, rather than make any profit; and iv) that the "more-likely-than-not" opinion letters had been offered to the clients as part of E&Y's promotion of the shelter.

32.      On or about January 5, 2000, E&Y's management decided that E&Y would no longer market COBRA to its clients.  That decision was reached after subject matter experts outside the VIPER/SISG group expressed the view that COBRA would not survive scrutiny under applicable law.  Among the objections raised by others within E&Y was that COBRA did not have a meaningful "business purpose."

-23-

### The Fraudulent CDS Add-On Shelters

33.　·CDS Add-On, which involved adding a COBRA-like transaction onto a CDS transaction, was marketed for a brief period in mid-2000. Approximately 61 wealthy individuals took part in a total of 37 Add-On transactions, which generated more than $24 million in fees for E&Y. In addition to the fees paid to E&Y and other participants in the transaction, clients paid $75,000 for a "more-likely-than-not" opinion letter from Law Firm A.

34.　The objective of CDS Add-On was for the client to defer indefinitely the income tax liability on the capital gains generated in the second year of the CDS transaction. In most cases, CDS Add-On consisted of two parts: 1) a two-year CDS transaction that would result in capital gains to the CDS "trading partnership"; and 2) a COBRA-like strategy that would generate artificial losses for the "trading partnership," and thus offset those capital gains. However, unlike in COBRA, the losses generated using CDS Add-On did not permanently eliminate taxes, but instead resulted in a tax deferral for as long as the income to be sheltered remained in the hands of the partnership.

35.　The second part of the transaction (the COBRA-like structure) was implemented by having each participating CDS "trading partnership" purchase one or more pairs of almost completely off-setting digital foreign currency options. The participating partnerships would then contribute their option pairs to a new LLC ("the Add-On LLC"), thereby becoming members of the Add-On LLC. Before the end of the tax year in which the client wanted to shelter their capital gains, the CDS partnership would withdraw from the Add-On LLC, and receive a capital asset which – as in COBRA – took on an artificially inflated tax basis. The CDS partnership would then sell the capital asset to trigger a loss equal to the final swap

-24-

payment, or a larger loss if the client wanted to shelter additional income or gains from taxes. The client's taxes would be deferred until cash was removed from the "trading partnership," or until that partnership terminated.

36.     The idea for CDS Add-On arose in or about early May 2000, after a similar idea was described to defendant BRIAN VAUGHN. VAUGHN passed the idea to defendant ROBERT COPLAN in an Instant Message ("IM"), stating, "If we could integrate CDS and the foreign currency trading program with the short option transaction, we could have a great transaction." COPLAN responded that he would consider VAUGHN's proposal, and forwarded the IM to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO.

37.     During the next several weeks, the defendants developed the Add-On strategy, and obtained the participation of Company X, which was then acting as the CDS general partner. The defendants were well aware that only a few months earlier, E&Y's management had decided that COBRA would no longer be marketed by E&Y, and that others within E&Y would oppose the Add-On strategy unless it had a more meaningful business purpose than COBRA. In order to provide the Add-On strategy with such a "business purpose," and thus to obtain approval to market Add-On, the defendants created a false cover story: they claimed that the idea for the CDS partnerships to purchase the digital foreign currency options, and the idea to consolidate those options in the Add-On LLC, had come from an individual who was managing activity in the CDS partnership trading accounts, and that the purpose of those steps was "to diversify trading and enhance performance" in the trading accounts. They also claimed that the plan to take those steps was formulated by Company X before the defendants learned of it, and that the defendants merely recognized the favorable tax consequences that could be obtained. According

-25-

to defendant ROBERT COPLAN, these events were simply a "fortuitous circumstance."

38.    The conspirators agreed that Company X would send letters to the CDS

clients, announcing the opportunity to participate in a new "program" that would diversify their

trading returns and enhance performance.  Defendant ROBERT COPLAN also drafted a letter to

be sent to the CDS clients by E&Y.  In that letter – which COPLAN sent to defendants MARTIN

NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN to review and edit – COPLAN

also referred to Company X's desire "to diversify trading and enhance performance."  As

COPLAN explained to his co-defendants in an email, he deliberately drafted the letter in such a

way as to conceal the fact that withdrawal from the Add-On LLC – a step necessary to generate

the artificial losses that would defer the client's taxes – was planned from the outset: "I softened

the last reference to the liquidation of the interest in the LLC so it sounds less like an event that

we know will happen in the near future."  These letters were prepared in anticipation of possible

future audits, in order to deceive the IRS into believing that the transaction was motivated by

investment concerns, and that the steps leading to the tax result were not pre-planned from the

outset.

39.    During the marketing of CDS Add-On in 2000, the defendants took

additional steps to ensure that the true motivation behind the strategy was not revealed.  A

PowerPoint presentation was created by an individual outside the VIPER/SISG group, to

illustrate the inter-relationship between CDS and CDS Add-On, and it was distributed to PFC

personnel.  In a series of emails that followed, defendant ROBERT COPLAN expressed concern

that the PowerPoint presentation would undermine the story the conspirators had constructed to

establish a business purpose for the strategy, and would thus reveal the tax motivation behind it:

a)      On or about June 14, 2000, COPLAN sent an email to VAUGHN and defendant RICHARD SHAPIRO, explaining that the Add-On strategy would "lose all of its business purpose if it is reduced to steps in a PowerPoint slide. The tax objective will appear to be the driving force rather than the money manager's interest in consolidating the accounts."

b)      The same day, COPLAN sent an email to PFC personnel who had received the PowerPoint presentation, stating that the slides were for internal use only, and were not to be shown when presenting CDS to clients. COPLAN cautioned, "There should be no materials in the client's hands – or even in their memory – that describe CDS as a single strategy that includes the Add-on feature."

c)      COPLAN then wrote to the individual who had prepared the PowerPoint slides:

> I hope you can understand the problem with portraying the strategy as an integrated transaction designed to produce a capital gain deferral. If these slides ever made their way to the IRS . . . the entire business purpose argument that gives us the ability to distinguish this from COBRA would be out the window. Since we got the internal OK to do this add-on feature on the basis that there is a much stronger business purpose than we had with COBRA, doing anything to undermine that business purpose would be creating unnecessary risk for our clients and unnecessary risk for the PFC practice.

40.      In an email to defendant ROBERT COPLAN, defendant RICHARD SHAPIRO also expressed his concern about linking the two strategies, stating, "I remain concerned of the formal pre-wired tie-in to cobra. I think it adversely impacts the story that we can tell regarding the purpose of the transaction."

41.      In order to persuade the IRS that the tax results achieved through the CDS Add-On strategy were allowable, and to avoid the imposition of penalties on clients if the IRS

-27-

were to disallow those results, the defendants and their co-conspirators caused Law Firm A to issue opinion letters which they knew contained false and fraudulent statements and omitted material facts, including but not limited to the following:

a)    The opinions stated that "organization of the LLC was based upon probability analysis and engaging a well reputed expert in the largest and most active trading market in the world . . . in order to profit from a trading program," when in reality, the LLC was organized at the behest of the defendants, who recognized its potential to generate favorable tax benefits for clients.

b)    The opinions stated that "[n]one of the business conducted by the Partnership or the LLC [had] a predetermined outcome" and that "[n]one of the transactions . . . [were] prearranged or structured to yield a predetermined economic result," when in reality, E&Y had marketed to its clients, and the clients had paid fees to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined outcome.

c)    The opinions stated that the partnership's "decision to maintain an investment in the LLC or terminate such investment [was] no different than any other investment decision exhibited by the Partnership," when in reality, this decision was not an investment decision at all, but was based solely on the timing of desired tax losses.

d)    The opinions stated that the business purpose of the Add-On LLC was "asset appreciation," when in reality, by virtue of the way the options were structured, they were likely to expire "out of the money," and generate no profits for the clients.

e)    The opinions failed to disclose that the purpose for entering into the CDS Add-On transaction was for participating E&Y clients to obtain tax deferrals, and that

the fees associated with the transaction were calculated on the basis of the intended tax losses to be generated.

        f)      The opinions failed to disclose that they were rendered by an attorney who had assisted the defendants in structuring, marketing, and implementing the transaction, and therefore were not independent.

## The Fraudulent PICO Shelters

42.      PICO was marketed and sold during 2000 and 2001. E&Y implemented approximately 96 PICO transactions for approximately 150 wealthy individuals. E&Y generated more than $56 million in fees from PICO, charging its clients approximately 2% of the tax losses the clients sought to generate. Each PICO client was provided with a "more-likely-than-not" opinion letter from one of two law firms, Law Firm C and Law Firm D; the fees for those letters ranged between $50,000 and $100,000, depending on the size of the transaction.

43.      The objective of PICO was to defer taxation and, in some cases, to convert ordinary income into capital gains. Within a period of a few months, a PICO client would follow a pre-planned series of steps, and generate artificial losses that could be used to defer taxes indefinitely on unrelated income.

44.      PICO included the following essential steps:

        a)      A client seeking to defer tax liability would form an S-Corporation (the "Personal Investment Corporation," or "PICO"), together with individuals affiliated with an entity that described itself as an "investment advisor," and purported to have special trading expertise ("Company Z"). The client was a 20% shareholder, and the other individuals were

80% shareholders ("the Company Z shareholders").  The PICO client funded the S-Corporation with an amount equal to approximately 4% of the tax loss the client wanted to generate (in other words, 4% of the income the client wished to shelter from taxes).

b)      The Company Z shareholder would then use those funds to engage in trading activity, entering into financial instruments commonly known as "straddles." The "straddles" were designed to generate essentially off-setting gains and losses, which could be realized for tax purposes, or "triggered," separately. By pre-arrangement, the trading would be carried out for approximately 60-90 days, and then the gains would be triggered. When that occurred, 80% of the gains would be allocated to the majority shareholders for tax purposes, and only 20% would be allocated to the client.

c)      By further pre-arrangement, the client would then buy out or "redeem" the Company Z shareholders, and trigger the trading losses. Because the client would, at that point, be the 100% shareholder of the PICO S-Corporation, 100% of the losses (an amount roughly equivalent to the amount of income the client was seeking to shelter), would be allocated to the client for tax purposes. These losses were artificial losses, in that there were no corresponding economic losses suffered by the client.

d)      In order for the client to claim the full benefit of the losses generated, the client would then contribute additional assets to the PICO entity. As long as the additional assets remained in the PICO entity, tax liability on the client's income would be deferred. When the assets were removed from the entity, those assets would be taxed at the capital gains rate.

-30-

45.    As the conspirators knew, in order for the PICO strategy to survive IRS scrutiny, it required a non-tax "business purpose." With knowledge that the true motivation behind the strategy was for the clients to obtain PICO's tax benefits, the conspirators developed a cover story to explain to the IRS – if the client were audited – why the client created an S-Corporation together with the Company Z shareholders, only to "buy out" those shareholders after 60-90 days. According to the cover story, the clients formed S-Corporations because they wanted to use those entities as their principal investment vehicles, and because they wanted to achieve asset protection and estate planning objectives. The clients included the Company Z shareholders in the S-Corporation, according to the story, because they wanted to "try out" Company Z's trading strategy, and intended to make a decision at the end of 60 or 90 days -- based on trading performance -- whether to continue with that strategy. According to the story, if the client was satisfied with the trading strategy, the client would buy out the other individuals, and then enter into a two-year asset management agreement with Company Z, or with one of Company Z's affiliates, so the client could continue to enjoy the benefit of Company Z's special trading expertise.

46.    In addition to developing the false cover story, the conspirators took other steps to conceal from the IRS the fact that PICO was primarily, if not exclusively, tax-motivated, and that it was designed, marketed and implemented as a pre-planned series of steps. Among other things:

a)    The defendants developed and used promotional materials that referred to PICO as "a long-term personal investment vehicle, integrating investment management services with estate planning and asset protection services." These materials made

no mention of tax benefits.

b)    Defendant ROBERT COPLAN directed that no promotional materials be left with clients, in order to prevent those materials from falling into the hands of the IRS. In an email sent in June 2001 to PFC personnel, as well as to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, COPLAN stated, "PICO slides are not to be left with clients, and this is a policy we must all adhere to. This is ultimately for the client's protection." In a later email, also copied to his co-defendants, COPLAN remarked that "a fax of the materials to certain people in the . . . government would have calamitous results," and urged, "Please take us seriously when we instruct that you not leave PICO materials behind at your presentations. . . . Impress upon [prospective PICO clients] that it [is] for their protection should they proceed with the strategy that we are not leaving them behind (i.e., in the event of an audit)."

c)    Defendant ROBERT COPLAN opposed a proposal by one PFC professional to provide clients with a work plan that laid out the steps of the transaction. In an email copied to defendant RICHARD SHAPIRO, COPLAN stated, "[A]fter we go to the trouble to make sure the client does not have any documents that walk through the steps of the transaction, I cannot imagine that we would want to hand him a work plan that shows each minute step including the redemption of the S shareholder. I would strongly advise against providing a written document to the client that lays out these steps as a prearranged plan."

d)    Defendant ROBERT COPLAN directed that a promotional brochure developed by Company Z, and biographical information concerning Company Z's officers, be provided not only to prospective PICO clients, but also to clients who had already

-32-

completed PICO transactions.  He explained that these documents "convey necessary information for the client to have made an informed decision to embark on a new investment program with [Company Z].

   e)  Although E&Y's fee for the PICO transaction was calculated as approximately 2% of the loss the client wished to generate, defendant ROBERT COPLAN directed that a fee of only $50,000 be listed in the client's engagement letter.

   f)  The conspirators arranged for the remainder of E&Y's fee to be paid by the client to Company Z or to one of its affiliates, and then for Company Z to pay the remainder to E&Y.  In order to justify such large payments from Company Z to E&Y, the defendants created a phony contract under which E&Y claimed to have performed consulting services to an affiliate of Company Z.  Those contracts – which were actually created and signed well after most of the clients' PICO fees had already been passed through Company Z to E&Y – were back-dated in order to make this discrepancy less obvious.  Defendant RICHARD SHAPIRO's concern that the so-called "consulting contract" for the 2000 PICO transactions had not been executed as of April 2001 was reflected in an email he sent to individuals at Company Z and Law Firm C, in which he stated, "I STILL DO NOT HAVE THE TAX CONSULTING AGREEMENT FROM LAST YEAR.  WITH MOST OF THE PAYMENTS MADE UNDER THAT AGREEMENT ALREADY, DON'T YOU THINK WE (AND YOUR CLIENTS) SHOULD HAVE A FINAL DRAFT THAT CAN BE SIGNED???????  WE MUST HAVE SOMETHING FOR OUR FILES."

   g)  After it became apparent that PICO clients were not inclined to continue conducting trading activities in their PICO entities after redeeming the Company Z

-33-

shareholders, the defendants encouraged them to do so in order to protect the clients' claims that the shelter was not tax-motivated. In a March 2001 email to PFC professionals, with copies to his three co-defendants, defendant ROBERT COPLAN explained, "When the PICO strategy was developed, E&Y and [Company Z] understood that the client's representations regarding his non-tax investment motives and expectation of a pre-tax profit would depend on maintaining trading activity after the 80% shareholders were redeemed." COPLAN observed that this was apparently "not the preferred approach of clients," and therefore, that PFC personnel had to "establish some guidelines and properly manage client expectations[.]" The problem did not abate; a few months later, COPLAN followed up with a similar email, reiterating the need for clients to engage in trading activity in their PICO entities, and stating, "Because we see reports that this is not the direction certain clients are headed in, we feel it necessary to establish some guidelines."

47.     In order to persuade the IRS that the tax results achieved through the PICO strategy were allowable, and to avoid the imposition of penalties on clients if the IRS were to disallow those results, the defendants and their co-conspirators arranged for Law Firm C and Law Firm D to provide the clients with opinion letters. The defendants and their co-conspirators knew these opinion letters contained false and fraudulent statements and omitted material facts, including but not limited to the following:

a)     The opinion letters stated the PICO S-Corporations were not formed to avoid or evade federal income taxes, but instead were designed to facilitate investment activities, provide asset protection and achieve estate planning objectives, when in reality, the S-Corporations were formed precisely so that clients could avoid or evade taxes.

b)     The opinion letters stated that the Company Y shareholders

-34-

became investors in the PICO in order to demonstrate the potential return available through interest rate arbitrage trading activity, when in reality, this step was necessary to accomplish the desired tax results.

c)    The opinion letters stated that the trading strategy was not designed to produce a predetermined result, when in reality, E&Y had marketed to its clients, and the clients had paid fees to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

d)    The opinions issued by Law Firm C failed to disclose that they were rendered by an attorney who had assisted the defendants in structuring, marketing, and implementing the transaction, and therefore were not independent.

## The IRS's 2002 Voluntary Disclosure Initiative

48.    In or about December 2001, the IRS announced a program under which taxpayers who had engaged in tax shelters could voluntarily disclose those transactions to the IRS, in exchange for amnesty from penalties that might otherwise be imposed if the IRS were to audit the transactions and find a tax underpayment.  In order to qualify for the program, taxpayers were required to disclose the transaction to the IRS, and to include in their disclosure, among other things, a statement describing the "material facts" of the transaction; the names and addresses of parties who had promoted, solicited or recommended the transaction to the taxpayer, and parties who had collected fees from the transaction;  a statement agreeing to provide various documents and materials relating to the transaction, including marketing materials and legal opinions; and a statement signed by the taxpayers, under penalties of perjury, that the taxpayers

-35-

had examined the disclosure, and that to the best of their knowledge and belief, the disclosure

contained all the relevant facts and was true, correct and complete.

        49.     During 2002, defendants ROBERT COPLAN, MARTIN NISSENBAUM

and RICHARD SHAPIRO prepared, and assisted in preparing, templates that could be used by

E&Y clients who had engaged in tax shelters, and who wished to participate in the IRS's

voluntary disclosure initiative in order to eliminate the possibility of IRS penalties. Although the

defendants knew that participation in the program required submission of a "true, correct and

complete" disclosure to the IRS of "all relevant facts" in a statement that would subject their

clients to penalties of perjury, the defendants drafted template disclosure letters that contained

many of the same false and fraudulent statements that had previously been included in

transaction documents and opinion letters, and omitted many of the same material facts. Tax

shelter clients who participated in the voluntary disclosure initiative thereafter submitted false,

fraudulent and incomplete statements to the IRS.

### The E&Y Promoter Penalty Audit

        50.     In or about April 2002, the IRS began an examination of whether E&Y

had complied with various legal requirements applicable to the firm's tax shelter activities. In

connection with that examination – commonly referred to as a "promoter penalty audit" – the

IRS sought documents and sworn testimony from individuals knowledgeable about the

VIPER/SISG tax shelters. In June and August of 2002, defendants ROBERT COPLAN,

MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN appeared before the

IRS to answer questions. After being placed under oath, they sought to obstruct and impede the