**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA        :

      - v. -              :          <u>INDICTMENT</u>

ROBERT COPLAN,            :          (S1) 07 Cr. 453 (SHS)
MARTIN NISSENBAUM,
RICHARD SHAPIRO,          :
BRIAN VAUGHN,
DAVID L. SMITH, and        :
CHARLES BOLTON,

                         :

            Defendants.

                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## <u>COUNT ONE</u>

### **(Conspiracy)**

The Grand Jury charges:

### <u>Background</u>

1.      At all times relevant to this Indictment, Ernst & Young ("E&Y") was
one of the largest accounting firms in the world. E&Y provided audit services to many of the
world's largest corporate clients, and provided tax services to corporate and individual clients,
including some of the wealthiest individuals in the United States. Those tax services included
preparing tax returns, providing tax advice and tax planning advice, and representing clients in
audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court.

2.      At all times relevant to this Indictment, as part of its tax practice, E&Y had
a business unit that was responsible for providing tax advice, as well as financial planning
advice, to individuals. That business unit was known as Personal Financial Counseling, or

"PFC." E&Y had partners and other professionals throughout the country who were members of the PFC practice.

3.    At all times relevant to this Indictment, E&Y also had a department within its tax practice known as the National Tax Department ("National Tax"). The individuals assigned to National Tax were generally experts in particular areas of taxation, and they provided expert tax advice to E&Y professionals in the field. Within National Tax was a sub-group of experts whose particular areas of expertise related to E&Y's PFC practice.

4.    In or about early 1998, the national leader of PFC formed a group that would devote itself to designing, marketing, and implementing high-fee tax strategies for individual clients. These strategies included tax shelters that could be used by high-net-worth clients to eliminate, reduce or defer taxes on significant income or gains. The group initially called itself the "VIPER Group" (an acronym for "Value Ideas Produce Extraordinary Results"), but changed its name to the "Strategic Individual Solutions Group," or "SISG," in or about early 2000.

5.    Defendants ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN ("the E&Y defendants") were members of the VIPER/SISG group for all or a significant part of the period relevant to this Indictment. The E&Y defendants worked together with banks, financial institutions, investment advisory firms, law firms and others, including defendants DAVID L. SMITH and CHARLES BOLTON, to design, market and implement tax shelters called CDS ("Contingent Deferred Swap"); COBRA ("Currency Options Bring Reward Alternatives"); CDS Add-On; and PICO ("Personal Investment Corporation").

6.    The tax shelters developed by the VIPER/SISG group were marketed to clients and prospective clients by members of the group, as well as by PFC professionals located throughout the country, who had primary responsibility for client contact. In or about mid-1999, certain PFC professionals around the country were designated to be members of the "Quickstrike Team," a nationwide area-based network created to provide greater efficiency in the marketing and execution of the VIPER/SISG strategies, including tax shelters.

### The Defendants

7.    At all times relevant to this Indictment, defendant ROBERT COPLAN, a lawyer with a Master's Degree in tax law, was a partner located in E&Y's Washington, D.C. office. COPLAN worked within the PFC section of National Tax, and was one of E&Y's "subject matter experts," or "SMEs," in the areas of personal income taxes, estate and gift taxes, and excise taxes. COPLAN, who was the National Director of E&Y's Center For Family Wealth Planning, was a member of the VIPER/SISG group from its inception in or about early 1998. For most of the next several years, COPLAN supervised the activities of the group. Among his other activities, COPLAN approved promotional materials, and ensured that essential information about the design and implementation of E&Y's tax shelters was shared throughout the PFC practice. He consulted regularly with defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, and also participated in sales presentations to clients. Before his employment at E&Y, COPLAN had worked for the IRS as a Branch Chief in the Legislation and Regulations Division.

8.    At all times relevant to this Indictment, defendant MARTIN NISSENBAUM, a lawyer with a Master's Degree in tax law, was a partner at E&Y. Located in E&Y's New York office, NISSENBAUM was a member of the PFC group within National Tax, and was a subject matter expert in the areas of individual income taxation, retirement benefits and compensation. NISSENBAUM was the National Director of E&Y's Personal Income Tax and Retirement Planning practice, and was a member of the VIPER/SISG group from its inception. Among other things, NISSENBAUM worked closely with defendants ROBERT COPLAN and RICHARD SHAPIRO in evaluating and developing the various tax shelters marketed by the group, and participated in sales presentations to clients and prospective clients.

9.    At all times relevant to this Indictment, defendant RICHARD SHAPIRO, a lawyer with a Master's Degree in tax law, was a partner located in E&Y's New York office. SHAPIRO was a subject matter expert in the taxation and structuring of financial products and instruments. Although he was not a formal member of National Tax or the VIPER/SISG group until 2000, SHAPIRO worked regularly with the group from its inception in or about early 1998. SHAPIRO worked closely with defendants ROBERT COPLAN and MARTIN NISSENBAUM in evaluating the shelters marketed by the group. Because of his background and expertise in financial instruments, he played an essential role in the approval process of several of the group's shelters. He also participated in sales presentations to clients and prospective clients. Before his employment at E&Y, SHAPIRO had been the Director of Tax for the Financial Services Industry Practice at another large accounting firm.

10.    At all times relevant to this Indictment, defendant BRIAN VAUGHN – who had a college degree in accounting – was a certified public accountant (CPA) and a certified

-4-

financial planner (CFP). After working at three other major accounting firms, VAUGHN joined

E&Y as a senior manager in 1998. As a member of the VIPER/SISG group from its inception

through at least 2001, VAUGHN led sales efforts for most of the SISG shelters, and also played a

development role. VAUGHN was promoted to partner in or about 2002, in large part based upon

his role in successfully developing and marketing E&Y's tax shelters.

      11.    Defendant DAVID L. SMITH was a lawyer with a master's degree in

business administration (MBA) and a CPA. During the period from approximately 1978 through

1996, he worked at several major accounting firms and brokerage houses, where he helped

design and develop various tax strategies and tax shelters. In 1997, SMITH joined an investment

advisory firm, where he developed, marketed and implemented tax shelters, including CDS.

SMITH left that firm in 1998, and soon afterward co-founded the Private Capital Management

Group ("PCMG"). PCMG marketed and implemented tax shelters, including CDS. While at

PCMG, SMITH – who was the 50% owner of the company – marketed and implemented CDS

with the E&Y defendants, as well as with defendant CHARLES BOLTON. SMITH also assisted

the E&Y defendants and BOLTON in marketing the CDS Add-On shelter in 2000. During the

period from 1999 through 2000, SMITH earned millions of dollars from his involvement in

CDS.

      12.    From in or about 1999 through at least in or about 2006, defendant

CHARLES BOLTON owned and operated a group of companies ("the Bolton companies") that

implemented and assisted in implementing tax shelters for E&Y's clients. BOLTON – who

studied business finance in college – held a series of finance jobs during the period from 1983

through 1992. In 1992, BOLTON formed the first of his own companies, Bolton Financial

Services. In or about mid-1999, BOLTON met defendant DAVID L. SMITH, and soon

afterward began to assist SMITH in implementing CDS for E&Y's clients. In or about early

2000, BOLTON arranged for one of his companies to license the CDS idea from SMITH.

BOLTON thereafter assisted in further developing and implementing CDS, together with E&Y.

In or about mid-2000, BOLTON agreed to assist the E&Y defendants in marketing and

implementing the CDS Add-On shelter. During the period from 1999 through 2002, BOLTON

made millions of dollars from his involvement in CDS and CDS Add-On.

### Tax Shelter Fraud

13.    During the period from in or about 1998 through in or

about 2006, the defendants, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD

SHAPIRO, BRIAN VAUGHN, DAVID L. SMITH and CHARLES BOLTON, and others known

and unknown to the Grand Jury (hereinafter "the co-conspirators"), participated in a scheme to

defraud the IRS by designing, marketing, implementing and defending tax shelters using means

and methods intended to deceive the IRS about the bona fides of those shelters, and about the

circumstances under which the shelters were marketed and implemented.

14.    The defendants and their co-conspirators designed, marketed,

implemented and defended these tax shelters so that wealthy individuals with taxable income

generally in excess of $10 or $20 million could eliminate or reduce the individual income taxes

they would have to pay to the IRS. As designed, marketed and implemented, instead of wealthy

clients paying U.S. individual income taxes that were legally owed (generally, between 20% and

40% of their taxable income), the clients could pay total costs calculated largely as a percentage

of the desired tax loss or deduction generated by the particular tax shelter. These costs included

the fees payable to E&Y and the other participants, including PCMG, the Bolton companies, the

various law firms that supplied opinion letters to the clients, and the banks and other financial

institutions that executed the transactions. The costs also included an amount that would be used

to execute purported "investments," which were designed, in part, to disguise and conceal the

true nature and purpose of the tax shelters.

15.    The defendants and their co-conspirators understood that if the IRS were

to detect the clients' use of these tax shelters, and learn the true facts and circumstances

surrounding the design, marketing and implementation of these shelters, the IRS would

aggressively challenge the claimed tax benefits. In that event, the IRS would seek to collect the

unpaid taxes plus interest, and might also seek to impose substantial penalties upon the clients.

Accordingly, the defendants and their co-conspirators undertook to prevent the IRS from: a)

detecting their clients' use of these shelters; b) understanding how the steps of the transactions

operated to produce the tax results reported by the clients; c) learning that these shelters were

marketed as cookie-cutter products that would eliminate, reduce or defer large tax liabilities; d)

learning that the clients had not undertaken these transactions because they were seeking profit-

making investment opportunities, but had instead done so because they were seeking huge tax

benefits; and e) learning that, from the outset, all the clients intended to complete a pre-planned

series of steps that had been designed by the conspirators to lead to the specific tax benefits

sought by the clients.

16.    In order to maximize the appearance that the tax shelters were

investments undertaken to generate profits, and to minimize the likelihood that the IRS would

learn the transactions were actually designed to create tax losses and deductions, the defendants

and their co-conspirators created, assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent descriptions of the clients' motivations for entering into the transactions, and for taking the various steps that would yield the tax benefits. They also carefully protected internal documents and promotional materials that set forth the tax benefits and pricing schedules of the various shelters against disclosure to the IRS. The conspirators' goal of deceiving the IRS into believing that the tax shelters were driven by investment objectives rather than tax savings objectives was demonstrated in an email sent by defendant ROBERT COPLAN to a PFC professional in 2001. That individual had prepared a proposed client solicitation letter, in which he provided short descriptions of various SISG strategies and their accompanying tax benefits. COPLAN expressed reservations about sending such a letter to clients, as the IRS would inevitably ask the clients for marketing and promotional materials in the course of any audit. COPLAN explained, "Since our ultimate goal is to make our strategies appear to be investment techniques that have advantageous tax consequences, letters like this are not helpful to the client's case[.]"

       17.    The law in effect at all times relevant to this Indictment provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the IRS could impose substantial penalties upon the taxpayer -- ranging from 20% to 40% of the underpayment attributable to the shelter -- unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the tax benefit "more likely than not" would survive IRS challenge. In order to encourage clients to participate in the shelters, and to shield the clients from possible penalties, the defendants worked with law firms that agreed to provide E&Y's clients with opinion letters that claimed the tax shelter losses

or deductions would "more likely than not" survive IRS challenge, or "should" survive IRS challenge. However, the defendants knew those opinions were based upon false and fraudulent statements, and omitted material facts. By helping their clients obtain false and fraudulent opinion letters, with the understanding and intent that those opinion letters would be presented to the IRS if and when the clients were audited, the defendants not only sought to undermine the ability of the IRS to ascertain the clients' tax liabilities, but also sought to undermine the ability of the IRS to determine whether penalties should be imposed.

18.    The defendants and their co-conspirators undertook these actions so that E&Y, PCMG, the Bolton companies and the other entities involved could participate in the highly lucrative tax shelter market in which other accounting firms and "investment advisory" firms were already participating; so that E&Y could prevent its high-net-worth clients from taking their business (including, potentially, the highly-prized audit business associated with some of these individuals) to its competitors; so that PFC – a business unit that was not a substantial contributor to the firm's revenues – could grow and prosper within the firm; so the individual E&Y defendants could enhance their own opportunities for professional recognition, advancement, job security, and remuneration; and so the Bolton companies could obtain access to E&Y's high net worth clientele for purposes of developing future business.

19.    In addition to implementing fraudulent tax shelters for E&Y's clients, in 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO implemented a tax shelter to evade their own taxes, and arranged for eight of their E&Y partners to participate in the transaction with them. Use of that tax shelter enabled the group of eleven E&Y partners to eliminate a total of approximately $3.7 million in taxes.

-9-

20.    In addition to implementing fraudulent tax shelters for E&Y's clients, in 2000 and 2001 defendant CHARLES BOLTON implemented fraudulent tax shelters to reduce and defer his own tax liabilities. Use of those tax shelters enabled BOLTON to reduce his tax liabilities by millions of dollars.

## The Fraudulent CDS Shelters

21.    CDS (an abbreviation for "Contingent Deferred Swap") was marketed and sold by E&Y from mid-1999 through 2001. During that period, approximately 69 CDS transactions were implemented for approximately 140 of E&Y's wealthy clients. As designed and marketed, E&Y's fee for CDS was approximately 1.25% of the tax deductions to be generated for each client. Various clients paid greater or lesser amounts, but ultimately the transaction generated more than $27 million in fees for E&Y. Clients who implemented CDS also paid fees to other participants in the transaction, including at least 1.25% to PCMG (for CDS transactions implemented in 1999) or the Bolton companies (for CDS transactions implemented in 2000 and 2001), as well as a fee to Law Firm A for an opinion stating that if the IRS were to disallow the CDS tax benefits, the client "should" ultimately prevail (a "should opinion"). Typically, Law Firm A's fee was at least $50,000.

22.    The objective of CDS was to convert a client's ordinary income into long-term capital gains, and defer the client's tax liability from the year in which the income was earned ("Year 1") to the following year ("Year 2"). During the period when CDS was sold, ordinary income for very wealthy individuals was typically taxed at a rate of approximately 40%, while long-term capital gains were taxed at approximately 20%. Accordingly, the conversion of

-10-

a client's income from the ordinary rate to the capital gains rate resulted in tax savings to the client of approximately 20% of their income. CDS was marketed to individuals or groups of individuals who had at least $20 million in ordinary income to shelter.

23.    Although there were variations, in a typical CDS transaction, the client sought to convert $20 million in ordinary income into capital gains. CDS was designed and implemented as a series of pre-determined steps intended to deceive the IRS by making it appear that the client was engaged in the business of currency trading for profit, and that the various component parts of the transaction were routine financial activities comprising a coherent business philosophy. The conspirators concealed the fact that CDS was mass-marketed to clients who had no genuine interest in putting their money at risk by engaging in the business of currency trading, but were instead merely carrying out steps they were told to carry out in order to achieve CDS's tax benefits. These steps, and the manner in which these steps were manipulated to deceive the IRS, included the following:

a)    The CDS strategy was implemented through the creation of a limited partnership in which an entity characterized as an investment advisor was the general partner and E&Y's client was the limited partner. Defendant DÁVID L. SMITH's company, PCMG, was the general partner for the CDS partnerships set up in 1999. After CHARLES BOLTON licensed CDS from SMITH in early 2000, one of the Bolton companies -- Bolton Capital Planning ("BCP") -- became the general partner for the CDS partnerships set up in 2000 and 2001. Although the main purpose for creation of each CDS limited partnership was for the client to obtain tax benefits, and for E&Y, PCMG, and the Bolton companies to earn tax shelter fees, the documents created to execute the transaction described each partnership as a "trading

partnership," and made no mention of the tax benefits, but instead stated that the partnership was "organized to generate capital appreciation."

        b)    After determining how much ordinary income the client wished to shelter from taxes in Year 1, the conspirators would typically arrange for the client to contribute approximately one-third of that amount ($6.6 million in the typical example) to the purported "trading partnership."

        c)    The success of the client's tax position with the IRS required that the partnership be characterized for tax purposes as a "trade or business," so that "business deductions" could be generated, and then used by the clients to offset their taxable income. Accordingly, the conspirators arranged for approximately $1 million of the client's $6.6 million contribution to be placed in a trading account. In order to make it appear that the "trading partnership" was genuinely engaged in the "business of trading for profit," the funds in that trading account were generally used to carry out a high volume of short-term trades. However, the activity in that account consisted largely of trades designed to preserve the client's capital, so the funds in the account could be returned to the client once the tax benefits of CDS had been obtained. As described by a co-conspirator employed by one of the Bolton companies in an email to another co-conspirator, "Our true investment objective in the various trading accounts was minimal gains and losses." As stated by the same co-conspirator in an email sent to defendant CHARLES BOLTON and others, "I am happy to report that ... [f]or the most part we were down an average of approximately 1% on all of the trading accounts. In my eyes, that is 100% in line with what our objective was." The conspirators affirmatively sought to conceal the fact that no trading profits were expected, as reflected in an email sent by another co-conspirator

in February 2000, asking that certain references be removed from CDS documents, and

explaining, "We don't want to highlight that we don't anticipate trading profits."

           d)      A portion of the client's cash contribution to the "trading

partnership" (approximately $5 million in the example) was put toward a $20 million swap

contract, which was entered into between the partnership and a bank or financial institution ("the

bank"). The swap contract called for the "trading partnership" to make periodic payments

totaling approximately $20 million to the bank over the life of the swap. Because the payments

made to the bank in Year 1 were made by an entity purportedly engaged in the "business" of

trading, those payments were claimed by the partnership as "business deductions." The

purported "business deductions" – which flowed through the "trading partnership" to the client –

would be used to offset the $20 million in ordinary income earned by the client in Year 1, and

thus would eliminate the client's tax liability that year.

           e)      In order for a CDS client to shelter $20 million in income, it was

necessary, under the tax code, for that client to have $20 million "at risk" in the CDS transaction.

In a typical transaction, only $5 million of the client's contribution was put toward the swap; the

additional $15 million was obtained by the partnership as a purported "loan" from the bank.

However, the so-called "loan" from the bank did not involve any actual disbursement of funds to

the CDS partnership. Instead, the bank merely made a "book entry" indicating that loan proceeds

were being deposited into a collateral account at the bank. The CDS swaps were structured so

that no real funds were  transferred to the control of the partnership, and there was no possibility

that any real funds of the bank would be placed at any risk of loss. Because the bank was at all

times fully collateralized on the "loan," there was also no possibility of a default on the "loan" by

-13-

the partnership. The conspirators caused the CDS clients to execute documents by which they

agreed to accept personal liability on the loans, while at the same time assuring the clients that

they would not have to contribute any additional money to the transaction. In causing the clients

to execute such documents, the conspirators sought to deceive the IRS into believing that the

individual clients were actually "at risk" for the loan amounts. In truth and in fact, they knew

that no such risk existed, that the so-called "loans" served no business purpose, and that the

"loans" served only to increase the amount of the tax deduction the individual could claim. This

tax purpose is reflected in a 1998 email concerning the CDS transaction, sent between employees

of the bank that executed the 1999 CDS transactions for E&Y's clients:

> You are right to say that the collateral is part funded out of our loan
> and, to that extent, seems non-sensical, but there is a tax reason
> why this circularity is necessary. . . . (You will recall that the
> purpose of the trade is to convert current income into long-term
> capital gains.) . . . Incidentally, this "loan" has zero capital
> implications for the bank.

    f)  The CDS swap contract also provided for a "termination payment"

to be paid by the bank to the CDS partnership in Year 2, at the end of the swap. For a $20

million swap, the termination payment was approximately $20 million, with some variation

based on market fluctuation. In order for the termination payment made to the CDS partnership

to qualify for long-term capital gains treatment, the swap termination in Year 2 had to occur

more than a year after the swap was executed, and had to be characterized as an "early

termination" of the swap contract. Although prospective CDS clients were told by E&Y that the

swaps would last for just over one year, the conspirators arranged for swap contracts to be drawn

up with 18-month maturity dates. This was done to mislead the IRS into believing that the

-14-

parties actually contemplated an 18-month swap, and that "early termination" was an option, but

not a foregone conclusion. The conspirators sought to conceal this plan from the IRS, as

reflected in an email sent by defendant BRIAN VAUGHN to a co-conspirator in June 2001. In

that email, VAUGHN suggested removing reference to "early termination" from a CDS

economic model, explaining, "This could adversely affect our tax situation given the level of

audits that are currently in progress. . . . Remember our goal is to convince the agents the client

did not have a predisposition of early termination." For a similar reason, defendant RICHARD

SHAPIRO recommended against use of an internal E&Y document called a "CDS Action Plan,"

which set forth all the steps of the transaction in advance, including early termination of the

swap. In an email SHAPIRO sent to defendants ROBERT COPLAN, MARTIN NISSENBAUM

and BRIAN VAUGHN, he explained:

> [O]ne of the problems with tax advantaged transactions when they
> are viewed is that they are perceived (correctly I might add) as too
> scripted. While having a plan is important, should we have in
> writing 'before the fact' such things as the fact that our swap will
> be terminated early? Clearly, that is necessary for the flow of the
> transaction. But should there be a document in existence (such as
> this) that has all the chapters and verses laid out? I question that
> seriously.

Thus, by manipulating the terms of the swap and by concealing the genuine intentions of all the

parties, the conspirators concocted a scenario that enabled them fraudulently to characterize the

termination payments received by the CDS partnerships from the bank as long-term capital gains.

Those capital gains flowed through the partnerships to the clients, so the clients could be taxed at

the lower, capital gains rate.

-15-

24.     As part of the scheme to defraud the IRS, the conspirators created

additional documents that purported to provide non-tax business motivations for steps that were

actually tax-motivated.  For example, defendant ROBERT COPLAN drafted a letter to be signed

by clients who had decided to terminate their CDS partnerships after the tax benefits had been

obtained.  In that letter, the clients falsely attributed their decision to discontinue their trading

activities to the September 11, 2001 terrorist attacks, and to "possible economic repercussions

resulting from such attacks."  In an email sent to various members of E&Y's PFC practice, as

well as to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, COPLAN attached

his draft letter, and explained that the letter could be used "as a means of establishing a logical

reason for winding down the trading account in the partnership. . . .  This could document for the

file a logical non-tax rationale for ending the trading account – if that is otherwise what the client

wants to do."  A copy of COPLAN's email and the attached letter was forwarded to defendant

CHARLES BOLTON.

25.     As part of executing the fraudulent CDS tax shelters, the conspirators

arranged for CDS clients to sign false factual representations that could be, and were,

incorporated into the CDS opinion letters prepared by Law Firm A.  For example, although the

real purpose of the CDS trading activity was to achieve a particular volume and frequency of

trading so the conspirators could plausibly characterize the CDS partnerships as involved in a

"trade or business," and could thereby assert that the swap payments made by the partnerships in

Year 1 were "business deductions," the CDS clients were directed to sign, and did sign, a

document stating, "I regard the various investments of the partnership -- including the swaps and

the trading activities -- as comprising one coherent business philosophy, and this diversity of

-16-

investments was an important element in my decision to invest in the partnership." In truth, as

the conspirators well knew, the diversity of investments was not an important element in the

clients' decisions, and the only "coherent philosophy" reflected in the various components of the

CDS transaction was a philosophy to reduce taxes.

26.     In addition to incorporating the false factual representations described in

paragraph 25, above, the defendants and their co-conspirators caused Law Firm A to issue

opinion letters which they knew contained false and fraudulent statements and omitted material

facts, including but not limited to the following:

a)     The opinions stated that the objective of the partnership's trading

activities was to "profit from short term market movements," when in reality, the primary

objective of the trading activity was to achieve a particular volume and frequency of trades, while

preserving the client's capital by minimizing trading losses.

b)     The opinions stated that because either party to the swap contract

could elect to terminate the swap early, the partnership was "not in control of that decision,

should it occur," and therefore the partnership should not be viewed as "being able to manipulate

the timing of income," when in reality, both parties to the swap contracts planned to terminate

the swaps early from the outset, and the sole purpose of that plan was to manipulate the timing of

income.

c)     The opinions stated that the limited partner (the client) was

"at risk" for an amount greater than the amount invested because the client had agreed to be

personally liable for the debts of the partnership, when in reality, the clients had been assured that

they would not be liable for any amount over their initial cash contribution, and the transaction

-17-

was arranged so there would be no such liability.

        d)     The opinions stated that "[n]one of the business conducted by the Partnership [had] a predetermined outcome," when in reality, the E&Y defendants and their co-conspirators had marketed to E&Y's clients, and the clients had paid fees to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

        e)     The opinions did not disclose that the client's primary purpose for implementing the CDS transaction was to obtain the tax benefits, or that the fees associated with the transaction were calculated on the basis of the intended tax deduction to be generated.

        f)     The opinions did not disclose that they were rendered by an attorney who had assisted the defendants in designing, marketing, and implementing the CDS transaction, and had been offered to the clients as part of a promotional package.

### The Fraudulent COBRA Shelters

        27.     COBRA (an acronym for "Currency Options Bring Reward Alternatives") was marketed and sold by E&Y during the last few months of 1999 to 51 wealthy taxpayers. Of the 16 COBRA transactions, all but one were implemented in late 1999; the other was implemented in 2000. Although some clients paid greater or lesser amounts, as designed and marketed, E&Y's fee was approximately 1.5% of the tax losses to be generated using the strategy, and COBRA generated approximately $14.7 million in fees for E&Y. The fees paid by COBRA clients amounted to approximately 4.5% of the losses to be generated, including a fee of just under 3% charged by the law firm of Jenkens & Gilchrist ("J&G"). J&G prepared most of

the transaction documents for the COBRA shelters, and implemented the COBRA transactions for the clients. J&G also issued "more likely than not" opinion letters to the COBRA clients. Defendants ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN realized that because J&G was involved in designing, structuring and implementing the transaction, the clients would not be able to obtain penalty protection on the basis of J&G's opinion letter. Therefore, the E&Y defendants arranged for another attorney, a partner at Law Firm B, to issue each of the COBRA clients a second "more likely than not" opinion for a fee of up to $150,000.

28.     The objective of COBRA was the complete and permanent elimination of all tax liability on whatever amount of ordinary income or capital gain a client might choose. COBRA, which involved the manipulation of basis in digital foreign currency options, was E&Y's brand of a strategy also known as the "digital option trade" or the "short option strategy."

29.     COBRA was designed, marketed and implemented as a series of pre-planned steps which, within a period of 30 to 45 days, would generate artificial losses sufficient to offset a client's income or gains completely. COBRA was intended to deceive the IRS by making it appear that the client – together with other like-minded individuals – was "investing" in foreign currency options in order to make a profit, and that non-tax business reasons existed for the various steps of the transaction. In reality, in exchange for substantial fees that were calculated largely as a percentage of the tax loss to be generated for E&Y's clients, the E&Y defendants and their co-conspirators provided the clients with a cookie-cutter transaction that utilized pairs of almost completely offsetting foreign currency options to generate huge artificial tax losses. Although the options had some chance of earning the clients a profit after the fees

-19-

were paid, this so-called "investment" opportunity was not offered generally through E&Y's Investment Advisory Service, but was instead marketed to a select group of individual clients with more than $20 million in income or gains to offset.

30.     COBRA included the following key steps:

a)     The client would identify an amount of ordinary income or capital gains on which the client wished to eliminate taxes. The client or E&Y would then identify other individuals who also wished to eliminate their taxes, with whom the client could participate in the transaction.

b)     Using J&G, each client would create a wholly-owned limited liability company ("LLC"). That LLC would purchase a digital foreign currency option (the "long option") from a bank, and would sell an almost completely off-setting digital foreign currency option ("the short option") to the same bank. The client's LLC paid a net amount to the bank for the pair of options; that amount equaled 5% of the tax loss the client wished to generate (in other words, 5% of the income the client wished to offset).

c)     The pair of offsetting options constituted a single financial bet between the client and the bank that, at the end of 30 days, a particular currency would have gone up or down in value against another currency by a specific amount. The option pairs were priced and structured by arrangement between E&Y and the bank so that if the client won the bet (or, was "in the money") at the end of the 30-day period, the bank would pay the client an amount sufficient to yield a profit over and above the client's initial 5% contribution plus the fees associated with the transaction. E&Y told its clients that the odds of that happening were approximately 38%. If the client lost the bet (or, was "out of the money") after 30 days, then the

client would lose his 5% contribution and his fees. E&Y told its clients that the likelihood of that outcome was approximately 62%. Thus, the E&Y defendants and the clients knew from the outset that the clients would probably lose their 5% contribution and their fees.

d)      Almost immediately after acquiring the option pair or pairs from the bank, each client – acting through his newly created LLC – would contribute the option pairs to a newly created partnership, also formed by J&G, in which one or more other COBRA clients were also partners. After approximately 30 days, the options would expire. Each client would also contribute a low-value asset to the partnership – an ordinary asset or a capital asset, depending on whether the client desired ordinary or capital losses.

e)      Each client would then transfer his partnership interest to a new S-Corporation, also formed by J&G. When this occurred, the partnership would automatically terminate. According to the E&Y defendants and their co-conspirators, each client could then claim – for tax purposes – that his tax basis in the partnership was equal to the cost of the long option (which had been calculated intentionally to equal the income the client wished to offset), rather than the net amount actually paid by the client to participate in the transaction (5% of the price of the long option). The conspirators claimed that the low-value asset contributed by the client to the partnership would take on that high tax basis when the partnership terminated, so that when the S-Corporation sold the low-value asset at fair market value only days later, a huge artificial loss – equal to almost twenty times the client's initial cash contribution – was created for the client.

31.    The E&Y defendants and their co-conspirators were aware that if the IRS were to discover all the facts surrounding the design, marketing and implementation of COBRA,

and that the COBRA clients were primarily or exclusively motivated by a desire to eliminate huge tax liabilities, the IRS would aggressively challenge the claimed tax benefits. Accordingly, among other steps they took to prevent the IRS from learning those facts, the conspirators: 1) falsely and misleadingly represented the COBRA clients' motivations for entering into the transaction, and for taking the various steps necessary to create the huge artificial losses; 2) encouraged COBRA clients to engage in activities designed to disguise and conceal their tax motivations for entering into the transaction; 3) falsely represented to the IRS the likelihood that clients could earn a profit from COBRA; 4) directed the destruction of documents which would reveal the true facts surrounding the design, marketing and implementation of COBRA; 5) caused and approved the issuance of false and fraudulent opinion letters; and 6) misled the IRS during audits of the COBRA transaction.

32. Among the ways in which the conspirators sought to conceal the fact that COBRA was tax-motivated, and was designed and implemented as a pre-planned series of steps, were the following:

a) Defendant ROBERT COPLAN directed that client engagement letters make no reference to tax losses, or to the fact that fees were calculated as a percentage of the tax losses the clients sought to generate.

b) Defendant ROBERT COPLAN directed that PowerPoint presentations which laid out all the steps of the COBRA transaction not be left with clients.

c) In addition to having clients contribute 5% of the desired loss amount to the transaction, the E&Y defendants directed clients to contribute an additional 2% of the desired loss amount to the COBRA partnerships, and recommended using that additional cash

-22-

to engage in trading activity. The sole purpose of that trading activity was to deceive the IRS into believing that the COBRA partnerships had been formed to conduct investment activities, and not merely to generate tax losses. The E&Y defendants' intent to deceive the IRS in this regard was reflected in a series of emails sent by defendant ROBERT COPLAN to various PFC members whose clients had initiated COBRA transactions, as well as to defendants RICHARD SHAPIRO, MARTIN NISSENBAUM and BRIAN VAUGHN. COPLAN explained in the first email, "[T]he more trading activity the better [because] the trading activity is important to the maintenance of a business purpose for the partnership." In a later email he advised, "Trades should occur weekly in the partnership, with weekly turnover of positions at or near 100% . . . . The tax position will be aided if there is at least some type of trading activity[.]"

> d)     Defendant ROBERT COPLAN sent an email to PFC professionals, with a copy to defendants RICHARD SHAPIRO, MARTIN NISSENBAUM and BRIAN VAUGHN, suggesting that their COBRA clients download foreign currency trading information from a website, and explaining that such material could be useful "as file material to evidence investigation into currency trading."

> e)     After the COBRA partnerships terminated in late 1999, and after the artificial losses had been generated, the E&Y defendants recommended that clients maintain the 2% cash contribution in their S-Corporations, and continue to engage in trading activities. This step was designed to deceive the IRS into believing that the S-Corporations had been created for some actual business purpose, instead of simply to achieve COBRA's tax benefits. In an email to PFC professionals in January 2000, defendant ROBERT COPLAN stated that he, together with defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, were "providing

guidance . . . as to what is recommended to strengthen the client's tax position[.]" COPLAN continued:

> It is preferable to leave the S Corp in place through the end of the year 2000 to enhance the substance of the transaction – i.e., so that the entire structure is not closed down within two months. . . . As for activity in the account we believe 'The more the better' [because] the tax position will be strengthened by significant trading activity . . . .

With respect to the S-Corporation, COPLAN explained to another PFC member, "The longer it runs, the better it looks from a business standpoint as to why the thing was formed."

   f) After the IRS began auditing COBRA clients, defendant ROBERT COPLAN sent an email to PFC professionals throughout the country, directing that they destroy COBRA documents. The email was titled "Important - Purge Of All Key COBRA Documents," and it instructed that recipients "immediately delete and dispose of" COBRA documents such as PowerPoint slides and work plans.

   33. As part of the COBRA client's fees, the client received two "more-likely-than-not" opinion letters, one from J&G, and the second from Law Firm B. The E&Y defendants and their co-conspirators knew that these opinion letters contained false and fraudulent statements, and omitted material facts.

   a) J&G's opinions were false and fraudulent for the following reasons, among others: i) they stated that the clients had made factual representations to J&G concerning their reasons for entering into the transaction, when in reality, no such factual representations had been made to J&G; ii) they stated that the clients had contributed their foreign currency options to the COBRA partnerships for "substantial non-tax business reasons,"

when in reality, there were no substantial non-tax business reasons for that step, and the clients took that step because the conspirators directed them to do so; and iii) they stated that the clients had contributed their partnership interests to the S Corporations for "substantial non-tax business reasons," when in reality, there were no substantial non-tax business reasons for that step, and the clients took that step because the conspirators directed them to do so.

        b)        Law Firm B's opinions were false and fraudulent for the following reasons, among others: i) they stated that the clients had contributed their foreign currency options to the COBRA partnerships for "substantial non-tax business reasons," when in reality, there were no "substantial non-tax business reasons" for that step, and the clients took that step because the conspirators directed them to do so; ii) they stated that the clients had contributed their partnership interests to the S Corporations for "substantial non-tax business reasons," when in reality, there were no "substantial non-tax business reasons" for that step, and the clients took that step because the conspirators directed them to do so; and iii) they stated that "there existed no understanding, obligation or agreement" under which the clients committed to undertake the various steps in the COBRA transaction, when in reality, the COBRA clients had been told they could obtain the promised tax benefits only if all the steps were completed, and therefore the clients intended to complete them.

        c)        The J&G opinions purported to be based upon "all the facts and circumstances necessary" for J&G to form its opinion, and Law Firm B's opinions purported to be based upon all "pertinent facts." However, the J&G opinions failed to disclose that J&G had implemented the COBRA transaction on behalf of the clients, and that J&G had collected as its fee a percentage of the loss amount generated. In addition, neither opinion disclosed the

-25-

following material facts, among others: i) that most of the COBRA clients responded to a promotional pitch that emphasized COBRA's tax benefits, and they entered into the transaction primarily or exclusively to obtain those tax benefits; ii) that the clients knew from the outset that a particular series of steps would be undertaken, for a given fee, leading ultimately to a specific tax result; iii) that COBRA was structured so that each client would probably lose his entire cash contribution plus fees, rather than make any profit; and iv) that the "more likely than not" opinion letters had been offered to the clients as part of E&Y's promotion of the shelter.

34.     On or about January 5, 2000, E&Y's management decided that E&Y would no longer market COBRA to its clients. That decision was reached after subject matter experts outside the VIPER/SISG group expressed the view that COBRA would not survive scrutiny under applicable law. Among the objections raised by others within E&Y was that COBRA did not have a meaningful "business purpose."

### The Fraudulent CDS Add-On Shelters

35.     CDS Add-On, which involved adding a COBRA-like transaction onto a CDS transaction, was marketed for a brief period in mid-2000. Approximately 61 wealthy individuals took part in a total of 37 Add-On transactions, which generated more than $24 million in fees for E&Y. CDS Add-On was implemented by defendant CHARLES BOLTON through the Bolton companies, and generated millions of dollars in fees for BOLTON and the Bolton companies. In addition to the fees paid to E&Y, the Bolton companies, and other participants in the transactions, clients paid $75,000 for a "more likely than not" opinion letter from Law Firm A.

36.     The objective of CDS Add-On was for the client to defer indefinitely the income tax liability on the capital gains generated in the second year of the CDS transaction. In most cases, CDS Add-On consisted of two parts: 1) a two-year CDS transaction that would result in capital gains to the CDS partnership; and 2) a COBRA-like strategy that would generate artificial losses for the CDS partnership, and thus offset those capital gains. However, unlike in COBRA, the losses generated using CDS Add-On did not permanently eliminate taxes, but instead resulted in a tax deferral for as long as the income to be sheltered remained in the hands of the partnership.

37.     The second part of the transaction (the COBRA-like structure, referred to as the "Add-On") was implemented by having each participating CDS partnership acquire one or more pairs of almost completely off-setting digital foreign currency options. As in COBRA, the premium for the long options equaled the amount of income the client wished to offset. Thus, each client's partnership could acquire options that would offset the capital gains received in the second year of CDS, or the partnership could acquire options with a higher premium, and thereby shelter additional income or gains. Participating partnerships would then contribute their option pairs to a new entity, BCP Trading & Investments, LLC ("BCPT&I"), which was created by defendant CHARLES BOLTON and was used solely to implement the Add-On shelter. By contributing their option pairs to BCPT&I, the CDS partnerships became members of BCPT&I. Before the end of the tax year in which the client wanted to shelter their CDS capital gains (Year 2 of the CDS transaction), the CDS partnership would withdraw from BCPT&I, and would receive foreign currency which – as in COBRA – took on an artificially inflated tax basis. The CDS partnership would then sell or exchange the foreign currency to trigger a loss equal to the

-27-

capital gain from the CDS swap termination payment, or such larger amount as the client had chosen. The client's taxes would be deferred until cash was removed from the CDS partnership, or until that partnership terminated.

38.     Like CDS, the Add-On transaction also involved a so-called "loan" from a financial institution. Just as the "loan" made to the partnership in CDS involved no genuine transfer of funds and served no purpose other than to generate tax benefits, the "loan" extended to the Add-On clients was also made with a "book entry" and served no purpose other than to assist the clients in claiming artificial tax losses.

39.     The idea for CDS Add-On arose in or about early May 2000, after a similar idea was described to defendant BRIAN VAUGHN. VAUGHN passed the idea to defendant ROBERT COPLAN in an Instant Message ("IM"), stating, "If we could integrate CDS and the foreign currency trading program with the short option transaction, we could have a great transaction." COPLAN responded that he would consider VAUGHN's proposal, and forwarded the IM to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO.

40.     During the next several weeks, the E&Y defendants developed the Add-On strategy, and obtained the participation of defendant CHARLES BOLTON. The E&Y defendants were well aware that only a few months earlier, E&Y's management had decided that COBRA would no longer be marketed by E&Y, and that others within E&Y would oppose the Add-On strategy unless it had a more meaningful business purpose than COBRA. In order to provide the Add-On strategy with such a "business purpose," and thus to obtain approval to market Add-On, the E&Y defendants created a false cover story: they claimed that the idea for the CDS partnerships to purchase the digital foreign currency options, and the idea to consolidate

-28-

those options in a new LLC, had come from one of the traders who was managing activity in the

CDS partnership trading accounts on behalf of BCP, and that the purpose of those steps was "to

diversify trading and enhance performance" in the trading accounts.  They also falsely claimed

that the plan to take those steps had been presented to them by defendant CHARLES BOLTON,

and that they had merely recognized the favorable tax consequences that could be obtained.

According to defendant ROBERT COPLAN, these events were simply a "fortuitous

circumstance."

      41.    In reality, there was no way the Add-On transaction could "enhance

performance" in the CDS trading accounts.  Unlike the COBRA transaction, which entailed a

foreign currency bet that could actually result in a profit for the client if the client's option pair

ended up "in the money," no such possibility existed for the Add-On transaction.  This was

because the Add-On client was required to contribute only about 0.5% of the desired loss amount

to the Add-On transaction (as opposed to 5% contributed by the COBRA client).  Although the

payout on a successful Add-On bet was 2:1, any profit potential on such a payout was far

exceeded by the amount the client was required to pay in fees to E&Y, the Bolton companies,

Law Firm A and the financial institution involved.  Thus, the Add-On transaction carried no

reasonable possibility of profit; it served no purpose other than to defer the client's tax liability

indefinitely, and to generate fees for the other participants.

      42.    The conspirators agreed, with respect to the marketing of Add-On, that

PCMG (the general partner of the CDS partnerships set up in 1999) and BCP (the general partner

of the CDS partnerships set up in early 2000) would send letters to the CDS clients, announcing

the opportunity to participate in a new "program" that would diversify their trading returns and

enhance performance. Defendant DAVID L. SMITH signed the letters sent on behalf of PCMG, and Belle Six – a co-conspirator not named as a defendant herein, who served as a Managing Director of BCP – signed the letters sent on behalf of BCP. Defendant ROBERT COPLAN also drafted a letter to be sent to the CDS clients by E&Y. In that letter – which was sent to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO, BRIAN VAUGHN and CHARLES BOLTON to review and edit – COPLAN also referred to BCP's desire "to diversify trading and enhance performance." As COPLAN explained in an email to the E&Y defendants, he deliberately drafted the letter in such a way as to conceal the fact that withdrawal from the BCPT&I – a step necessary to generate the artificial losses that would defer the client's taxes – was planned from the outset: "I softened the last reference to the liquidation of the interest in the LLC so it sounds less like an event that we know will happen in the near future." These letters were prepared in anticipation of possible future audits, in order to deceive the IRS into believing that the transaction was motivated by investment concerns, and that the steps leading to the tax result were not pre-planned from the outset.

43.    In order for the many steps of the Add-On shelter to be implemented efficiently for all the CDS clients who wished to participate, defendant DAVID L. SMITH agreed to transfer from PCMG to BCP the control of all 1999 CDS partnerships whose limited partners wished to participate in Add-On. This was accomplished through three agreements executed in July 2000, all of which were signed by both SMITH and defendant CHARLES BOLTON. BCP thereafter served as the general partner for all the CDS partnerships that implemented Add-On shelters, and ensured that all the necessary steps were executed on behalf of each one.

44. During the marketing of CDS Add-On in 2000, the E&Y defendants took additional steps to ensure that the true motivation behind the strategy was not revealed. A PowerPoint presentation was created by an individual outside the VIPER/SISG group, to illustrate the inter-relationship between CDS and CDS Add-On, and it was distributed to PFC personnel. In a series of emails that followed, defendant ROBERT COPLAN expressed concern that the PowerPoint presentation would undermine the story the conspirators had constructed to establish a business purpose for the strategy, and would thus reveal the tax motivation behind it:

a) On June 14, 2000, COPLAN sent an email to defendants BRIAN VAUGHN and RICHARD SHAPIRO, explaining that the Add-On strategy would "lose all of its business purpose if it is reduced to steps in a PowerPoint slide. The tax objective will appear to be the driving force rather than the money manager's interest in consolidating the accounts."

b) The same day, COPLAN sent an email to all the PFC personnel who had received the PowerPoint presentation, stating that the slides were for internal use only, and were not to be shown when presenting CDS to clients. COPLAN cautioned, "There should be no materials in the client's hands – or even in their memory – that describe CDS as a single strategy that includes the Add-on feature."

c) COPLAN then wrote to the individual who had prepared the PowerPoint slides:

> I hope you can understand the problem with portraying the strategy
> as an integrated transaction designed to produce a capital gain
> deferral. If these slides ever made their way to the IRS . . . the
> entire business purpose argument that gives us the ability to
> distinguish this from COBRA would be out the window. Since we

-31-

got the internal OK to do this add-on feature on the basis that there
is a much stronger business purpose than we had with COBRA,
doing anything to undermine that business purpose would be
creating unnecessary risk for our clients and unnecessary risk for
the PFC practice.

45.    In an email to defendant ROBERT COPLAN, defendant RICHARD

SHAPIRO also expressed his concern about linking the two strategies, stating, "I remain

concerned of the formal pre-wired tie-in to cobra.  I think it adversely impacts the story that we

can tell regarding the purpose of the transaction."

46.    In addition to offering the Add-On shelter to partnerships that had been

created in order to participate in CDS, the E&Y defendants offered Add-On to several existing

entities that were genuinely engaged in the business of trading options, but which had not

participated in the CDS tax shelter.  Representatives of these entities  met with E&Y personnel,

and were offered the opportunity to reduce and defer the owners' income tax liabilities by

acquiring pairs of digital currency options, which would ultimately be contributed to BCPT&I,

together with the digital option pairs acquired by the CDS partnerships.  Several such entities

agreed to participate.

47.    In July and August 2000, after pairs of digital options were acquired for

the various Add-On participants, defendant CHARLES BOLTON signed documents directing

that all the digital option pairs be transferred from accounts held by the CDS partnerships to an

account held by BCPT&I.  BOLTON also caused the digital option pairs purchased by the

entities described in paragraph 46, above, to be transferred from accounts held by those entities

to the account held by BCPT&I.

-32-

48.    After the digital option pairs had all been transferred to BCPT&I,

additional steps were taken to further deceive the IRS about the reason the clients entered into

the Add-On transaction.  For example, in November 2000, the conspirators crafted a letter for

Add-On clients to submit to BCP, expressing either interest or disinterest in participating in a

"second round of digital option purchases."  In reality, there was no plan for BCP to engage in a

"second round of digital option purchases," and this letter was designed purely to create the false

impression that the decision of the particular Add-On clients to withdraw from BCPT&I or to

remain as members – a decision that would determine whether each client's artificial tax loss

would be triggered in 2000 or 2001 – was made for business reasons rather than tax reasons.  The

real purpose of the "second round of digital option purchases" letter is illustrated in emails sent

by defendant ROBERT COPLAN to PFC personnel whose clients had implemented Add-On

transactions, as well as to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and

BRIAN VAUGHN.  In an email dated November 8, 2000.  COPLAN explained:

> Belle Six has sent you a letter (sample below) intended for each of
> your CDS Add-On clients.  The letter mentions that the Bolton
> LLC into which the . . . trading account was transferred is
> considering doing a second round of digital option trading.  The
> client is offered the option of declining to participate in this digital
> activity, in which case he is to notify Bolton (Belle Six) by written
> reply, thereby triggering the termination of their partnership's
> interest in the LLC. . . .  Those of you advising clients whose CDS
> partnerships will remain active into 2001 to maintain deferral
> should be aware that the letter does not mean that [Bolton] will
> **actually** be investing in new digitals – only that they are
> **considering it.**

One recipient of COPLAN's email who was apparently unsure how to advise his client

responded:

-33-

> Our client ... is a CDS 2000 client (with add on) – we do not want
> to redeem the LLC interest and trigger the loss until 2001 (when
> the capital gain from the CDS 2000 will result). Therefore, I
> assume that our client should not sign the letter (even though they
> are not necessarily interested in doing more digitals for investment
> purposes). Correct?

COPLAN replied, "You are correct. The only clients who should sign the letter are those who want to be redeemed out of the LLC this year. The fact that your client does not sign the letter does not mean that more digitals will in fact be acquired."

49.     Steps were also taken to conceal from the IRS the fact that the "loans" purportedly extended in connection with the Add-On transaction were not real loans but were instead "book entries" made so that the Add-On clients would have sufficient basis in their CDS partnerships to deduct their Add-On tax losses. After the financial institution that had supposedly funded the "loans" provided a sample statement reflecting interest payments to and from the partnerships, Belle Six, a co-conspirator not named as a defendant herein, commented on the format of the statement in an email defendant CHARLES BOLTON and others within the Bolton companies:

> I like that we have statements that show the date of the loan . . .;
> I like that we can see both interest earned/paid. The thing that
> concerns me is that on one statement we are showing that we took
> out a loan that is 100% fully collateralized. In other words, we
> have made it easy to ask the question, "What is the purpose of the
> loan?" I have copied BV to ask his opinion.

Defendant BRIAN VAUGHN responded to Belle Six in an email she forwarded to BOLTON and the others. VAUGHN stated:

> I agree with your comments. The clients should love this format. It is
> very easy to follow. However, I don't think [the Law Firm A lawyer]
> would want to see this schedule nor the IRS. It clearly demonstrates the
> loan is used to obtain tax basis and not for investment. . . . Maybe if we
> could demonstrate the client is staying in "cash" for a short period of time
> . . . it would disguise the tax basis loan issue.

50.     In addition, with knowledge that the financial institution that extended the

so-called "loans" would not actually allow real funds to be used by the partnerships, defendant

CHARLES BOLTON sent a letter to the financial institution that was designed to conceal that

fact. By pre-arrangement with the financial institution, BOLTON's letter said:

> It is the intention of BCP to utilize the proceeds of these loans to invest in
> securities and trading strategies other than [financial institution's] paper.
> As such, we would like to inquire on [your] willingness to remove some of
> the restrictions that are currently in place with regards to the proceeds of
> the loan. It is the intent of BCP to handle each partnership on a case by
> case basis. Please let us know your decision on our request as soon as
> possible as it is our desire to move forward with these trading strategies
> promptly.

A representative of the financial institution then assisted in concealing that the loans were not

genuine by responding:

> I am in receipt of your letter dated February 16, 2001. Let me
> assure you that [financial institution] will be flexible as possible
> with transactions of the various CDS partnerships. We will review
> each request on a case by case basis. Please consider me as your
> point person for your requests and I will review each one
> personally.

51.     As part of executing the fraudulent Add-On tax shelter, the

conspirators arranged for Add-On clients to sign representation letters prepared by Law Firm A,

which contained false and misleading factual representations that could be, and were,

-35-

incorporated into Law Firm A's Add-On opinion letters. For example, each client signed a document stating, among other things, that the client regarded the various activities of the partnership – specifically including the client's "investment" in BCPT&I – as comprising "one coherent business philosophy." In truth, as the conspirators well knew, the acquisition of the digital option pairs and the contribution of those option pairs to BCPT&I was not an "investment" at all, and was not part of any "coherent business philosophy."

52. As part of executing the fraudulent CDS Add-On tax shelter, defendant CHARLES BOLTON also signed representation letters prepared by Law Firm A, which contained false and misleading factual representations that could be, and were, incorporated into Law Firm A's opinion letters. For example, with knowledge that no genuine "loan proceeds" were available for use by the partnerships that participated in Add-On, BOLTON signed documents which stated:

> I intend to utilize Loan funds, as appropriate, to leverage the existing trading programs of the Partnership and/or invest in other programs, designed to yield returns in excess of the cost of funds while minimizing risk to capital, such as strategic investments in sovereign debt with manageable currency risk.

53. In order to persuade the IRS that the tax results achieved through the Add-On strategy were allowable, and to avoid the imposition of penalties on clients if the IRS were to disallow those results, the defendants and their co-conspirators caused Law Firm A to issue opinion letters which they knew contained false and fraudulent statements and omitted material facts, including but not limited to the following:

a)    The opinions stated that "organization of the LLC was based upon probability analysis and engaging a well reputed expert in the largest and most active trading market in the world . . . in order to profit from a trading program," when in reality, BCPT&I was organized at the behest of the E&Y defendants, who recognized that the purported "trading program" carried no chance of generating a profit, but would generate tax benefits for the clients and fees for the conspirators.

b)    The opinions stated that "[n]one of the business conducted by the Partnership or the LLC [had] a predetermined outcome" and that "[n]one of the transactions . . . [were] prearranged or structured to yield a predetermined economic result," when in reality, E&Y had marketed to its clients – and the clients had paid fees to obtain – a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

c)    The opinions stated that the partnership's "decision to maintain an investment in the LLC or terminate such investment [was] no different than any other investment decision exhibited by the Partnership," when in reality, the partnership's decision to terminate its membership in BCPT&I was not an investment decision at all, but was based solely on the timing of desired tax losses.

d)    The opinions stated that the business purpose of BCPT&I was "asset appreciation," when in reality, the digital option pairs contributed to BCPT&I were likely to expire "out of the money," and they carried no practical possibility of a profit for the clients even if they expired "in the money."

e)    The opinions stated that the loan funds obtained in connection with the transaction would be used "to opportunistically invest in trading or other programs," and

-37-

accordingly, that the loan would likely be treated as a "genuine indebtedness."

    f)  The opinions failed to disclose that the purpose for entering into the Add-On transaction was for participating E&Y clients to obtain tax benefits, and that the fees associated with the transaction were calculated on the basis of the intended tax losses to be generated.

    g)  The opinions failed to disclose that they were rendered by an attorney who had assisted the defendants in designing and implementing the transaction, and therefore were not independent.

### The Fraudulent PICO Shelters

    54.  PICO was marketed and sold during 2000 and 2001. E&Y implemented approximately 96 PICO transactions for approximately 150 wealthy individuals. E&Y generated more than $56 million in fees from PICO, charging its clients approximately 2% of the tax losses the clients sought to generate. Each PICO client was provided with a "more likely than not" opinion letter from one of two law firms, Law Firm C and Law Firm D; the fees for those letters ranged between $50,000 and $100,000, depending on the size of the transaction.

    55.  The objective of PICO was to defer taxation and, in some cases, to convert ordinary income into capital gains, thus reducing the client's tax rate. Within a period of a few months, a PICO client would follow a pre-planned series of steps, and generate artificial losses that could be used to defer taxes indefinitely on the income the client wanted to shelter.

56.    PICO included the following essential steps:

a)    A client seeking to defer tax liability would form an S-Corporation (a "Personal Investment Corporation," or "PICO"), together with one or two individuals affiliated with an entity which described itself as an "investment advisor," and which purported to have special trading expertise ("Company Z"). The client was a 20% shareholder in the PICO, and the other individuals were 80% shareholders ("the Company Z shareholders" or the "majority shareholders"). The PICO client funded the S-Corporation with an amount equal to approximately 4% of the tax loss the client wanted to generate (in other words, 4% of the income the client wished to shelter from taxes).

b)    Company Z would then use those funds to engage in trading activity, entering into financial instruments commonly known as "straddles." The "straddles" were designed to generate essentially off-setting gains and losses, which could be realized for tax purposes, or "triggered," separately. By pre-arrangement, the trading would be carried out for approximately 60-90 days, and then the gains would be triggered. When that occurred, 80% of the gains would be allocated to the majority shareholders for tax purposes, and only 20% of the gains would be allocated to the client.

c)    By further pre-arrangement, the client would then buy out or "redeem" the Company Z shareholders from the PICO. At that point, the client would be the 100% shareholder. Once the client was the 100% shareholder, the losses would be triggered, and 100% of the losses (an amount roughly equivalent to the amount of income the client was seeking to shelter) would be allocated to the client for tax purposes. These losses were artificial losses, in that there were no corresponding economic losses suffered by the client.

-39-

d)    In order for the client to claim the full benefit of the losses generated, the client would then contribute additional assets to the PICO entity. As long as the additional assets remained in the PICO entity, the tax liability on the client's income would be deferred. When the assets were removed from the entity, those assets would be taxed at the capital gains rate.

57.    As the conspirators knew, in order for the PICO strategy to survive IRS scrutiny, it required a non-tax "business purpose." With knowledge that the true motivation behind the strategy was for the clients to obtain tax benefits, the conspirators developed a false cover story to explain to the IRS – if the client were audited – why the client created an S-Corporation together with the Company Z shareholders, only to "buy out" those shareholders after 60-90 days. According to the cover story, each client formed an S-Corporation because the client wanted to use that entity as their principal investment vehicle, and because the client wanted to achieve asset protection and estate planning objectives. The client included the Company Z shareholders in the S-Corporation, according to the cover story, in order to "try out" Company Z's trading strategy, and the client intended to make a decision at the end of 60 or 90 days -- based on trading performance -- whether to continue with that strategy. According to the story, if the client was satisfied with the trading strategy, the client would buy out the other shareholders, and then enter into a two-year asset management agreement with Company Z, or with one of Company Z's affiliates, so that the client could continue to enjoy the benefit of Company Z's special trading expertise.

58.    In addition to developing the false cover story, the conspirators took other steps to conceal from the IRS the fact that PICO was primarily, if not exclusively, tax-motivated,

-40-

and that it was designed, marketed and implemented as a pre-planned series of steps. Among

other things:

a)    The E&Y defendants developed and used promotional materials

that referred to PICO as "a long-term personal investment vehicle, integrating investment

management services with estate planning and asset protection services."

b)    Defendant ROBERT COPLAN directed that no promotional

materials be left with clients, in order to prevent those materials from falling into the hands of the

IRS. In an email sent in June 2001 to PFC personnel, as well as to defendants MARTIN

NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, COPLAN stated, "PICO slides

are not to be left with clients, and this is a policy we must all adhere to. This is ultimately for the

client's protection." In a later email, also sent to PFC personnel and to his co-defendants,

COPLAN remarked that "a fax of the materials to certain people in the . . . government would

have calamitous results," and he urged, "Please take us seriously when we instruct that you not

leave PICO materials behind at your presentations. . . . Impress upon [prospective PICO clients]

that it [is] for their protection should they proceed with the strategy that we are not leaving them

behind (i.e., in the event of an audit)."

c)    Defendant ROBERT COPLAN opposed a proposal by one PFC

professional to provide clients with a work plan that laid out the steps of the transaction. In an

email copied to defendant RICHARD SHAPIRO, COPLAN stated, "[A]fter we go to the trouble

to make sure the client does not have any documents that walk through the steps of the

transaction, I cannot imagine that we would want to hand him a work plan that shows each

minute step including the redemption of the S shareholder. I would strongly advise against

providing a written document to the client that lays out these steps as a prearranged plan."

        d)      Defendant ROBERT COPLAN directed that a promotional brochure developed by Company Z, and biographical information concerning Company Z's officers, be provided not only to prospective PICO clients, but also to clients who had already completed PICO transactions. He explained that these documents "convey necessary information for the client to have made an informed decision to embark on a new investment program with [Company Z]."

        e)      Although E&Y's fee for the PICO transaction was calculated as approximately 2% of the loss the client wished to generate, defendant ROBERT COPLAN directed that a fee of only $50,000 be listed in the client's engagement letter.

        f)      The conspirators arranged for the balance of E&Y's fee to be paid by the client to Company Z or to one of its affiliates, and for Company Z's affiliate then to pay the remainder to E&Y. In order to justify such large payments from Company Z's affiliate to E&Y, the conspirators created a phony contract under which E&Y claimed to have performed consulting services to the affiliate. Those contracts -- which were actually created and signed well after most of the clients' PICO fees had already been passed through the affiliate to E&Y -- were back-dated in order to make this discrepancy less obvious. Defendant RICHARD SHAPIRO's concern that the so-called "consulting contract" for the 2000 PICO transactions had not been executed as of April 2001 was reflected in an email he sent to individuals at Company Z and Law Firm C, in which he stated, "I STILL DO NOT HAVE THE TAX CONSULTING AGREEMENT FROM LAST YEAR. WITH MOST OF THE PAYMENTS MADE UNDER THAT AGREEMENT ALREADY, DON'T YOU THINK WE (AND YOUR CLIENTS)

SHOULD HAVE A FINAL DRAFT THAT CAN BE SIGNED??????? WE MUST HAVE SOMETHING FOR OUR FILES."

g) After it became apparent that PICO clients were not inclined to continue conducting trading activities in their PICO entities after redeeming the Company Z shareholders, the E&Y defendants encouraged them to do so in order to protect the clients' claims that the PICO transaction was not tax-motivated. In a March 2001 email to PFC personnel, with copies to his three E&Y co-defendants, defendant ROBERT COPLAN explained, "When the PICO strategy was developed, E&Y and [Company Z] understood that the client's representations regarding his non-tax investment motives and expectation of a pre-tax profit would depend on maintaining trading activity after the 80% shareholders were redeemed." COPLAN observed that this was apparently "not the preferred approach of clients," and therefore, that PFC personnel had to "establish some guidelines and properly manage client expectations[.]" The problem continued; a few months later, COPLAN followed up with a similar email, reiterating the need for clients to engage in trading activity in their PICO entities, and stating, "Because we see reports that this is not the direction certain clients are headed in, we feel it necessary to establish some guidelines."

59. In order to persuade the IRS that the tax results achieved through the PICO strategy were allowable, and to avoid the imposition of penalties on clients if the IRS were to disallow those results, the conspirators arranged for Law Firm C and Law Firm D to provide the clients with opinion letters. The E&Y defendants and their co-conspirators knew these opinion letters contained false and fraudulent statements and omitted material facts, including but not limited to the following:

a)      The opinion letters stated that the PICO S-Corporations were not formed to avoid or evade federal income taxes, but were instead designed to facilitate investment activities, provide asset protection and achieve estate planning objectives.  In reality, as the conspirators well knew, the S-Corporations were formed precisely so that clients could avoid or evade taxes.

b)      The opinion letters stated that the Company Z shareholders became investors in the various PICOs in order to demonstrate the potential return available through interest rate arbitrage trading activity, when in reality, this step was necessary to accomplish the desired tax results.

c)      The opinion letters stated that the trading strategy was not designed to produce a predetermined result, when in reality, E&Y had marketed to its clients, and the clients had paid fees to E&Y and Company Z to obtain, a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit.

d)      The opinions issued by Law Firm C failed to disclose that they were rendered by an attorney who had assisted the E&Y defendants and the principals of Company Z in designing, marketing, and implementing the transaction, and therefore were not independent.

### The IRS's 2002 Voluntary Disclosure Initiative

60.      In or about December 2001, the IRS announced a program under which taxpayers who had engaged in tax shelters could voluntarily disclose those transactions to the IRS, in exchange for amnesty from penalties that might otherwise be imposed if the IRS were to

audit the transactions and find a tax underpayment. In order to qualify for the program, taxpayers were required to disclose the transaction to the IRS, and to include in their disclosures, among other things, a statement describing the "material facts" of the transaction; the names and addresses of parties who had promoted, solicited or recommended the transaction to the taxpayer, and parties who had collected fees from the transaction; a statement agreeing to provide various documents and materials relating to the transaction, including marketing materials and legal opinions; and a statement signed by the taxpayers, under penalties of perjury, that the taxpayers had examined their disclosures, and that to the best of their knowledge and belief, the disclosures contained all the relevant facts and were true, correct and complete.

   61. During 2002, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO prepared, and assisted in preparing, templates that could be used by E&Y clients who had engaged in tax shelters, and who wished to participate in the IRS's voluntary disclosure initiative in order to eliminate the possibility of IRS penalties. Although COPLAN, NISSENBAUM and SHAPIRO knew that participation in the program required the submission of a "true, correct and complete" disclosure to the IRS of "all relevant facts" in a statement that would subject their clients to penalties of perjury, they drafted template disclosure letters that contained many of the same false and fraudulent statements that had previously been included in transaction documents and opinion letters, and omitted many of the same material facts. Tax shelter clients who participated in the voluntary disclosure initiative thereafter submitted false, fraudulent and incomplete statements to the IRS.

## The E&Y Promoter Penalty Audit

62.      In or about April 2002, the IRS began an examination of whether E&Y

had complied with various legal requirements applicable to the firm's tax shelter activities.  In

connection with that examination – commonly referred to as a "promoter penalty audit" – the

IRS sought documents and sworn testimony from individuals knowledgeable about the

VIPER/SISG tax shelters.  In June and August of 2002, defendants ROBERT COPLAN,

MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN appeared before the

IRS to answer questions.  After being placed under oath, they sought to obstruct and impede the

IRS by providing false and misleading testimony concerning the origin, design, marketing and

implementation of E&Y's tax shelters.

a)      Among other things, COPLAN provided the following false

and misleading testimony: that E&Y had no involvement in the operation of the CDS trading

partnerships; that the CDS clients were not sure whether the CDS swaps would terminate early,

and thus did not know whether the income they received in the second year of the swap would be

characterized as capital gains; that the fees charged to CDS clients were "fixed fees" rather than

fees calculated based on a percentage of the tax benefits; that when E&Y became involved with

CDS Add-On, the CDS partnerships were already planning to consolidate digital options in a

single LLC, and that E&Y learned about the plan as a "fortuitous circumstance";  that no

promotional materials had been distributed or shown to CDS Add-On clients because COPLAN

and others "didn't think the transaction was that complicated"; that the fees paid by the PICO

investment advisor to E&Y were paid "for consulting with them on the tax aspects of the PICO

transaction"; and that the reason an S-Corporation was used for PICO instead of a partnership

-46-

was that clients viewed the S-Corporation as a "good family investment vehicle."

        b)      Among other things, VAUGHN provided the following false and misleading testimony: that the VIPER/SISG group was not involved in the wide-spread marketing of tax shelters, but instead merely responded to questions and proposals that came from clients; that the CDS Add-On transaction was brought to E&Y's attention by defendant CHARLES BOLTON, who had already created a fund, and had offered E&Y's clients an opportunity to participate in that fund; that the digital options used in the Add-On transaction were purchased "from the investment standpoint," and were "just part of [the client's] investing"; that the fees charged by E&Y for the digital option transactions were "fixed fees" calculated based on E&Y's assessment of how much time would be spent by particular E&Y personnel involved with a particular transaction for a specific client; that E&Y did not set fees based upon a percentage of tax results; that E&Y "typically" encouraged its clients to use their own counsel, and recommended counsel if the clients felt their own counsel were "not competent in digital option taxation"; that the VIPER/SISG group maintained no database of documents relating to its tax shelters; that E&Y did not develop its own brand of digital option trade, and that there was "no tax strategy, per se, that was developed internally by E&Y's individual tax practice"; that there were no predetermined tax benefits for the Add-On strategy, and that "it was very difficult" to estimate the Add-On tax benefits until after the transactions were complete; and that he could not recall the nature of COPLAN's involvement in the Add-On strategy, or that SHAPIRO provided the subject matter expertise for the digital option transactions.

        c)      Among other things, NISSENBAUM provided the following misleading testimony: that the CDS partnership was a "trading partnership"; and that the

partnership "would be trading in short-term securities to get as much short-term profit as possible."

         d)      Among other things, SHAPIRO provided the following false and misleading testimony: that E&Y "received fees for tax consulting services" provided to Company Z in connection with the development of PICO; and that COBRA was designed to provide an investor with the ability to obtain a return of approximately 31% with "a probability of success of just under 40%."

### The BCP Promoter Penalty Audit

63.      In or about May 2004, the IRS began an examination of whether BCP had complied with various legal requirements applicable to the firm's tax shelter activities. In connection with that promoter penalty audit, the IRS sought documents and information from BCP. In responding to those requests for information and documents, representatives of BCP produced to the IRS various false and fraudulent documents, including opinion letters issued by Law Firm A for the CDS and Add-On, representations letters relating to the opinions issued for CDS and Add-On, and loan agreements, notes and guarantees relating to Add-On.

### IRS Examinations of the Various Tax Shelters

64.      As a result of information provided in connection with the voluntary disclosure initiative, as well as information produced by E&Y and the Bolton companies during the promoter penalty audits, and in taxpayer audits, the IRS undertook detailed examinations of many of the CDS, COBRA, CDS Add-On, and PICO shelters. In connection with these examinations, the IRS sent Information Document Requests ("IDRs") to many of

E&Y's individual tax shelter clients, and to many of the entities created by the conspirators in order to execute the tax shelters. Those IDRs sought additional information, and requested production of various documents. Defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO, together with others at E&Y, participated in the production of information and documents to the IRS in response to those IDRs. Defendant CHARLES BOLTON, together with others at the Bolton companies, also participated in the production of information and documents to the IRS in response to those IDRs. In that process, many of the false and fraudulent explanations and cover stories that had been created by the conspirators to conceal the tax motivations behind the shelters were presented to the IRS, and many of the false and fraudulent documents that had been created by the conspirators to conceal those tax motivations – including opinion letters and correspondence – were produced to the IRS. The IRS also took sworn testimony from various individuals involved in the marketing and implementation of the shelters, including clients, financial advisors to clients, E&Y personnel, and defendants DAVID L. SMITH and CHARLES BOLTON.

65.    Represented by attorneys and professionals provided by E&Y, various tax shelter clients and their financial advisors gave false and misleading testimony and statements to the IRS concerning, among other things, the clients' motivations for entering into the tax shelter transactions in question.

66.    On or about December 9, 2003, defendant DAVID L. SMITH gave sworn testimony to the IRS concerning one of the CDS transactions implemented in 1999 by PCMG. Among other things, SMITH falsely testified that he not explained the tax ramifications of CDS to the bank that implemented the transaction, and that he had not received any money from

defendant CHARLES BOLTON in connection with CDS. In reality, SMITH had explained the

tax ramifications to the bank, and BOLTON had paid SMITH $3.75 million to license CDS.

67.      On or about April 12 and 13, 2005, defendant CHARLES BOLTON

gave sworn testimony to the IRS concerning two CDS transactions implemented by BCP in

2000. Among other things, BOLTON falsely testified that E&Y never indicated that the CDS

swaps would terminate early; that the decision to terminate the swaps was based on "economics";

that there was no understanding or agreement – either written or non-written – that the swaps

would terminate early; and that he did not recall what tax benefits CDS clients could receive

based on their loans.

### The E&Y Partners' Own Fraudulent Tax Shelter
### (The "Tradehill" Transaction)

68.      In addition to designing, marketing and implementing fraudulent tax

shelters for clients and prospective clients of E&Y, defendants ROBERT COPLAN, MARTIN

NISSENBAUM and RICHARD SHAPIRO developed and utilized a tax shelter to evade their

own taxes, and assisted eight other E&Y partners to do the same. The strategy they employed

was a short option strategy, similar to a COBRA shelter.

69.      In or about late 1999 or early 2000, E&Y announced a proposal to sell its

global consulting business to a French company called Cap Gemini. In that transaction, E&Y

partners would receive shares of stock in the new company. Those shares would be denominated

in euros, and would not be transferable for a period of time that was unknown, but that was

expected to exceed four years. Although the stock received by the partners could not be sold, the

E&Y partners were told that their receipt of the stock would constitute income on which they

would be taxed in 2000. Accordingly, in order to assist the partners in paying their tax liabilities on the stock received, E&Y proposed to sell some of the Cap Gemini stock at the time of the transaction, and to give each partner – in addition to shares of Cap Gemini stock – cash that could be used by that partner to cover his or her 2000 personal income tax liability generated by receipt of the stock.

      70.     After a vote of E&Y's partners, the transaction took place in or about May 2000, and on or about May 23, 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, as well as other E&Y partners, each received a distribution of Cap Gemini stock. An amount of cash was set aside by E&Y for their use in paying income taxes on the stock they received.

      71.     Upon learning of the intended Cap Gemini transaction, defendant MARTIN NISSENBAUM began discussing with other E&Y partners the possibility of using a tax shelter to eliminate the income tax liability arising from their receipt of the Cap Gemini stock. By late October 2000, a group of eleven E&Y partners, including defendants ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, had decided to form an entity called Tradehill Investments, LLC ("Tradehill"), and to use Tradehill to carry out a transaction similar to COBRA, thereby eliminating all or most of their tax liability on the Cap Gemini stock ("the Tradehill transaction"). The three defendants undertook to act as representatives for the other E&Y partners.

      72.     In order to execute the transaction, defendant MARTIN NISSENBAUM, working in conjunction with a tax shelter promoter and with attorneys from Law Firm D, created Tradehill, in which all eleven E&Y partners were members. The Operating Agreement for

Tradehill falsely stated that Tradehill was organized "for investment purposes." The defendants created a second entity called Churchwind Investments, LLC ("Churchwind"), which was wholly owned by Tradehill. The Operating Agreement for Churchwind – which was signed by NISSENBAUM, as well as by defendants ROBERT COPLAN and RICHARD SHAPIRO – falsely stated that Churchwind was organized "for investment purposes."

73.    The eleven members of Tradehill collectively contributed $350,000 in cash, and on or about November 1, 2000, defendant MARTIN NISSENBAUM caused Churchwind to acquire three almost completely offsetting pairs of euro/dollar currency options. The premiums paid for the three long options totaled $25 million, but the actual cost to the partners (the "net premium") was only $350,000. The three option pairs all had different maturity dates, one in April 2001, one in May 2001, and one in June 2001.

74.    On or about November 13, 2000, defendant MARTIN NISSENBAUM, acting on behalf of the group, caused Tradehill to contribute the three pairs of currency options to an entity called AD International FX Fund, LLC ("ADFX"), in exchange for 90% ownership of ADFX. The other two owners of ADFX were tax shelter promoters who had contributed a total of $30,000 in cash to the entity.

75.    In or about mid-December 2000, ADFX closed out one of the euro/dollar option pairs that had been contributed by Tradehill, and purchased shares of stock. Then, on or about December 19, 2000, defendant MARTIN NISSENBAUM caused Tradehill to resign from ADFX in exchange for stock, dollars and euros worth approximately $187,246. At that time, none of the three option pairs contributed to ADFX by Tradehill was "in the money," and the maturity dates of the three options were approximately four, five and six months away.

-52-

76.    On or about December 26, 2000, defendant MARTIN NISSENBAUM caused Tradehill to distribute the stock it had received upon resignation from ADFX to two new entities, Hiddenbrook Holding, LLC ("Hiddenbrook"), and Greenoak Holdings, LLC ("Greenoak"). Hiddenbrook – which had been created only days earlier – had five members, including defendants MARTIN NISSENBAUM, ROBERT COPLAN and RICHARD SHAPIRO. The members of Greenoak – which had also been created only days before – were the other six E&Y partners. The same day, NISSENBAUM directed the immediate sale of the stock distributed to Hiddenbrook, and a member of Greenoak directed that Greenoak's shares be sold. The shares were sold the following day, triggering artificial losses.

77.    From in or about December 2000 through in or about mid-April 2001, an attorney at Law Firm D, working together with defendant MARTIN NISSENBAUM, drafted a legal opinion. The opinion was intended to be used to support the position that the losses triggered by the sale of stock by Hiddenbrook and Greenoak could be used by the eleven E&Y partners to eliminate the tax liability related to their Cap Gemini stock, and to protect the eleven partners against IRS penalties.

78.    In connection with the drafting of that opinion, defendant MARTIN NISSENBAUM assisted in preparing a "Certificate of Facts." The "Certificate of Facts" – which contained false and fraudulent statements – was intended to be incorporated by reference into Law Firm D's opinion, and was intended to deceive the IRS into believing that the E&Y partners executed the various steps of the Tradehill transaction for investment reasons rather than tax reasons. Among other things, the document falsely stated: 1) that "[t]he purpose and purchase and sale of [the] Options [was] that Tradehill believed that such investments could result in

-53-