IRS by providing false and misleading testimony concerning the origin, design, marketing and implementation of E&Y's tax shelters.

a)      Among other things, COPLAN provided the following false and misleading testimony: that E&Y had no involvement in the operation of the CDS trading partnerships; that the CDS clients were not sure whether the CDS swaps would terminate early, and thus did not know whether the income they received in the second year of the swap would be characterized as capital gains; that the fees charged to CDS clients were "fixed fees" rather than fees calculated based on a percentage of the tax benefits; that when E&Y became involved with CDS Add-On, the CDS partnerships were already planning to consolidate digital options in a single LLC, and that E&Y learned about the plan as a "fortuitous circumstance"; that no promotional materials had been distributed or shown to CDS Add-On clients because COPLAN and others "didn't think the transaction was that complicated"; that the fees paid by the PICO investment advisor to E&Y were paid "for consulting with them on the tax aspects of the PICO transaction"; and that the reason an S-Corporation was used for PICO instead of a partnership was that clients viewed the S-Corporation as a "good family investment vehicle."

b)      Among other things, VAUGHN provided the following false and misleading testimony: that the VIPER/SISG group was not involved in the wide-spread marketing of tax shelters, but instead merely responded to questions and proposals that came from clients; that the CDS Add-On transaction was brought to E&Y's attention by the CDS general partner, who had already created a fund, and had offered E&Y's clients an opportunity to participate in that fund; that the digital options used in the Add-On transaction were purchased "from the investment standpoint," and were "just part of [the client's] investing"; that the fees

-37-

charged by E&Y for the digital option transactions were "fixed fees" calculated based on E&Y's

assessment of how much time would be spent by particular E&Y personnel involved with a

particular transaction for a specific client; that E&Y did not set fees based upon a percentage of

tax results; that E&Y "typically" encouraged its clients to use their own counsel, and

recommended counsel if the clients felt their own counsel were "not competent in digital option

taxation"; that the VIPER/SISG group maintained no database of documents relating to its tax

shelters; that E&Y did not develop its own brand of digital option trade, and that there was "no

tax strategy, per se, that was developed internally by E&Y's individual tax practice"; that there

were no predetermined tax benefits for the Add-On strategy, and that "it was very difficult" to

estimate the Add-On tax benefits until after the transactions were complete; and that he could not

recall the nature of COPLAN's involvement in the Add-On strategy, or that SHAPIRO provided

the subject matter expertise for the digital option transactions.

        c)      Among other things, NISSENBAUM provided the following

misleading testimony: that the CDS partnership was a "trading partnership"; and that the

partnership "would be trading in short-term securities to get as much short-term profit as

possible."

        d)      Among other things, SHAPIRO provided the following false and

misleading testimony: that E&Y "received fees for tax consulting services" provided to Company

Z in connection with the development of PICO; and that COBRA was designed to provide an

investor with the ability to obtain a return of approximately 31% with "a probability of success of

just under 40%."

## The Fraudulent Tradehill Shelter

51.     In addition to designing, marketing and implementing fraudulent tax shelters for clients and prospective clients of E&Y, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO developed and utilized a tax shelter to evade their own taxes, and assisted eight other E&Y partners to do the same.   The strategy they employed was a short option strategy, similar to a COBRA shelter.

52.     In or about late 1999 or early 2000, E&Y announced a proposal to sell its global consulting business to a French company called Cap Gemini.  In that transaction, E&Y partners would receive shares of stock in the new company.  Those shares would be denominated in euros, and would not be transferable for a period of time that was unknown, but that was expected to exceed four years.  Although the stock received by the partners could not be sold, the E&Y partners were told that their receipt of the stock would constitute income on which they would be taxed in 2000.  Accordingly, in order to assist the partners in paying their tax liabilities on the stock received, E&Y proposed to sell some of the Cap Gemini stock at the time of the transaction, and to give each partner – in addition to shares of Cap Gemini stock – cash that could be used by that partner to cover his or her 2000 personal income tax liability generated by receipt of the stock.

53.     After a vote of E&Y's partners, the transaction took place in or about May 2000, and on or about May 23, 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, as well as other E&Y partners, each received a distribution of Cap Gemini stock.  An amount of cash was set aside by E&Y for their use in paying income taxes on the stock they received.

-39-

54.    Upon learning of the intended Cap Gemini transaction, defendant

MARTIN NISSENBAUM began discussing with other E&Y partners the possibility of using a

tax shelter to eliminate the income tax liability arising from their receipt of the Cap Gemini

stock.  By late October 2000, a group of eleven E&Y partners, including defendants ROBERT

COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, had decided to form an entity

called Tradehill Investments, LLC ("Tradehill"), and to use Tradehill to carry out a transaction

similar to COBRA, thereby eliminating all or most of their tax liability on the Cap Gemini stock

("the Tradehill transaction").  The three defendants undertook to act as representatives for the

other E&Y partners.

55.    In order to execute the transaction, defendant MARTIN NISSENBAUM,

working in conjunction with a tax shelter promoter and with attorneys from Law Firm D, created

Tradehill, in which all eleven E&Y partners were members.  The Operating Agreement for

Tradehill falsely stated that Tradehill was organized "for investment purposes."  The defendants

created a second entity called Churchwind Investments, LLC ("Churchwind"), which was wholly

owned by Tradehill.  The Operating Agreement for Churchwind – which was signed by

NISSENBAUM, as well as by defendants ROBERT COPLAN and RICHARD SHAPIRO –

falsely stated that Churchwind was organized "for investment purposes.

56.    The eleven members of Tradehill collectively contributed $350,000 in

cash, and on or about November 1, 2000, defendant MARTIN NISSENBAUM caused

Churchwind to purchase three almost completely offsetting pairs of euro/dollar currency options.

The premiums paid for the three long options totaled $25 million, but the actual cost to the

partners (the "net premium") was $350,000.  The three options all had different maturity dates,

one in April 2001, one in May 2001, and one in June 2001.

57.     On or about November 13, 2000, defendant MARTIN NISSENBAUM, acting on behalf of the group, caused Tradehill to contribute the three pairs of currency options to an entity called AD International FX Fund, LLC ("ADFX"), in exchange for 90% ownership of ADFX.  The other two owners of ADFX were tax shelter promoters who had contributed a total of $30,000 in cash to the entity.

58.     In or about mid-December 2000, ADFX sold one of the euro/dollar option pairs that had been contributed by Tradehill, and purchased shares of stock.  Then, on or about December 19, 2000, defendant MARTIN NISSENBAUM caused Tradehill to resign from ADFX in exchange for stock, dollars and euros worth approximately $187,246.  At that time, none of the three option pairs contributed to ADFX by Tradehill was "in the money," and the maturity dates of the three options were approximately four, five and six months away.

59.     On or about December 26, 2000, defendant MARTIN NISSENBAUM caused Tradehill to distribute the stock it had received upon resignation from ADFX to two new entities, Hiddenbrook Holding, LLC ("Hiddenbrook"), and Greenoak Holdings, LLC ("Greenoak").  Hiddenbrook – which had been created only days earlier – had five members, including defendants MARTIN NISSENBAUM, ROBERT COPLAN and RICHARD SHAPIRO.  The members of Greenoak – which had also been created only days before – were the other six E&Y partners.    The same day, NISSENBAUM directed the immediate sale of the stock distributed to Hiddenbrook, and a member of Greenoak directed that Greenoak's shares be sold.  The shares were sold the following day, triggering artificial losses.

60.    From in or about December 2000 through in or about mid-April 2001, an attorney at Law Firm D, working together with defendant MARTIN NISSENBAUM, drafted a legal opinion. The opinion was intended to be used to support the position that the losses triggered by the sale of stock by Hiddenbrook and Greenoak could be used by the eleven E&Y partners to eliminate the tax liability related to their Cap Gemini stock, and to protect the eleven partners against IRS penalties.

61.    In connection with the drafting of that opinion, defendant MARTIN NISSENBAUM assisted in preparing a "Certificate of Facts." The "Certificate of Facts" – which contained false and fraudulent statements – was intended to be incorporated by reference into Law Firm D's opinion, and was intended to deceive the IRS into believing that the E&Y partners executed the various steps of the Tradehill transaction for investment reasons rather than tax reasons. Among other things, the document falsely stated: 1) that "[t]he purpose and purchase and sale of [the] Options [was] that Tradehill believed that such investments could result in substantial profits with only limited downside risk"; 2) that Tradehill contributed its membership interest in Churchwind to ADFX to "diversify its risk"; 3) that Tradehill's "primary motivation" in participating in the transaction "was to attain, on a risk-adjusted basis, an attractive return on its investment . . . without regard to tax benefits"; and 4) that "the decision to withdraw from [ADFX] was based on a variety of factors, including anticipated future market conditions, currency exchange rates, interest rates, the availability of alternative investments, and Tradehill's financial situation."

62.    In or about April 2001, Law Firm D – which had assisted the defendants in creating the entities used to execute the shelter – issued a back-dated opinion letter to

Hiddenbrook and Greenoak.  The opinion letter incorporated the false statements contained in the "Certificate of Facts" described in paragraph 61, above.  In addition, the opinion letter falsely stated, among other things, that all "pertinent facts" relating to the transaction had been set forth in the opinion.

63.    From in or about April 2001 through in or about October 2001, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO, as well as their eight partners, filed tax returns on which they used the losses generated through the Tradehill transaction to eliminate tax liability on all or most of the income they received in the form of stock and cash from the Cap Gemini transaction.

64.    In or about May 2003, the IRS notified the eleven participants in the Tradehill transaction that their 2000 tax returns were being audited.  In connection with that audit, the IRS sent each of the eleven partners who had participated in the Tradehill transaction an Information Document Request ("IDR #1"), requesting both information and documents. The members of the group made arrangements for an attorney at Law Firm D to represent them in responding.  Defendant MARTIN NISSENBAUM assisted that attorney in drafting responses on behalf of each partner to IDR #1, as well as to a second IDR ("IDR #2") and a third ("IDR #3").  A copy of each partner's letter was sent to defendant MARTIN NISSENBAUM.

65.    The responses to IDR #2 were sent to the IRS on or about September 25, 2003.  Those responses contained false and misleading statements, including but not limited to the following: 1) statements that he and the other E&Y partners had entered into the Tradehill transaction in order to generate profits, when in reality the transaction had no reasonable possibility of generating a profit; 2) a statement that the Tradehill transaction was intended fully

-43-

to hedge the partners' exposure to fluctuation in the euro, when in reality, the transaction had no capacity to do so; 3) a statement that there were no unwritten understandings between the participants in the Tradehill transaction, when in reality, there was an understanding among all the parties to the transaction that the E&Y partners would exit their option positions before the end of 2000, in order to claim tax losses they could use to offset their Cap Gemini income; and 4) a statement that there was no expectation or referral of any future business to Law Firm D, when in reality, in 2001, the defendants referred PICO clients to Law Firm D for opinion letters.

### **Statutory Allegations**

66.     From in or at least early 1998 through at least in or about 2003, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, the defendants,  together and with each other and with others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201 and 7212, and Title 18, United States Code, Section 1001.

67.     It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did defraud the United States and the IRS by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

68.    It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by E&Y's tax shelter clients, themselves, and their partners, in violation of Title 26, United States Code, Section 7201.

69.    It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did corruptly obstruct and impede, and endeavor to obstruct and impede the due administration of the Internal Revenue laws, in violation of Title 26, United States Code, Section 7212(a).

70.    It was a part and an object of the conspiracy that ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, the defendants, and their co-conspirators, unlawfully, wilfully and knowingly would and did make materially false, fictitious, and fraudulent statements and representations in matters within the jurisdiction of the executive branch of the Government of the United States, in violation of Title 18, United States Code, Section 1001.

**Means and Methods of the Conspiracy**

71.    Among the means and methods by which ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, the defendants, and their co-conspirators, would and did carry out the objectives of the conspiracy were the following:

-45-

a)      They would and did design, market and implement tax shelter transactions, and create false and fraudulent factual scenarios to support those transactions, so that wealthy individuals could pay a percentage of their income or gain in fees to E&Y and the other participants in the transactions, rather than paying taxes on that income or gain to the IRS;

b)      They would and did design, market and implement tax shelter transactions in ways that made them difficult for the IRS to detect;

c)      They would and did design, market and implement tax shelter transactions in ways that disguised the fact that the shelters were largely or exclusively tax-motivated, and lacked substantial non-tax business purposes;

d)      They would and did seek to prevent the IRS from learning that they had marketed strategies consisting of pre-planned steps leading to pre-determined tax benefits;

e)      They would and did prepare and assist in preparing false and fraudulent documents to deceive the IRS, including but not limited to, engagement letters, transactional documents, and representation letters;

f)      They would and did assist in crafting legal opinions designed to shield E&Y's clients from penalties, knowing that these opinions contained false, fraudulent and misleading information and omitted other information, all of which was material to a determination of whether the tax results claimed by the clients were allowable;

g)      They would and did prepare and cause to be prepared tax returns that were false and fraudulent because, among other things, they incorporated phony tax losses and thereby substantially understated the tax due and owing by the shelter clients;

-46-

h)      They would and did destroy documents and take other steps to prevent the creation and retention of materials that would reveal to the IRS the true facts surrounding the fraudulent tax shelters;

i)      they would and did provide false information in response to IDRs issued by the IRS in connection with audits of tax shelter transactions;

j)      they would and did draft documents to be submitted by the tax shelter clients to the IRS in connection with the IRS's voluntary disclosure initiative, under penalties of perjury, which they knew contained false statements of material fact; and

k)      they would and did make false and misleading statements, under oath, in connection with efforts by the IRS to ascertain the circumstances surrounding the design, marketing and implementation of the tax shelters.

## **OVERT ACTS**

72.    In furtherance of the conspiracy and to effect the illegal objects thereof, ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, the defendants, and their co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a)      In or about early 1999, defendants ROBERT COPLAN, MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, discussed conducting "box trades" in the CDS trading accounts.

b)      In or about early 1999, defendant BRIAN VAUGHN described CDS to potential clients.

       c)      In or about November 1999, the defendants created and distributed a "COBRA Action Plan," which instructed, "**DO NOT** leave marketing materials with client under any circumstances," and which further instructed, "DO NOT reference tax losses in the engagement letter."

       d)      On or about December 5, 1999, defendant ROBERT COPLAN sent an email to PFC professionals whose COBRA clients had option positions that were "in the money," warning that if the clients cashed out of those positions at too large a discount, they would undermine their tax argument, which was based upon the chance of making a profit in excess of fees.

       e)      On or about February 8, 2000, defendant RICHARD SHAPIRO sent an email to defendants ROBERT COPLAN, MARTIN NISSENBAUM and BRIAN VAUGHN, offering to be involved in CDS sales contacts.

       f)      On or about February 8, 2000, after reviewing a proposed "CDS Action Plan," defendant RICHARD SHAPIRO sent an email to defendants ROBERT COPLAN, MARTIN NISSENBAUM, and BRIAN VAUGHN, among others, expressing his concern about the existence of a document which laid out in writing "all the chapters and verses" of CDS, and which indicated "before the fact" that the swaps would terminate early.

       g)      In or about early 2000, the defendants created and distributed a "CDS Action Plan" which instructed, "**DO NOT** leave marketing materials with client under any circumstances," and which further instructed, "**DO NOT** reference tax losses in the engagement letter."

       h)      On or about February 18, 2000, a co-conspirator not named as a

defendant herein sent an email concerning an economic model prepared for a CDS transaction, stating, "[I]n meeting with the E&Y people on Tuesday, we have a list of things that we would like you to change on the model. . . . We don't want to highlight that we don't anticipate trading profits.  Please remove it from the economic model."

          i)      On or about April 14, 2000, defendant RICHARD SHAPIRO told defendants ROBERT COPLAN, MARTIN SHAPIRO, and BRIAN VAUGHN in an email that it was "essential" to delete from a CDS economic model a footnote stating that the calculations set forth in the model assumed early termination of the swap.

          j)      On or about April 21, 2000, in response to concerns expressed by a PFC practice member that CDS could result in a complete loss of the CDS partnership's capital, thereby exposing the client to personal liability, a co-conspirator not named as a defendant herein explained, "In reality, even if the client loses everything they will not have to contribute any more money."

          k)      In or about early May 2000, in an Instant Message ("IM") conversation between defendant BRIAN VAUGHN and defendant ROBERT COPLAN, VAUGHN told COPLAN about an idea to combine the CDS strategy with the COBRA strategy.

          l)      On or about May 5, 2000, defendant ROBERT COPLAN forwarded his IM conversation with defendant BRIAN VAUGHN to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO.

          m)      On or about June 5, 2000, defendant ROBERT COPLAN sent an email to PFC practice members, announcing the availability of the CDS Add-On strategy, in which he described it as an "indefinite capital gain deferral strategy."

-49-

n)      On or about June 14, 2000, defendant ROBERT COPLAN sent an email to PFC professionals, explaining that if PowerPoint slides setting out the steps of CDS Add-On "ever made their way to the IRS ... the entire business purpose argument that [gave] us the ability to distinguish this from COBRA would be out the window."

o)      On or about July 10, 2000, defendant ROBERT COPLAN drafted a letter to be sent by E&Y to prospective CDS Add-On clients, in which he described the Add-On strategy as a consolidation of a portion of the client's trading account "to further diversify the trading and enhance performance."

p)      On or about August 4, 2000, defendant ROBERT COPLAN sent an email to defendants MARTIN NISSENBAUM, RICHARD SHAPIRO and BRIAN VAUGHN, as well as to PFC practice members, in which he explained that a loan amendment document would highlight for the IRS the issue of whether the CDS clients had personal liability on their CDS loans, and advised them "to dispose of the loan amendment document after you have reviewed it."

q)      On or about November 27, 2000, defendant ROBERT COPLAN sent an email to another PFC partner, with a copy to defendants RICHARD SHAPIRO and BRIAN VAUGHN, explaining that SISG did not leave with clients promotional materials that went through the steps of a strategy, or that highlighted the benefits of a strategy, because "the less evidence there is that the client responded to a tax-savings promotion, the better his argument that there were non-tax motivations guiding his actions."

r)      In or about 2000 and 2001, defendant MARTIN NISSENBAUM participated in presenting the CDS strategy to clients.

-50-

s)    In or about 2000 and 2001, defendant MARTIN NISSENBAUM participated in presenting the PICO strategy to clients.

t)    In or about late 2000, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO signed the Tradehill Operating Agreement and the Churchwind Operating Agreement.

u)    In or about November 2000, defendant MARTIN NISSENBAUM caused the contribution of Churchwind to ADFX.

v)    On or about February 7, 2001, defendant ROBERT COPLAN sent an email to the defendants and to other PFC personnel, explaining that assets placed in the PICO LLC's trading account should be used for trading, and that this needed to be addressed with clients who had "different ideas."

w)    On or about April 15, 2001, defendant ROBERT COPLAN filed his Form 1040 for the year 2000, on which he reported losses he had generated through the Tradehill transaction.

x)    On or about April 16, 2001, defendant MARTIN NISSENBAUM filed his Form 1040 for the year 2000, on which he reported losses he had generated through the Tradehill transaction.

y)    On or about May 17, 2001, defendant RICHARD SHAPIRO met with representatives of the IRS in connection with the audit of three COBRA clients.

z)    On or after May 9, 2001, defendant ROBERT COPLAN signed a consulting agreement between E&Y and an affiliate of Company Z, which was backdated to January 3, 2001.

aa)    On or about May 22, 2001, defendant RICHARD SHAPIRO sent an email cautioning against leaving presentation materials with clients, explaining that in the Minneapolis COBRA audit, the taxpayer had been asked to produce promotional materials.

bb)    On or about May 24, 2001, defendant ROBERT COPLAN sent an email to defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, as well as others, recommending that the CDS partnerships maintain their trading activity through the end of the year in which the CDS swaps terminated, in order to avoid raising an issue with the IRS about whether the CDS partnerships were actually engaged in a trade or business.

cc)    On or about June 6, 2001, defendant ROBERT COPLAN asked an employee of the CDS general partner to consider changing the names of the CDS partnerships so that it would be more difficult for the IRS to identify all the CDS transactions.

dd)    On or about June 28, 2001, defendant BRIAN VAUGHN sent an email to a co-conspirator, stating with respect to a CDS transaction, "We should consider removing the footnote language concerning implied early termination. This could adversely affect our tax situation given the level of audits that are currently in progress. . . . Remember our goal is to convince the agents the client did not have a predisposition of early termination."

ee)    On or about July 12, 2001, defendant ROBERT COPLAN sent an email directing that clients who had already implemented PICO transactions be given a brochure describing PICO, and explaining that the brochure conveyed information necessary "for the client to have made [an] informed decision" to embark on the PICO transaction.

ff)    On or about July 17, 2001, defendant ROBERT COPLAN sent an email directing the recipients immediately to "delete and dispose of" COBRA materials in their

files and their computers.

        gg)     On or about August 16, 2001, defendant RICHARD SHAPIRO filed his Form 1040 for the year 2000, on which he reported losses he had generated through the Tradehill transaction.

        hh)     On or about September 14, 2001, defendant ROBERT COPLAN emailed a form letter to E&Y personnel whose CDS clients might wish to close down their trading accounts, suggesting that the clients use the form letter – which attributed their desire to end their trading activity to the September 11th terrorist attacks – to "document for the file a logical non-tax rationale."

        ii)     On or about October 31, 2001, in response to an email from defendant ROBERT COPLAN inquiring about how to respond to an IDR sent by the IRS in connection with a COBRA audit, defendant MARTIN NISSENBAUM stated, "Never give them more than they ask for.  (That's why we never allow clients to attend examinations, they talk too much)."

        jj)     On or about November 12, 2001, defendant ROBERT COPLAN emailed defendants MARTIN NISSENBAUM and RICHARD SHAPIRO, informing them that the general partner of the CDS partnerships wanted the CDS partnerships shut down almost immediately after termination of the swaps, and asking, "Should we intercede and suggest running another year out with the trading account?"

        kk)     On or about November 12, 2001, defendant MARTIN NISSENBAUM responded to the email sent by defendant ROBERT COPLAN earlier that day, stating, "Yes.  They sound way too anxious to get out."

ll)    On or about November 26, 2001, defendant ROBERT COPLAN sent an email to an E&Y employee, discouraging the use of a document that described SISG's strategies and their accompanying tax benefits, explaining that such documents would provide evidence of their clients' tax avoidance motives, and that SISG's "ultimate goal" was "to make our strategies appear to be investment techniques that have advantageous tax consequences."

mm)    In or about February and March 2002, defendants ROBERT COPLAN, MARTIN NISSENBAUM and RICHARD SHAPIRO drafted and reviewed template disclosure documents that would be used by clients who wished to participate in an amnesty program announced by the IRS.

nn)    On or about June 12, 2002, defendant BRIAN VAUGHN gave false and misleading testimony to the IRS.

oo)    On or about June 20, 2002, defendant ROBERT COPLAN gave false and misleading testimony to the IRS.

pp)    In or about September 2003, defendant MARTIN NISSENBAUM provided false and misleading information to an individual who was preparing responses to IDRs sent by the IRS to the eleven E&Y partners who had participated in the Tradehill transaction.

(Title 18, United States Code, Section 371).

## COUNT TWO

### (Obstruction of the IRS)

The Grand Jury further charges:

73.     The allegations set forth in paragraphs 1 through 65 and 71 are repeated and realleged as if fully set forth herein.

74.     On or about July 17, 2001, in the Southern District of New York and elsewhere, ROBERT COPLAN, the defendant, unlawfully, wilfully, and knowingly did corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the internal revenue laws, to wit, with knowledge that one of E&Y's COBRA transactions was then under audit, and that the IRS had formally requested production of COBRA promotional materials, COPLAN sent an email directing PFC professionals and others throughout the country immediately to "delete and dispose of" COBRA materials in their files and their computers.

(Title 26, United States Code, Section 7212).

## COUNT THREE

### (False Statements To The IRS)

The Grand Jury further charges:

75.     The allegations set forth in paragraphs 1 through 65 and 71 are repeated and realleged as if fully set forth herein.

76.     On or about June 12, 2002, in the Southern District of New York and elsewhere, BRIAN VAUGHN, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, unlawfully, wilfully, and knowingly made

-55-

materially false, fictitious and fraudulent statements and representations, to wit, in connection

with an examination by the IRS of tax shelters marketed by Ernst & Young, VAUGHN gave the

false testimony underlined below:

(Page 22, line 17)


    Q.     How did you get involved in these digital option transactions?

    A.     Mainly from our clients. Our clients, as I mentioned before, were getting
bombarded by a couple of other accounting firms. And they would – it would
bubble up to us, and come to the client service professional, and they'd call and
say, "Hey, look. My client is being called on on these various solutions. We need
an answer. Does it work or doesn't it? And what is the firm's position?" And so

**(a)**             that's how we were first introduced to the concept. Other time – <u>to my
knowledge, there was one other time when a fund was created, and certain of our
high net worth individuals were offered the potential to go into the fund, so that
came through a broker-dealer.</u>


                    * * * *


(Page 31, line 13)


    Q.     [D]o you know anything about the fees that investors paid to enter into these
[digital option] contracts? I already asked about the premium amounts, but do
you know any fees that were paid to [financial institution], fees that were paid to
[bank]? Were there any standard fees?

    A.     Like I said, I think the counterparty did take a fee for the execution. There was a
tax fee for the tax advice, and for – for future examination, if they were to be

**(b)**           examined. <u>We would forecast what we thought our time and expense would be
to go through an examination process with that specific client.</u> So our – there was

a tax fee paid to Ernst & Young, there was a fee paid to the attorney, whichever attorney they chose to issue the tax opinion. And then there was, I'm sure, the investment fees that – whoever the counterparty would charge.

Q.    Was Ernst & Young's fees fixed fees?

**(c)**    A.    It was fixed per client, but they were negotiated fees. <u>As always, we try to start with our 100 percent per diem billing rates, but we never somehow got there. So but on all our solutions, whether it is wealth management, which is our personal CFO service, whether its investment advisory services, we always do a front-end work plan, sort of a budget, on here is the various professionals in the national group, in the local group, in the area groups, what their billing rates are, how much time that we would think to expend on a particular transaction. And then we try to back that into a fixed fee, because we found our clients liked fixed fees</u> rather than open-ending, you know, invoice, invoice me at your will, and it keeps coming. So all of our engagement letters, for whatever we do, is fixed.

* * * *

(Page 49, line 10)

Q.    Who developed the structure ... of the digital currency option trade?

A.    The digital option trade, I believe, was – [Law Firm] actually approached one of our clients with that. . . . [I]t was either [Law Firm], or it was Arthur Andersen had approached one of our clients that had this particular program, then it came bubbling up to us. Then we had to assess whether our client should go into this particular transaction. . . .

Q.    So did E&Y develop its own brand?

**(d)**    A.    <u>No. The only thing we do is, again, we look at the tax issue surrounding how the proposed structure is.</u> And if we can get to a filing position, then we will tell the client service professionals that we believe we can sign this return. But we don't –

**(e)**        we – <u>since day one, the only solutions that I know that we have created ourself is wealth management solutions, investment advisory services, equity risk management services. But there was no tax strategy, per se, that was developed internally by our individual tax practice.</u>

* * * *

-57-

(Page 53, line 4)

    Q.    Are you familiar with [name of the Add-On LLC]?

    A.    [Add-On LLC]?  That sounds like – sounds like one of the funds that [Mr. X] used for one of the, seems like, one of the clients for the swap, but I can't recall specifically.  Sounds like a [Company X] entity.

    Q.    So you don't know anything about the structure of the LLC of [name of the Add-On LLC]?

**(f)**    A.    <u>All I know was to the best of my knowledge, that entity was structured by [Mr. X] as a private offering to clients, whether they were clients of Ernst & Young or clients of, you know, [Mr. X] et cetera, to participate in foreign currency trading.  That's my knowledge of it</u>. . . .  <u>But I know that that was one where [Mr. X] felt that he could take advantage of the dollar-yen movements and some Euro-yen movements, and felt that he came to us and said, look, I've got this private offering, a fund that I want to set up, and do you have any high net worth clients that could participate?  I'm offering it to, you know, sort of a universe of people.  That was my knowledge of it.</u>

* * * *

(Page 61, line 11)

    Q.    Were subject matter specialists involved in the digital currency option trade?

**(g)**    A.    Oh, I'm sure.  <u>That's why I was trying to remember who the right subject matter person on that would have been.</u>  I – but yes.  There had to have been a subject matter expert involved in every – if it was – involved a tax strategy that the client was looking at, then it had to go to the appropriate subject matter expert on that.

* * * *

(Page 67, line 3)

    Q.    Did E&Y ever develop its own investment strategies that it would then pitch to its own clients, similar to the way you described it earlier, that, let's say, Arthur Andersen went to one of your clients?

    A.    Well, we have investment advisory services, which we believe is our propriety [sic] investment advisory solution.  That's where we've gone out and we've contacted what we believe is the best agreed money managers, we got them to

-58-

reduce their minimums that a client could get into that specific manager, and we got them to reduce their fees that they would charge off the street, because we felt our clients – we could bring a lot of clients to them. . . . So that is our investment – when you say have we developed an investment alternative for our clients, that is one that we developed in-house and we are taking out to our clients to market for investment advisory services.

Q.    But the digital currency option trade did not come out of that group?

A.    No.  No.  That was, again, brought to us by an outside organization.

Q.    And who was that?

**(h)**    A.    Again, [Mr. X] came to our clients with a fund to participate in.  That was one instance.  And, again, the other instance is when a client was shown a digital option strategy, and [Bank] had been, you know, the counterparty with that.

* * * *

(Page 70, line 21)

Q.    So it would be someone like [Company X] that would develop [a swap transaction] and bring it to E&Y?

**(i)**    A.    Yeah.  That would be for one instance, yeah.  [Company X] would have a – I mean, because they did.  They created a fund, and they brought it to a client – the client of the firm.  And of course, that client service professional says hey, what do you think of this.  And that's you know, how the process works.

* * * *

(Page 71, line 22)

Q.    Did [Company X] bring . . . the digital currency option trade to E&Y?  Was it [Company X] who approached the client of yours?

**(j)**    A.    [Company X] approached the client with a fund, with a private offering memorandum that dealt with foreign currency trading, which included some, you know – with the digital, whether American, European, it was a foreign currency fund.

* * * *

-59-

(Page 84, line 4)

Q.   How did you – how did E&Y determine its fees when it came – or did it – with its consulting fees for, let's say, is it done on a transaction-by-transaction basis?

A.   Client by client.

Q.   Client by client.  For providing tax advice on –

A.   Yes.

Q.   – let's say, that – the digital currency option trade, the client came to you and said, "Can you look at this and let me know what you think," how would you determine the fees?

**(k)**   A.   <u>Time and expense, and forecasting, again, as I mentioned before</u>.  Part of our engagement was not only to consult with them to give them tax advice on their specific investment, but also to build in, if we thought there was a high likelihood of examination, we were not just going to, you know, bill them again.  So we had to try to best estimate what our fee is going to be, based on the time that we would incur from a national perspective, you know, defending the client.

Q.   And –

A.   Then we would fix – then it would be a fixed fee.

Q.   How would you determine the fixed fee?  Was there any kind of formula used?

**(l)**   A.   Well, again, with each – <u>every time that we go about working on a solution, we come up with a budget, sort of a work plan.  It involves the level of personnel assigned to it, their appropriate billing rate, the hours that we estimate it's going to expend with that particular client, and then we come to our best guess of what that is from a fixed fee standpoint, and the margin that we want, you know, from a business perspective</u>.  If we want a 15 percent margin or 10 percent margin, that affects, obviously, from a pricing standpoint, what we want.  We got to have a business, you know.

Q.   None of that fee was ever based on a tax savings?

**(m)**   A.   <u>No.</u>  We never – our policy as a firm is not to take a percentage of tax savings.  So we, from an individual perspective, – and I can't speak to what other groups in Ernst & Young but only the PFC practice, we take no contingent fees and <u>we don't take a percentage of tax savings</u>.  Now, the fixed fee may be a percentage of their investment, because a lot of times the private offering memorandum will have to state all fees associated with it.  And the normal rule of thumb on how private offering memorandums is always related back to the fixed fee as a percentage of your invested capital.

* * * *

(Page 87, line 8)

> Q.    Let's go back to the [Company X] fund, that type of transaction that then went to your client, and you did your review, came back with a more likely than not, and then determined that it could work for X amount of clients, how would you then bill your time when you presented it to your – the various clients?

**(n)**    A.    Client by client. . . .  <u>So it's all determined in about – the team assigned to that client, how many hours they anticipate there's an amortization of the research and development time, there's forecast for defense.  But really, it's client by client by client, because we don't know how this particular investment is going to fit with their overall financial plan. . . . I have never seen a cookie-cutter deal.  You know, I've never seen, you know, let's just replicate this, because every client's demands are so unique.</u>

* * * *

(Page 100, line 11)

> Q.    Do you know Robert Copeland [sic]?
>
> A.    Yes.  He is our subject matter expert in estate and gift tax area.
>
> Q.    So would he have been involved in this transaction [CDS Add-On]?

**(o)**    A.    If it dealt – <u>maybe tangentially</u>, because his expertise is estate and gift.  I think – I'm sure – I'm sure Bob was involved to some extent.  <u>To what his personal involvement was, I don't know.</u>   Because anything dealing, you know, with a fund that affects a person's gift and estate tax ramifications, definitely Bob could have been called.  . . . <u>Bob probably did get called, but I don't know.  I don't know.</u>

* * * *

(Page 103, line 14)

> Q.    Did E&Y ever come out with a more likely than not conclusion to any deal that he –
>
> A.    One.
>
> Q.    One.  Okay.  Which one?
>
> A.    That was a swap with [Company X].

-61-

Q.     What was [Company X]'s role in the swap?

A.     Execute.  They executed the swap. . . .

Q.     Do you know what type of entity would have been used to facilitate the swap?

A.     I think most of the time it was either LLCs or limited partnerships or general partnerships.

Q.     Do you know why you would use that type of entity?

**(p)**  A.     Client choice.  Either client choice or the recommendation of client counsel.

* * * *

(Page 107, line 20)

Q.     And there was the name of someone that you had mentioned before that had left E&Y that worked – [name of former E&Y employee], I think you –

A.     Yeah.  She was an employee I think in 1998, and then pursued other –

Q.     Where did she go?

**(q)**  A.     I couldn't tell you.  I don't know where she is.

* * * *

(Page 126, line 12)

Q.     So who would bring all the parties to the transaction together, be it, you know, the broker-dealer, who would bring that entity in?

**(r)**  A.     Well, for instance, on the fund that we talked about earlier, [Company X] already had all the pieces together from the investment standpoint.   And so they were bringing the transaction to us.  So they had already put – you know, they had put everything together from the investment standpoint, the private offering memorandum, et cetera.

* * * *

(Page 136, line 6)

Q.     Do you recall what the probability of a tax benefit was?

**(s)**  A.     No, I don't recall.

* * * *

-62-

(Page 138, line 21)

       Q.    Would you give any advice to clients as to timing of exiting?

**(t)**    A.    I think that was – <u>well, only from an investment standpoint. Obviously, if they were making money, stay in. If they were losing money, let's look at alternatives</u>

       Q.    In terms of tax benefits, though?

**(u)**    A.    <u>No. I mean, this was an investment for the client. So our advice was centered around if you're going to – if you believe this is a good investment and it makes sense, stay in. Continue to do, you know, to do the digital trading, do the foreign currency trading. If it doesn't make sense, let's think about exiting and how should we exit.</u>

* * * *

(Page 139, line 22)

       Q.    Do you know if clients withdrew from [the Add-On LLC]?

       A.    Yes. I do know clients withdrew from it.

       Q.    Do you know what the basis would have been for withdrawing from it?

**(v)**    A.    <u>Lack of profit.</u>

* * * *

(Page 142, line 9)

       Q.    When you were determining the entrance, . . . [h]ow would you calculate what their contribution would be?

       A.    I think a lot was dictated on how much percentage profits that they wanted in the fund, and how much they felt comfortable with contributing.

       Q.    What are the types of assets that they were contributing?

       A.    If I remember the fund, the fund was a digital, foreign currency digital program. . . .

       Q.    Where did they get the options from?

**(w)**    A.    <u>Well, the digital options were purchased as part of their, from the investment standpoint, as part of their alternative investment, you know, that was just part of their investing.</u>

* * * *

(Page 165, line 6)

> Q.   Are you aware of any of the listed transactions that your clients engaged in prior to them being listed?
>
> A.   [Looking at Notice 2001-51] Yes.
>
> Q.   Do you know which ones?
>
> A.   CDS, I think, just got listed, if I remember right, is a listed transaction, the swap transaction.  . . .
>
> Q.   Are you familiar with any of the other ones? . . . What about No. 11, the Notice 2000-44?
>
> **(x)**   A.   Inflating the basis of partnership interests?  <u>I don't think we did any inflation of partnership interest.</u>

* * * *

(Page 169, line 8)

> Q,   I'm going to get off the list of transactions and ask whether at any time did you ever consult an E&Y database for strategy?
>
> A.   An E&Y database for strategy.  Trying to think.  Database.  We have – if the client asked for a – trying to think what an example would be – an engagement letter, then we would have  – there is a repository for engagement letters so that we wouldn't have to duplicate that effort. . . .
>
> Q.   Where would that be?
>
> A.   That is in a just – I think it's a general PFC database. And you're talking to someone that's administratively, again, very weak in this. . . . So, yeah, I do think there's a PFC database that would have engagement letters there.
>
> Q.   Would there be a database where after you review, say, the currency, the fund, where you could let everyone out there in the country know that hey, this is a good vehicle for your clients if you have someone that wants it?
>
> **(y)**   A.   Other than email?  <u>I don't know.   I mean, if a client – see, everything was driven from the client's perspective.   So if the client came to the client service professional and said, you know, we've got this that's – you know, got this fact pattern, or whatever, and then they call the subject matter expert, the subject matter expert said send them an email, look, this has been done for another client and, you know, the fact pattern sounds similar, you may want to investigate this particular deal[.]</u>

* * * *

-64-

(Page176, line 4)

> Q.    [T]ake just a digital currency option trade as an example, would that fit into the definition of a solution?

**(z)**  A.    <u>That would be a one off tax strategy. So, in other words, there would be no database or this thing formed for digital option, because it was a one off investment fund that was produced by a third party that came to us.</u>  Most of our solutions, I think almost all the solutions are internally developed. So a solution is just a way that Ernst & Young has been doing a service, it needs to be standardized. If it was a tax strategy that was brought to us by a third-party vendor, that's not a solution per se. We used to call it just, you know, a tax strategy.

> Q.    Did Ernst & Young create its own tax strategies?

**(aa)**  A.    Unfortunately, <u>no. We – the only, I guess, strategies, per se, a [Mr. X] would have brought to us.</u>

* * * *

Page 186, line 22)

> Q.    Would – back to the fund, the [Company X] fund . . . – the eight to ten that you actually were involved in . . . did each client approach E&Y to engage in the fund?

**(bb)**  A.    <u>For financial planning assistance. They would have come to their relationship person and said, you know, for whatever reason I've got this fact pattern. And then the relationship person would say, "Hey, Brian, you know, this is the fact pattern." Well, if I was aware this fund was being offered, I'd say, "Well, look, you need to probably check with [Mr. X], see if the facts of this make sense for you." If it was an investment planning professional that had done an asset allocation, said we need to look at a hedge fund, you know, [Mr. X]'s hedge fund at that time would have been one that they probably would have considered. So it really just, you know, it really depended upon the risk tolerance of the client from an investment perspective and whether a hedge fund fit in their asset allocation.</u>

(Title 18, United States Code, Section 1001).

## COUNT FOUR

### (False Statements To The IRS)

The Grand Jury further charges:

77.    The allegations set forth in paragraphs 1 through 65 and 71 are repeated and realleged as if fully set forth herein.

78.    On or about June 20, 2002, in the Southern District of New York and elsewhere, ROBERT COPLAN, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, unlawfully, wilfully, and knowingly made materially false, fictitious and fraudulent statements and representations, to wit, in connection with an examination by the IRS of tax shelters marketed by Ernst & Young, COPLAN gave the false testimony underlined below:

(Page 24, line 10)

Q.    Who produced the materials [to be distributed to clients] for the [Company X Add-On] transaction. . . . a description of the transaction that you would give to investors before they invest --

A.    Yeah.  On the [Company X] transaction, there were no materials given.  That was just explained. . . .  I believe 1 office did produce something, and it was on their own and without national involvement. . . .

Q.    What office was it?

A.    Seattle.

Q.    Did you review any of those materials?

A.    I did after I became aware of them, but not for distribution.  In other words, I basically said, these are not to be distributed.

Q.    And why did you say they were not to be distributed?

(a)    A.    We didn't see the need to, and anything – or even show it to clients.  We didn't think the transaction was that complicated, to be honest with you, so we only really had it for internal purposes.

* * * *

(Page 34, line 9)

Q.    And who was the counterparty in most of these [CDS Add-On transactions]?

A.    I believe it was [Financial Institution] in both transactions.

Q.    And [Financial Institution] is a U.S. entity?

A.    Again, I've become aware there was some confusion about that . . . .  On the [Company X] transaction, it was really being – all the investments aspects of it were being done in connection with the existing partnerships.  And those existing partnerships had trading accounts that were doing exotic option trading and other

**(b)**    trading, and so – and <u>Ernst & Young had nothing really to do with the operation of that partnership.</u>

Q.    M-hm.

A.    So [Company X] was the asset manager. [Company X] was not necessarily at the time, but they became the general partner also of those accounts during the period in question.

And so they were leading the investment decisions of who to use, and they were using a trader who specialized in these type of currency options.  And so we

**(c)**    really didn't – we, <u>Ernst & Young, really didn't have involvement in the decisions that the general partner made as to who to use to do the trading, how to structure those trades.  It was really their investment decision and their decision as general partner.  They didn't have to ask us anything.</u>

\* \* \* \*

(Page 38, line 11)

Q.    What were the risks on the tax transaction?

A.    That the IRS would disagree, that you had basis in the partnership.

Q.    What did you think the IRS would – just on the basis issue alone, that's what you thought the issue would be?

A.    Yeah.  But I think in the explanations that have been put forth of the facts and amnesty disclosures, et cetera, on this transaction, the surrounding facts were such

**(d)**    that when we analyzed it, <u>we looked at the fact that the partnerships were existing partnerships, they had been doing some of this trading, and that there was going to be a transfer of a portion of the trading accounts to this [Financial Advisor] outfit for management, and he said, I'm not going to manage a whole bunch of these little accounts, I'm going to put all of these things into an LLC so I can do 1 account</u>

trading for these options.  And it was 1 of those circumstances where his tax
planner – as we say, we're aware of this idea that's out there.  We hear about the
concept of transferring a long and a short option that aren't matched and getting
basis and not having to reduce it for the liability, and so here was kind of a
fortuitous circumstance where if these accounts are going to be transferred into an
entity anyway, that it's a matter of taking the tax position, because along with that
transfer, if someone felt appropriate to do it.

\* \* \* \*

(Page 62, line 7)

Q.   So how did [Company X] get involved in the option transaction?

A.   [Company X] got involved – this was later on after [name of co-conspirator]
     brought the idea to us.  So in other words, we had the idea.  That's why I said at
     some point, we kind of married an idea with facts in the [Company X] transaction,
     so that it was what we did with [Company X].  But we had the idea at some
     previous time from [name of co-conspirator].

Q.   Okay.  So maybe I asked this: How did [Company X] actually come to do the
     transaction?  Did you have – is this based on a preexisting relationship with
     [Company X]?

A.   Yeah.  I mean, I said we – [Company X] was involved in the swap partnerships.

Q.   Okay.

A.   And so they were involved as the asset allocators and the investment folks.  And
     they were dealing with these trading-type people like [Financial Advisor] is the 1
     involved.

(e)      And so we're the tax advisors, and we said, hey, if you are happening to be
         forming these – transferring these trading accounts over to [Financial Advisor] and
         he's going to put them in an LLC, we know this tax idea.  That's kind of what I
         said before.

\* \* \* \*

(Page 98, line 6)

Q.   Were clients concerned about the large capital gain at the end of the [CDS]
     transaction in that they would have a large amount to pick up in income that year?

(f)   A.   That was – well, they weren't sure that that would happen, because they had to

-68-

make a decision on the economic side to – they would have to decide to early-
terminate the swap, because the swap was scheduled to run for 18 months. And so
a decision was required on their part or the counterparties' part to terminate the
swap prior to the majority. Otherwise, you'd have ordinary income on the back
end.

Q.    Did – do you know, did all the partnerships terminate early?

A.    I believe they did.

* * * *

(Page 118, line 116)

Q.    Was there a reason why [the Add-On transaction] was done through an LLC and
not for the Jenkens partnerships for lack of a better description?

A.    Well, as I think I explained, the – well, the Jenkens came first. They were done
with individual folks forming a partnership. And they did their ... currency

**(g)**       contracts and contributed them to partnerships. The [Add-On] transaction wasn't
really done that way. It was done based on the fact that the partnerships were
transferring their trade – I mean, it really was a fact that existed prior to the tax
idea. In other words, the LLC was formed as an LLC because of Mr. [K's] interest
in forming an LLC for all those trading accounts. . . . For the – for all those
partnerships that were doing this type of trading that [Company X] said, we can't
use [Financial Institution] anymore to do this kind of trading, we've got to move
the trading account to [Financial Advisor]. And so they moved it and he said, if
I'm going to do this trading for you, I'm going to have all these accounts in 1
entity.

* * * *

(Page 139, line 12)

Q.    Who would pay E and Y fees [for PICO], the individual or the S Corp?

A.    We had an engagement letter with the individual.

Q.    The individual was responsible for paying the fees?

**(h)**    A.    We were paid by the individual. We also received a fee from [Company Z] for
consulting with them on the transaction. . . . We were advising them on the tax
aspects of the results of investors investing in these types of S corporations.

(Title 18, United States Code, Section 1001).

-69-

## COUNTS FIVE THROUGH SEVEN

### (Tax Evasion)

The Grand Jury further charges:

79.    The allegations set forth in paragraphs 51 through 65 are repeated and realleged as if fully set forth herein.

80.    From in or about 2000, through at least in or about 2003, in the Southern District of New York and elsewhere, ROBERT COPLAN, MARTIN NISSENBAUM, and RICHARD SHAPIRO, the defendants, unlawfully, wilfully and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by each of them to the United States of America for calendar year 2000, by various means, including among others:

a)    structuring and then implementing a tax shelter transaction which they knew had no reasonable possibility of generating a profit;

b)    using that tax shelter to generate tax losses they knew could not properly be deducted on their respective tax returns;

c)    creating entities that served no legitimate business purpose, but were used merely to obtain tax benefits;

d)    preparing and executing false and fraudulent documents intended to deceive the IRS, including but not limited to transactional documents and a Certificate of Facts;

e)    preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which substantially understated each defendant's taxable income and tax due and owing; and

f)       taking various steps to conceal from the IRS the true facts relating to the

tax shelter, including providing false information in response to IDRs sent by the IRS.

| Count | Defendant | Return | Approx. Amount of Fraudulent Underpayment | Approx. Filing Date |
|-------|-----------|--------|-------------------------------------------|---------------------|
| 5 | ROBERT COPLAN | 2000 Form 1040 | $ 291,913 | April 15, 2001 |
| 6 | MARTIN NISSENBAUM | 2000 Form 1040 | $ 340,262 | April 16, 2001 |
| 7 | RICHARD SHAPIRO | 2000 Form 1040 | $ 201,565 | August 16, 2001 |

(Title 26, United States Code, Section 7201)


**COUNT EIGHT**

**(Obstruction of the IRS)**

The Grand Jury further charges:

81.      The allegations set forth in paragraphs 51 through 65 are repeated and

realleged as if fully set forth herein.

82.      On or about September 25, 2003, in the Southern District of New York and

elsewhere, MARTIN NISSENBAUM,  the defendant, unlawfully, wilfully, and knowingly did

corruptly obstruct and impede, and did endeavor to obstruct and impede, the due administration of

the Internal Revenue Code; to wit, in response to IDR #2, NISSENBAUM caused the false and

misleading statements set forth in paragraph 65, above, to be submitted to the IRS on behalf of himself and ten other E&Y partners.

(Title 26, United States Code, Section 7212).


_____              _____
FOREPERSON                    .         MICHAEL J. GARCIA
                                        United States Attorney