UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,    )
    )
    v.    )
    )
ROBERT COPLAN,    )
MARTIN NISSENBAUM,    )
RICHARD SHAPIRO,    )    (S1) 07 Cr. 453 (SHS)
BRIAN VAUGHN,    )
DAVID L. SMITH, and    )
CHARLES BOLTON,    )
    )
    Defendants.    )
    )

---

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT RICHARD SHAPIRO'S PRE-TRIAL MOTIONS

MORVILLO, ABRAMOWITZ, GRAND,
  IASON, ANELLO & BOHRER, P.C.
Attorneys for Richard Shapiro
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

Of Counsel:
John J. Tigue, Jr.
Jeremy H. Temkin
Kristy Watson Milkov
Matthew B. Homberger (pending admission)

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES..............................................................................ii

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT.....................................................................................................1

I.   Shapiro is Entitled to a Bill of Particulars Specifying Whether the Government
     is Alleging that the Tax Shelters are Fraudulent as Designed ....................1

     A.  The Question is Not Vague...............................................................2

     B.  There is No "Significant" Difference Between the KPMG Case and
         This Case..........................................................................................2

     C.  The Government Should be Required to Answer the Question............2

II.  Counts Two, Three, Four and Seven Should be Dismissed.........................4

     A.  Courts Look Beyond the Statutory Language When Deciding a Motion
         to Dismiss an Indictment ..................................................................4

     B.  Tradehill and the Add-On are Substantially Similar to COBRA for Purposes
         of Shapiro's Motion Thereby Negating the Element of Willfulness.....................5

III. Irrelevant and Prejudicial Surplusage Should be Stricken from the Indictment..........7

     A.  Shapiro's Former Title Has No Relevancy to Charges Arising from his Present
         Employment and is Designed to Imply to the Jury a Larger Role in the Alleged
         Criminal Conduct ..............................................................................7

     B.  The Indictment's Extensive Use of Broadening Language Risks Misleading the
         Jury into an Inference that Defendants are Accused of Additional Crimes...........8

     C.  The References to the "Attorneys and Professionals Provided by E&Y" and the
         "Purported" CDS Partnerships Should be Stricken...........................10

CONCLUSION...............................................................................................11

## TABLE OF AUTHORITIES

### Cases

United States v. Atkins, 869 F.2d 135 (2d Cir. 1989).....................................................5, 6

United States v. Bongiorno, No. 05-CR-390 (SHS), 2006 WL 1140864
  (S.D.N.Y. May 1, 2006) .............................................................................................5, 6

United States v. DeFabritus, 605 F. Supp. 1538 (S.D.N.Y. 1985) ..............................9, 10

United States v. Hubbard, 474 F. Supp. 64 (D.D.C. 1979) ...............................................9

United States v. Ingredient Technology, 698 F.2d 88 (2d Cir. 1983)...........................5, 6

United States v. Killeen, 98-CR-143 (AGS), 1998 WL 760237
  (S.D.N.Y. Oct. 29, 1998)..............................................................................................11

United States v. Mayo, 230 F. Supp. 85 (S.D.N.Y. 1964) ..................................................9

United States v. Pirro, 212 F.3d 86 (2d Cir. 2000) .........................................................5, 6

United States v. Pope, 189 F. Supp. 12 (S.D.N.Y. 1960) ...................................................9

United States v. Prejean, 429 F. Supp. 2d. 782 (E.D. La. 2006) ......................................10

United States v. Schiff, 06-CR-406 (FSH), 2008 WL 726897
  (D. N.J. March 19, 2008)................................................................................................5

United States v. Stein, 424 F. Supp. 2d 720 (S.D.N.Y. 2006) ..................................2, 3, 4

United States v. Stein, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) ...........................................6

United States v. Strawberry, 892 F. Supp. 519 (S.D.N.Y. 1995) .......................................4

United States v. Willner, 07-CR-183 (GEL) 2007 WL 2963711
  (S.D.N.Y. Oct. 11, 2007)................................................................................................8

**Rules & Procedures**

C. Wright, <u>Federal Practice and Procedure</u> (1969) ............................................................. 8

**Miscellaneous**

Black's Law Dictionary (1996) ....................................................................................... 8

**PRELIMINARY STATEMENT**

Defendant Richard J. Shapiro respectfully submits this memorandum in further support of

his motion for an order (1) requiring the government to specify the nature of the criminality

charged against him; (2) dismissing certain of the charges; and (3) striking surplusage from the

Indictment.[1] Rather than address the merits of Shapiro's substantive arguments, the government

has responded by resorting to mischaracterization and intemperate language.[2] Far from

"purposely [confusing] the Court regarding the matters at the heart of this case" (Opp. Mem. at

11), Shapiro has demonstrated, in his moving papers and below, that the Indictment contains

serious deficiencies that warrant the relief sought.

**ARGUMENT**

**I.    Shapiro is Entitled to a Bill of Particulars Specifying Whether the Government is Alleging that the Tax Shelters are Fraudulent as Designed**

In Shapiro's moving papers, he demonstrated that it was necessary for the government to

provide a bill of particulars answering the following question (the "Question"):  "With respect to

each of the tax shelters as to which the government intends to offer proof, does the government

allege that the tax shelter was fraudulent as designed and approved by E&Y, and if so, in what

respects?" (Shapiro Mov. Memo. at 8-10.) In United States v. Stein, (the "KPMG case"), Judge

---

[1] "Indictment" refers to the Superseding Indictment returned by the grand jury on February 19, 2008, a copy of which is annexed to the Affidavit of John J. Tigue, Jr., sworn to May 5, 2008 (the "Tigue Aff." or the "Tigue Affidavit") as Exhibit A; "Defendants' Disc. Mem." refers to the Memorandum of Law in Support of the Discovery Motions Filed on Behalf of All Defendants; "Defendants' Disc. Reply Mem." refers to the Reply Memorandum of Law in Further Support of the Discovery Motions Filed on Behalf of All Defendants; "Shapiro Mov. Mem." refers to the Memorandum of Law in Support of Richard Shapiro's Pre-trial Motions; "Opp. Mem." refers to the Government's Memorandum of Law in Opposition to Defendants' Pretrial Motions; and "Shapiro Aff." refers to the Affidavit of Richard Shapiro, sworn to May 5, 2008.

[2] The Opposition Memorandum is replete with inappropriate language including claims that the defendants (or more precisely their counsel) engaged in "seeking purposely to confuse the court" (Opp. Mem. at 4), made "attempts to confuse" (id.), made a "calculated effort to distract the court" (id. at 21), engaged in an attempted "slight [sic] of hand" (id. at 15), and presented arguments which are claimed to be "absurd" (id. at 15, 65), "utterly specious" (id. at 65), "frivolous" (id. at 69, 96) and "laughable" (id. at 98). An experienced prosecution team should have more confidence in this Court's ability to distinguish between arguments that have merit and those that do not, whether made by the government or the defendants.

Kaplan ordered the government to answer this precise question. The government has failed to provide a convincing reason why this Court should not do the same.

### A.    The Question is Not Vague

Although the government argues that "the [Q]uestion is too vague" and "has no clear meaning," (Opp. Mem. at 92), it clearly understood the meaning of the Question as posed by Judge Kaplan in the KPMG case and it provided an answer to that Question without requesting clarification. (See Tigue Aff., Exhibit H.) Thus, the government's statement that it is "difficult to discern precisely what Shapiro is actually asking" is wholly unpersuasive.

### B.    There is No "Significant" Difference Between the KPMG Case and This Case

The government next asserts that "the factual context in which [the Question] arises here is significantly different than the context in which [it] arose in the KPMG case" because there were "essentially two factions of defendants from KPMG as to whom there might be different theories of criminality." (Opp. Mem. at 93-94.) But nothing in Judge Kaplan's opinion suggests that differences between the defendants was relevant to his decision to order the government to answer the Question. See United States v. Stein, 424 F. Supp. 2d 720 (S.D.N.Y. 2006).[3]

### C.    The Government Should be Required to Answer the Question

The government's remaining argument, and its only substantive one, is that the "detailed allegations in the Indictment make clear the nature of the alleged conspiracy and the tax fraud" and, thus, that the defendants do not need an answer to the Question. (Opp. Mem. at 94.) That argument misses the point. The Indictment, like the indictment in the KPMG case, is consistent with two theories of the case: "(1) [that] the structures of the tax strategies clearly violated existing tax law, and the defendants nevertheless wilfully implemented them, and (2) [that] the

---

[3] Moreover, not all of the defendants are similarly situated. For example, the Indictment makes clear that Shapiro's primary role was in connection with the approval of the transactions (Indictment, ¶ 9), while Vaughn is primarily alleged to have led the sales efforts for most of the shelters. (Id., ¶ 10.)

structures, if they had been implemented through bona fide transactions, would not have

involved criminal violations of the tax laws, but the defendants implemented them fraudulently

by such measures as sham transactions, false tax returns, and the like." Stein, 424 F. Supp. 2d at

724. The first theory is that the shelters were fraudulent in their design while the second is that

they were fraudulent in their execution.

In the KPMG case, "the indictment describe[d] in detail the nature and goals of the

charged conspiracy and disclose[d] sufficient information generally to inform the defendants of

the charges against them." Stein, 424 F. Supp. 2d at 724. That level of detail, however, did not

obviate the need for an answer to the Question where, as here, the indictment was ambiguous

about the underlying theory.

As in the KPMG case, the government appears to assert that the four tax shelters

identified in the Indictment were fraudulent from the outset because of how they would be

executed. (See Opp. Mem. at 94-95 (asserting that Shapiro "is accused of planning from the

outset to conceal true facts from the IRS")). Doubt remains, however, as to whether the

government also intends to argue that the transactions are fraudulent in their design.[4]

The government implies that the CDS Add-On (the "Add-On") and Tradehill transactions

were fraudulent in their design because they purportedly provided no reasonable opportunity for

the taxpayer to earn a profit. (See id. at 95-96.) On the other hand, the government also suggests

that, although the Indictment provides "more than ample basis" to conclude that the IRS would

have found CDS, COBRA and PICO to be fraudulent in their design if it had been made aware

of the true facts surrounding the shelters, the government will not attempt to prove that those

---

[4] In the KPMG case, by contrast, the government specifically "sets forth its position on whether it would be criminally fraudulent to advise the claiming of tax benefits as a result of transactions that actually occurred as described in the opinion letters (assuming no material facts were omitted from that description)." (See Tigue Aff., Exh. H at 2.) Shapiro is simply asking for a similarly unambiguous answer to the Question.

3

shelters were fraudulent in their design such that the clients who utilized them would have a tax due and owing. (Id. at 95-96.) As Judge Kaplan stated with respect to the indictment in the KPMG case, "[t]he ramifications of the government proceeding on one track versus the other, or both, are profound, both for the defendants' ability properly to prepare for trial and for the conduct of the trial itself." Stein, 424 F. Supp. 2d at 725.

Finally, the government reveals that it is concerned that it might be "compelled to limit its proof at trial" with respect to one or more of the transactions. (Opp. Mem. at 93.) Such a concern does not outweigh the government's responsibility to provide Shapiro with the information necessary to prepare for, and avoid any unfair surprise at, trial. See Stein, 424 F. Supp. 2d at 724-25; United States v. Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995). Thus, the Court should order the government to provide Shapiro with a bill of particulars, similar to the one ordered in the KPMG case, answering the Question.

## II.    Counts Two, Three, Four and Seven Should be Dismissed

In Shapiro's moving papers, he demonstrated that the charges in Counts Two, Three, Four and Seven (the "Challenged Counts") should be dismissed if the government's theory is that the transactions at issue in those counts – Add-On and Tradehill – were fraudulent in their design. As stated above, see supra Point I, it appears that this is, in fact, the government's theory, and that dismissal of the Challenged Counts is warranted.

## A.    Courts Look Beyond the Statutory Language When Deciding a Motion to Dismiss an Indictment

The government argues that Shapiro's motion should be rejected because "[the Challenged Counts] track the language of the statute and clearly allege the well-established elements of the crime of tax evasion." (Opp. Mem. at 8, 10-11.) The government would have the Court believe that indictments are never dismissed for failure to state an offense or legal

insufficiency. That is clearly not true. See, e.g., United States v. Pirro, 212 F.3d 86, 90-93, 95 (2d Cir. 2000) (allegation insufficient where it stated that defendant omitted a fact from a filed tax return that he was not required to report); United States v. Bongiorno, No. 05-CR-390 (SHS), 2006 WL 1140864, at *4 (S.D.N.Y. May 1, 2006) ("Because the government has set forth enough facts in the indictment to rule on defendants' motion and has not averred that it intends to present additional theories of securities fraud at trial, there is no reason for the Court to delay ruling on the merits of the defendants' arguments.") (citing Fed. R. Crim. P. 12(b)(3)(B)); United States v. Schiff, 06-CR-406 (FSH), 2008 WL 726897, at *5 (D. N.J. March 19, 2008) ("in a criminal case, the Court must still ensure that a theory of liability meets the legal standards for the alleged crime"). These cases stand for the proposition that notwithstanding the inclusion of the appropriate statutory language, an indictment, or counts thereof, will be dismissed if the factual allegations do not support the conclusion that the defendant has violated the statute.

Here, Shapiro asks the Court to dismiss the Challenged Counts because the allegations in the Indictment are insufficient, as a matter of law, to establish that he acted wilfully (despite the conclusory assertion in the charging language). The government's assertion that Shapiro's motion is a challenge to its proof is, thus, off the mark.

**B.    Tradehill and the Add-On are Substantially Similar to COBRA for Purposes of Shapiro's Motion Thereby Negating the Element of Willfulness**

Perhaps recognizing that merely tracking the statutory language does not preclude dismissal, the government goes on to address (unsuccessfully) Shapiro's argument that, as a matter of law, it cannot prove that he acted willfully with respect to the economic substance doctrine. The government relies on United States v. Ingredient Technology, 698 F.2d 88 (2d Cir. 1983), and United States v. Atkins, 869 F.2d 135 (2d Cir. 1989), both of which are

distinguishable.[5]  The government also ignores the fact that Judge Kaplan's rejection of the

motions to dismiss in United States v. Stein *followed* the filing of a bill of particulars specifying

that the government intended to proceed on the theory that the transactions at issue were

fraudulent in their implementation, which negated the argument that the defendants could not

have acted wilfully with respect to the design of the transactions. See United States v. Stein, 429

F. Supp. 2d 633, 637 (S.D.N.Y. 2006); see also supra Point I.[6]

While the government argues that "a transaction with no reasonable possibility of a profit

has no economic substance," (Opp. Mem. at 16), its conclusion that the Add-On and Tradehill

transactions had no reasonable possibility of profit is unsupported by the factual allegations of

the Indictment.  (See Indictment ¶¶ 41, 127(a); Opp. Mem. at 15-17.)  Rather, the government's

argument that the lack of clarity in the economic substance doctrine is irrelevant to the issue of

willfulness ignores the fact that the Add-On and Tradehill transactions were technically similar

to COBRA.  (Shapiro Mov. Mem. at 18-19.)[7]

---

[5] In Ingredient Technology and Atkins, the defendants' actions included traditional badges of fraud, not activities relating to the analysis of complex financial transactions under the economic substance doctrine. See Ingredient Technology, 698 F.2d at 96 (buying sugar while simultaneously executing agreement to sell it back); Atkins, 869 F.2d at 137, 139 (using self-reversing transactions that could be done without any economic effect and lying to lawyers and clients).  The allegation upon which the government's argument is based – that the defendants purportedly knew that the Add-On and Tradehill transactions had no potential for profit and, thus, lacked economic substance – is substantively different from an allegation that a defendant engaged in conduct constituting a traditional badge of fraud (e.g., keeping a double set of books or creating false invoices) and, thus, cases where courts have relied on traditional badges of fraud to deny defendants' relief are inapplicable to the instant challenge related to the lack of clarity in the economic substance doctrine.
[6] The same analysis applies to the government's use of Atkins to attack Shapiro's Due Process Clause argument. (Opp. Mem. at 17-18.)  Although this Court, in Bongiorno, denied a motion to dismiss an indictment based on the rule of lenity and due process concerns, that case is distinguishable because defendants there argued "that they were not put on notice that their conduct could constitute criminal securities fraud because the NYSE treated [their conduct] as minor violations of the rules equivalent to 'mere 'traffic tickets'' as opposed to securities fraud." 2006 WL 1140864, at *9.  Shapiro argues that he was not on notice that his conduct could constitute criminal tax evasion because the technical tax law and the economic substance and business purpose doctrines were unclear, not because he thought violations of those laws and doctrines was not criminal conduct.  Shapiro's circumstances are, thus, more analogous to those in Pirro, where the court affirmed the dismissal of charges based on an argument that the tax law was unclear as to whether an ownership interest in an S-Corporation ("S-Corp") was equivalent to a share of stock in that S-Corp such that the ownership interest must be presented on the S-Corp's return.  212 F.3d at 89.
[7] The government concedes as much when, in response to Nissenbaum's motion to sever Count Seven, it refers to the Tradehill transaction as "a personal variation of the COBRA transaction."  (Opp. Mem at 54.)  See also

Indeed, the only basis for the government's conclusory allegation in ¶¶ 82 and 127 of the Indictment that Tradehill "had no reasonable possibility of generating a profit" is the assertion (alleged in ¶ 75) that none of the option pairs expired in the money. The out-of-the-money expiration of the options is not dispositive of the possibility that they could have resulted in a profit as purchased. Moreover, with respect to the Add-On transaction, the Indictment recognizes that a $30 million return was possible. (See Indictment, ¶ 102.)[8] This statement negates the allegation in the Indictment that the Add-On had no reasonable possibility of profit. (See id. ¶ 41.) Thus, the Indictment fails to support the conclusion that the Add-On and Tradehill transactions had no reasonable possibility of profit and, for the reasons set forth above and in Shapiro's moving papers, Counts Two, Three, Four and Seven of the Indictment should be dismissed.

**III.   Irrelevant and Prejudicial Surplusage Should be Stricken from the Indictment**

**A.   Shapiro's Former Title Has No Relevancy to Charges Arising from his Present Employment and is Designed to Imply to the Jury a Larger Role in the Alleged Criminal Conduct**

In his moving papers, Shapiro argued that the Indictment's description of his prior employment as "the Director of Tax for the Financial Services Industry Practice at another large accounting firm," (see Indictment, ¶ 9), is both irrelevant and prejudicial, and should therefore be stricken. See Shapiro Mov. Mem. at 25-27. In response, the government resorts to hyperbole, arguing that "the notion that a description of [Shapiro] as a 'Director of Tax' is somehow prejudicial is nothing short of laughable" on the ground that the description "carries no

---

Indictment, ¶ 71 (defendants would "use Tradehill to carry out a transaction similar to COBRA"); ¶ 126 (realleging COBRA allegations (¶¶ 27-34) in Tradehill counts); Opp. Mem. at 56 ("because the Tradehill transaction was a successor to and variation of the earlier COBRA tax shelter, proof of the COBRA transaction . . . would likely be admissible [in a trial of Counts Five through Seven – dealing with the Tradehill transaction] as well").

[8] Although the Indictment also states that it is virtually impossible for the investor to obtain that return (see id.), the government ignores the lack of clarity in the case law as to exactly how much of a possibility of profit is enough to meet the requirements of the economic substance doctrine. (See Mov. Mem. at 15-18 (citing cases).)

connotation of violence, organized crime, terrorism, or anything else prejudicial." (Opp. Mem. at 98.) This is a blinkered definition.

The prejudice associated with particular language in an indictment must be measured in light of the charges of each case. Surely the word "prejudicial" means more than a tendency to suggest violence, organized crime, or terrorism.[9] Here, Shapiro had no title at E&Y and operated mainly as a subject matter expert. (See Indictment, ¶ 9.) The inclusion of Shapiro's former title as a Director of Tax at another firm could only have been intended to suggest that he played a larger role in the charged conduct than the facts otherwise support, and thereby seek to prejudice him in the eyes of the jury. See C. Wright, Federal Practice and Procedure § 127, at 277 (1969) ("The purpose of 7(d) is to protect the defendant against prejudicial allegations or irrelevant or immaterial facts. Prosecutors have been known to insert unnecessary allegations for 'color' or 'background' hoping that these will stimulate the interest of the jurors").

Moreover, Shapiro's previous employment, which pre-dated the charged conspiracy by 4 to 8 years and had nothing to do with tax shelters, adds nothing to the charges. (See Shapiro Aff. at ¶ 4.) The government does not explain how general knowledge of the tax laws tends to establish "knowledge and intent" with respect to the particular laws surrounding the tax shelters at issue.[10]

**B.     The Indictment's Extensive Use of Broadening Language Risks Misleading the Jury into an Inference that Defendants are Accused of Additional Crimes**

The defendants also moved to strike numerous instances of "broadening language" such

---

[9]  See Black's Law Dictionary (1996) ("[P]rejudice, *n.*, . . . 2. A preconceived judgment formed without a factual basis; a strong bias.")

[10] United States v. Willner, 07-CR-183 (GEL), 2007 WL 2963711 (S.D.N.Y. Oct. 11, 2007), cited by the government in support of its contention that the reference to Shapiro's former title is relevant, is not persuasive. Willner was employed as an IRS agent when he committed the charged conduct. Willner, 2007 WL 2963711, at *1. Shapiro's previous employment pre-dated the charged conspiracy by 4 to 8 years. (Shapiro Aff., ¶ 4.) Moreover, while Willner's experience as an IRS agent supported "his knowledge of the tax laws and the proper treatment of income," Shapiro's earlier employment in a tax field unrelated to tax shelters does not support his knowledge of the law surrounding tax shelters.

as "other things" and "other ways" from the Indictment on the ground that they create a danger

that the jury may be misled into inferring that the defendants are accused of crimes beyond those

actually charged. (Shapiro Mov. Mem. at 27.) In response, the government defends much of

this language as "clearly part of the description of how the conspiracy and the other charges were

carried out." (Opp. Mem. at 100.) However, the challenged language in the conspiracy count

(and incorporated into the other counts) suggests additional uncharged criminal conduct,

including making false statements and obstruction.[11] Moreover, the government has minimal

interest in retaining this language, as its very imprecision limits its ability to inform the

defendants of the Grand Jury charges. See United States v. DeFabritus, 605 F. Supp. 1538, 1547

(S.D.N.Y. 1985).

     The government attempts to distinguish Judge Weinfeld's opinion in United States v.

Pope, 189 F. Supp. 12 (S.D.N.Y. 1960), by pointing to United States v. Mayo, 230 F. Supp. 85

(S.D.N.Y. 1964), in which the same judge denied a defendant's motion to dismiss an indictment

for its use of prejudicial surplusage. (See Opp. Mem. at 102, n.40.) However, broadening

language is prejudicial "[r]egardless of [its] location in the indictment, [because] [it] may

encourage the jury to draw the inferences that the defendants are believed to be involved in

activities not charged in the indictment." United States v. Hubbard, 474 F. Supp. 64, 82 (D.D.C.

1979); see also DeFabritus, 605 F. Supp. at 1547 and n. 11 (striking language describing manner

in which conspirators executed tax evasion).[12] Thus, this Court should reject the government's

distinction between the false statement and obstruction counts and the conspiracy and tax

---

[11] For example, broadening language in paragraphs 62(a) through 62(d), 66, and 67 of the Indictment suggests that each of the defendants made false statements to the IRS in addition to those charged elsewhere in the Indictment. (See Indictment, Counts 10-11.) Paragraphs 31-32 similarly permit the inference of uncharged acts of obstruction.

[12] Moreover, as the government points out, the challenged language in Mayo was limited to a means and methods paragraph of the Indictment while the disputed language in Pope was not. See Opp. Mem. at 102, n. 40. Here, the vast majority of the challenged language is not contained within means paragraphs. (See Opp. Mem. at 100 (noting that all of the instances of broadening language identified by defendants, with the exception of paragraphs 96 and 96(g), are not contained within means and methods paragraphs).)

evasion counts.  See Opp. Mem. at 102.  See, e.g., DeFabritus, 605 F. Supp. 1538 (striking

broadening language in a prosecution for conspiracy to defraud the United States and for

numerous substantive violations of the federal income tax laws).[13]

**C.     The References to the "Attorneys and Professionals Provided by E&Y" and the
         "Purported" CDS Partnerships Should be Stricken**

In opposing defendants' motion to strike language in paragraph 65 suggesting that the

attorneys and professionals representing E&Y clients knew of or suborned false testimony, the

government argues that the language is relevant because, "[t]o the extent lawyers intentionally

coached witnesses to lie during testimony before the IRS, those instructions are co-conspirator

statements in furtherance of the conspiracy and the Government may seek to introduce them at

trial." (Opp. Mem. at 103.)  Paragraph 65, however, does not describe the lawyers and other

professionals as co-conspirators, and if the government claims that these individuals are co-

conspirators, it should be required to provide particulars identifying the specific individuals who

allegedly suborned perjury and the clients who they represented.  If not, the Indictment is

impermissibly misleading and the offensive language should be stricken.[14]  United States v.

Prejean, 429 F. Supp. 2d. 782, 796 (E.D. La. 2006) ("a court may strike as surplusage any

'[i]ndirect expressions, implied allegations, argumentative statements, and uncertainty due to

generalizations in language'" (citations omitted)).

Defendants have also argued that the Indictment's characterization of the CDS trading

partnerships as "purported" partnerships, see Indictment, ¶ 23(b), is misleading and inaccurate,

and should therefore be stricken.  (See Shapiro Mov. Mem. at 30-31.)  The government

---

[13] In any case, despite the government's claim that "there is no such 'broadening language' in Counts Eight through Eleven of the Indictment," see Opp. Mem. at 102, those counts explicitly incorporate the paragraphs containing the offensive language.  (See Indictment, ¶¶ 128 (incorporating ¶¶ 8, 31, 32, 33(a)-(c), 34, 78, 79, 96), 130 (¶¶ 8, 31, 32, 33(a)-(c), 34, 65, 96), 132 (¶¶ 8, 31, 32, 33(a)-(c), 34, 51, 58, 62(a)-(d), 65, 67, 96), 134 (same).)

[14] The government's assertion that these attorneys and professionals are among the unnamed co-conspirators underscores defendants' need for a listing of the unidentified co-conspirators.  See Defendants' Disc. Mem. at 11-13; Defendants' Disc. Reply Mem. at 8-10.

responded that the term was "appropriate" because the "true objective of the 'trading partnership' was to trade only to preserve the client's capital, and not to earn a profit." (Opp. Mem. at 104.) Whether the government disputes the motivation underlying the formation of the trading partnerships is beside the point. The fact remains that it does not and cannot dispute that they (i) actively engaged in actual trades (see Indictment, ¶ 23(c)), and (ii) were properly formed under the relevant state laws. Therefore, its inaccurate description of those partnerships should be stricken. See United States v. Killeen, 98-CR-143 (AGS), 1998 WL 760237, at *4 (S.D.N.Y. Oct. 29, 1998).[15]

## CONCLUSION

For the reasons stated above, Defendant Richard J. Shapiro respectfully requests that the Court grant his motion for an order (1) requiring the government to specify the nature of the criminality charged against him; (2) dismissing certain of the charges; and (3) striking surplusage.

Dated: June 16, 2008
   New York, New York

       MORVILLO, ABRAMOWITZ, GRAND,
       IASON, ANELLO & BOHRER, P.C.

      By: s/John J. Tigue, Jr.
         John J. Tigue, Jr.
         565 Fifth Avenue
         New York, NY 10017
         (212) 856-9600

---

[15] The government's reliance on cases supporting the inclusion of colorful and prejudicial but relevant language in the Indictment (see Opp. Mem. at 105) is inapposite. While the Indictment's description of the trading partnerships is certainly prejudicial, defendants' principal point is that the description is misleading and inaccurate, not that it is unnecessarily colorful.