UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

UNITED STATES OF AMERICA,

    - v. -

ROBERT COPLAN,                      (S-1) 07 Cr. 453 (SHS)
MARTIN NISSENBAUM,
RICHARD SHAPIRO,
BRIAN VAUGHN,
DAVID SMITH, and
CHARLES BOLTON,

            Defendants.

-------------------------------------X


# REPLY MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT VAUGHN'S
## OMNIBUS PRETRIAL MOTION


**BUTLER, SNOW, O'MARA**
**STEVENS & CANNADA, PLLC**
**210 E. Capitol Street, 17th Floor**
**AmSouth Plaza Building**
**Jackson, MS 39225-2567**

**PAUL B. BERGMAN, P.C.**
**950 Third Avenue**
**32nd Floor**
**New York, NY 10022**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

REPLY IN SUPPORT OF POINTS I - III ................................................................................ 2

REPLY IN SUPPORT OF POINT IV ...................................................................................... 17

REPLY TO THE GOVERNMENT'S RESPONSE TO THE POTENTIAL
VIOLATION OF 26 U.S.C. § 6103 ........................................................................................ 21

A.    Substantial Facts Suggest A Violation of 26 U.S.C. §6103,
        Warranting Further Disclosure ..................................................................................... 21

B.    Suppression of Evidence And Dismissal of The Indictment Are
        Both Potential Remedies For a §6103 Violation ........................................................... 24

CONCLUSION ....................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

Armour Packing Co. v. United States, 209 U.S. 56 (1908) .......................................................... 10

Crawford v. Washington, 541 U.S. 36, (2004) ........................................................................ 12

Foucha v. Louisiana 504 U.S. 71 (1992) (Kennedy, *J.*) (dissenting) ........................................... 25

Maryland v. Craig, 497 U.S. 836 (1990) ................................................................................ 12

Ohio v. Roberts, 448 U.S. 56, (1980) .................................................................................... 12

Petite v. United States, 361 U.S. 529 (1960) ........................................................................... 5

Strickland v. Washington, 466 U.S. 668 (1984) ...................................................................... 13

Travis v. United States, 364 U.S. 631 (1961) ........................................................................... 10

United States  v. Guzman, 282 F.3d 56 (1st Cir. 2002) ............................................................ 24

United States v. Barnes, 604 F.2d 121 (2d Cir. 1979) ............................................................. 25

United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181 (2d Cir. 1989) ................................ 4

United States v. Bin Laden, 146 F. Supp. 373 (S.D.N.Y. 2001) .................................................. 7

United States v. Brennan, 183 F.3d 139 (2d Cir. 1999) ............................................................ 11

United States v. Cabrales, 524 U.S. 1 (1998) ..................................................................... 7, 16

United States v. Candella, 487 F.2d 1223 (2d Cir. 1973) ........................................................... 7

United States v. Clark, 360 F.Supp. 936 (S.D.N.Y. 1973) ......................................................... 20

United States v. Gonzalez-Lopez, 548 U.S. 140 (2006) ............................................................ 12

United States v. Hanley, 1995 WL 60019, 2 (S.D.N.Y. 1995) ................................................... 20

United States v. Johnson, 323 U.S. 273 (1944) ...................................................................... 15

United States v. Lard 734 F.2d 1290 (8th Cir. 1984) ............................................................... 24

United States v. Mahaffy, 2006 WL 2224518 (E.D.N.Y. Aug. 2, 2006) ....................................... 7

United States v. Martino, 2000 WL 1843233, at *6 (S.D.N.Y. 2000) ......................................... 20

United States v. Michaelian, 803 F.2d 104 (9th Cir. 1986) ....................................................... 26

United States v. Novak, 443 F.2d 150 (2d Cir. 2006) ................................................................ 4

United States v. Ramirez, 420 F.3d 134 (2d Cir. 2005) .......................................................... 7, 8

United States v. Reed, 601 F. Supp. 685 (S.D.N.Y.),
    rev'd on substantive grounds, 773 F.3d.477 (2d Cir. 1985) ............................................. 7, 15

United States v. Russell, 582 F.Supp. 660 (S.D.N.Y. 1984) ...................................................... 19

United States v. Saavedra, 223 F.3d 85 (2d Cir. 2000) .......................................................... 4, 15

United States v. Schmidt, 105 F.3d 82 (2d Cir. 1997) .............................................................. 24

United States v. Smith, 198 F.3d 377 (2d Cir. 1999).................................................. 10

United States v. Stein, S1 05 Cr  0888 (LAK) ............................................................. 22

United States v. Tweel, 550 F.2d 297 (5th Cir. 1977) ................................................. 25

United States v. U.S. Steel Corp., 226 F.Supp. 152 (D.C.N.Y. 1964)......................... 20

**Statutes**

18 U.S.C. §1001 .............................................................................. 8, 9, 10, 12, 13, 16

18 U.S.C. §1001 (a)(2) ................................................................................................... 9

18 U.S.C. §3237(a) ........................................................................................... 11, 13, 15

18 U.S.C. §3331 .............................................................................................................. 3

18 U.S.C. §3332 .......................................................................................................... 3, 4

26 U.S.C. §6103 ........................................................................................................... 21

26 U.S.C. §6103(b)(2) .................................................................................................. 21

26 U.S.C. §6103(h) ................................................................................................. 22, 25

26 U.S.C. §6103(h)(2) .................................................................................................. 22

26 U.S.C. §6103(i) ........................................................................................................ 25

26 U.S.C. §6103(i)(1) ................................................................................................... 25

New York Penal Law §120.10 ...................................................................................... 26

**Rules**

Rule 12(b)(2), Fed.R.Crim.P.......................................................................................... 3, 6

Rule 12(b)(3)(A) Fed.  R. Crim. P. .................................................................................... 2

Rule 12(b)(3)(B), Fed. R. Crim. P. .................................................................................... 2

Rule 21(b) Fed. R. Crim. P. ............................................................................................... 3

**Other Authorities**

Amy Hamilton and Sheryl Stratton, Taxpayer Confidentiality: Civilian Casualty
    in War on Shelters? 2002 TNT 140-1 (July 19, 2002)......................................... 23

Marilyn Adams et. al., *Fliers in for Pain as Airlines Pack It In*, USA TODAY, June
    3, 2008.................................................................................................................. 18

Michael Idov, *Gridlock at 30,000 Feet, What Went So Catastrophically Wrong*,
    NEW YORK, Nov. 5, 2007........................................................................................ 19

Micheline Maynard, *Airlines' Cuts Making Cities No-Fly Zones*, N.Y. TIMES,
    May 21, 2008 ......................................................................................................... 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

UNITED STATES OF AMERICA,

        - v. -

ROBERT COPLAN,                                            (S-1) 07 Cr. 453 (SHS)
MARTIN NISSENBAUM,
RICHARD SHAPIRO,
BRIAN VAUGHN,
DAVID SMITH, and
CHARLES BOLTON,

                Defendants.

-------------------------------------X

### REPLY MEMORANDUM OF LAW
### IN SUPPORT OF DEFENDANT VAUGHN'S
### OMNIBUS PRETRIAL MOTION

This Reply Memorandum of Law is submitted in reply to the Government's

Memorandum in Opposition to Defendant's Pretrial Motions dated June 2, 2007 (hereinafter

referred to as "Gov't. Memorandum") and in further support of the Vaughn motions.[1]  As

applicable, we adopt the reply submissions of co-counsel for the defendants Coplan,

Nissenbaum, Shapiro and Bolton.

--------------------------------

[1]/  Our initial Memorandum of Law is referred to herein as "Vaughn Memorandum."

## REPLY IN SUPPORT
## OF POINTS I - III

The Government's response to the issues arising from the fact that Vaughn's IRS deposition was conducted in Nashville, Tennessee, conflates and ignores arguments, and disregards settled Supreme Court venue authority which uncompromisingly requires ascertainment of the conduct elements of the charged offense.

(1)

The conflation occurs in its assertion that Vaughn's Point I, which addresses the jurisdiction of the Special Grand Jury to indict, is resolved in method and substance by determining the validity of our Constitutional venue argument in Point II. The Government asserts: "These alternative formulations appear duplicative, as they seek the same remedy (dismissal of the Count) for the same alleged defect (lack of venue). Accordingly, the Government addresses Vaughn's argument as a single motion to dismiss for lack of venue." Gov't. Memorandum at 21, n. 10.

To begin, the Government's supposition is wrong; different relief has been requested. The dismissal of Count Ten is, of course, the sole available remedy for the Special Grand Jury's lack of authority to indict a crime committed outside its statutory jurisdiction, and that is what we have requested.[2/] It is not based, therefore, on the failure, as such, of "venue."

---

[2/]   ¶ 1 of the Vaughn Notice of Omnibus Pretrial Motion ("Notice") requests this relief:

> For an Order, pursuant to Rule 12(b)(3)(A) and (B), Fed. R. Crim. P., and the grand jury clause of the Sixth Amendment, U.S. Constitution, dismissing Count Ten of the Superseding Indictment on the ground that the Special Grand Jury, impaneled and acting pursuant to 18

. . . ./. . .

But we have not sought a dismissal of Count Ten because of its venue defect. As set forth in our Notice of Omnibus Pretrial Motion, at ¶ 2, the alternative relief we have sought is a transfer of the charge in Count Ten to the Middle District of Tennessee.[3/] This is something which the Court is expressly authorized to order under 28 U.S.C. §1406(a), and implement under Rule 21(b), Fed. R. Crim. P.[4/] We had requested the alternative relief of transfer to accommodate the possibility that the Government might advance some other

_____

. . . *footnote continued*

> U.S.C. §§3331-3332 had no jurisdiction to charge the defendant with a crime committed wholly outside the geographical jurisdiction of the Special Grand Jury;

[3/]    ¶ 2 of the Vaughn Notice states:

> In the alternative to a dismissal of Count Ten, for an Order pursuant to Rules 12(b)(2) and 18, Fed. R. Crim. P., 28 U.S.C. §1406(a), and Article III, Section 2 of the U.S. Constitution, and the venue clause of Sixth Amendment of the U.S. Constitution, directing that the charge in Count Ten of the Superseding Indictment be transferred to the Middle District of Tennessee, on the ground that there is no venue for the charge in the Southern District of New York;

[4/]    28 U.S.C. §1406(a) provides as follows:

> (a) The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interests of justice, transfer such case to any district or division in which it could have been brought. (emphasis added).

Rule 21(b), Fed. R. Crim. P. ("Proceedings on transfer") provides:

> When the court orders a transfer, the clerk must send to the transferee district the file, or a certified copy, and any bail taken. The prosecution will then continue in the transferee district.

argument (which it has not) that would sustain the Grand Jury's jurisdiction to charge Count Ten even though the crime was not committed within the Southern District of New York.[5]

Our request, therefore, for the alternative relief of transfer has been made to effectuate the "strength" of the venue provision, "which is manifested in the principle that, when an indictment charges a defendant with multiple counts, 'venue must be proper with respect to each count.' " United States v. Novak, 443 F.2d 150, 160-61 (2d Cir. 2006) (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1188 (2d Cir. 1989). An important corollary of that principle was expressed in United States v. Saavedra, 223 F.3d 85, 89 (2d Cir. 2000): "Where . . .a defendant is charged with conspiracy as well as substantive offenses, venue must be laid in a district where all the counts may be tried." (emphasis added).

While the Government has agreed with the first principle, see Gov't. Memorandum at 22, it has turned on its head the second, irrelevantly arguing that venue for Count Ten is proper in the Southern District because, "[t]his District played a central role in the conspiracy alleged in Count One and in the substantive acts [which include the false statement allegations against Vaughn] that form the basis of the challenged counts." Gov't.

---

[5]   We take it as a concession from the Government's decision to ignore in its response the textual limitation in 18 U.S.C. §3332(a), and the authority of such cases as United States v. Fein, 370 F. Supp. 446 (E.D.N.Y.), aff'd., 504 F.2d 1170 (2d Cir. 1974), and United States v. McKay, 45 F. Supp. 1007, 1015, (E.D. Mich. 1942), that the alleged false statements in Count Ten must be dismissed on jurisdictional grounds if the Court determines they were not committed in the Southern District of New York as required by §3332(a). See Point I, Vaughn Memorandum.

Memorandum at 26; and 28, n. 11 (the Southern District had a "primary nexus" to the IRS

investigation).

    With due regard, the Government has it backwards. The Constitution's venue

guarantees were written for a defendant's benefit, not in subservience to the Government's

interests, however compelling, in having a single trial. The transfer of Count Ten to the

Middle District of Tennessee, upon Vaughn's unflinching exercise of his right to be tried in a

constitutional venue, would thus _properly_ require that the entire case against him be

transferred there as well. This is hardly a farfetched "fairness" idea, arising as it does from

fundamental notions of fairness as well as the policy of the Department of Justice as

expressed in Petite v. United States, 361 U.S. 529, 530 (1960):  ". . . it is the general policy of

the Federal Government that 'several offenses arising out of a single transaction should be

alleged and tried together and should not be the basis of multiple prosecutions, a policy

dictated be considerations both of fairness to defendants and of efficient and orderly law

enforcement.' "  The Government cannot, we submit, successfully argue that a defendant's

right to be tried in a proper venue is trumped if the Government would thereby be required

to try the case a second time.

(2)

    These different "remedy" positions, while they both arise from the same fact, which

is that Vaughn's deposition was given in Nashville, each involves its own analysis.  The most

striking difference in the two is that whatever may be said of the merits of the Government's

argument that an indictment sufficient on its face as to venue is immune from pretrial attack

(an argument which we believe is wrong anyway), has no application to the Court's authority

5

to determine the jurisdiction of the Special Grand Jury to indict. See Vaughn Memorandum, at p. 3, n.1.

Basically, the Government has sloughed off inquiry as to whether the Special Grand Jury could indict a crime beyond its statutory authority, by arguing that the jurisdictional inquiry has all the trappings of the venue argument, including the supposed limitation on the Court's authority to determine, pretrial, whether the false statement charge was "committed within" the Southern District. Thus, to the extent that it would insulate from the Court's direct inquiry the legal and factual basis upon which the Government has claimed that the alleged false statement crimes of Vaughn were committed in the Southern District of New York, the Court should disregard so much of the Government's self-serving decision to "address[ ] Vaughn's two arguments as a single motion to dismiss for lack of venue."

(3)

The Government's venue argument as it relates to the sufficiency of the indictment is based upon two arguments:  one, because the indictment alleges that the false statements were made in the Southern District of New York, the Court is obliged to accept it as alleged; and two, the prediction that the evidence at trial will, in any event, be sufficient to support the allegation.

The first argument, which we anticipated in our initial memorandum, altogether ignores two arguments which take this case out of the typical challenge to the venue-fixing allegation in an indictment.  First, as we have urged, the pretrial determination of the proper venue for Count Ten can be, and indeed should be made because it can be done "without a trial of the general issue," Rule 12(b)(2), Fed.R.Crim.P.  It is noteworthy that the

Government has not argued that the issue of proper venue is a matter which involves the "general issue," nor has it made any argument distinguishing those cases, such as United States v. Cabrales, 524 U.S. 1 (1998) and United States v. Reed, 601 F. Supp. 685 (S.D.N.Y.), rev'd on substantive grounds, 773 F.3d.477 (2d Cir. 1985), in which the venue-fixing allegation in the indictment were tested and resolved before trial of the "general issue." See Vaughn Memorandum, at pp. 20-24.  This case also presents an appropriate instance in which the non-general issue of venue should also be determined because, taking the skimpy factual scenario as outlined in the Government's Memorandum, it is clear, as a matter of law, that there is no venue in this District for Count Ten.[6/]

(4)

The Government's substantive venue argument is advanced principally on the basis of two venue decisions from the Court of Appeals, United States v. Candella, 487 F.2d 1223 (2d Cir. 1973), and United States v. Ramirez, 420 F.2d 134 (2d Cir. 2005), each of which involved written false statements, and the decision in United States v. Mahaffy, 2006 WL 2224518 (E.D.N.Y. Aug. 2, 2006), which declines to follow a case upon which we rely, United States v. Bin Laden, 146 F. Supp. 373 (S.D.N.Y. 2001).  Mahaffy is a case which involved false oral statements in which the District Court stated that,"[i]n light of the expansive interpretation of Candella offered in Ramirez, the district court in Bin Laden might have ruled differently."  Id. at *9.  The Government goes so far as to suggest that

---

[6/]  The Government has also not responded to the argument we advanced in Point II, pp. 24-26 of Vaughn Memorandum, that a defendant has a Constitutional right to test venue pretrial. We draw the Court's attention to that argument.

Ramirez has "effectively overruled Bin Laden, a case which, we maintain, correctly applies the constitutional venue guarantee to the conduct which constitutes the described crime under §1001 in that case and in this one.

In Ramirez, the defendants were indicted for a violation of §1001(a)(3), which is the provision of the section that deals with written false statements.  It provides for criminal liability for anyone who knowingly and willfully" makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." (emphasis added). The Court in Ramirez pointedly emphasized the "makes or uses" language in subdivision (3) of the section, stating that "[i]t is thus unlawful under §1001 to *make or use* false statements in matters within the jurisdiction of the United States government." (emphasis in original) Ramirez, at 142.[7/] Candella also involved a written statement prepared by the defendant.[8/]

---

[7/]   The charge against the defendants in Ramirez, was that they "made and used false writings and documents knowing the same to contain materially false fictitious and fraudulent statements and entries, . . ." See Appendix A to this Reply Memorandum, Indictment in United States v. Ramirez, et ano. 52 Cr. 414 (KMW), at p. 8.

[8/]   Prior to a 1996 amendment, §1001 provided as follows:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

That was how the statute appeared in the Candella prosecution. See Candella, at 1224, n.1

In contrast, the provision in §1001 (a)(2), which applies to oral statements, eliminates the <u>use</u> of the false statement as a conduct element. It states: "[whoever] makes any materially false, fictitious, or fraudulent statement or representation." Thus, the statute itself distinguishes between the type of conduct which is prohibited. Only because a false written statement carries with it the conduct element of "use," can it be stated, as in <u>Candella</u> and <u>Ramirez</u>, that the charge continued into the district in which the statement was used.

Thus, while the false written documents in <u>Candella</u> and <u>Ramirez</u> may have been <u>made</u> outside the Southern District of New York, their <u>use</u> within the Southern District was part of the crime which was charged and the applicable statutory provision. That cannot be said, however, about either the statutory provision which criminalizes false oral statements under §1001 ("makes any materially false, fictitious, or fraudulent statement or representation") nor the charge in Count Ten which, consistent with the statutory underpinning, alleges that Vaughn ". . . knowingly made materially false, fictitious and fraudulent statements and representations . . . " etc.

The <u>Ramirez</u> decision, in describing the charge against the defendant Vitug, stated: "Vitug was charged . . . with making false statements under 18 U.S.C. §1001 by <u>presenting</u> to the U.S. DOL [the petitions and other documents], all of which contained false statements (emphasis added) <u>Ramirez</u>, at 142. Given the statutory injunction against the use of a false statement, the Court employed the adverb "presenting," and thereafter concluded, quoting <u>Candella</u> that Vitug's "statements continued to be false" and continued to be within the jurisdiction of the United States "when they finally reached Manhattan." <u>Ramirez</u>, at 143. But these are not statements which reflect the use to which the defendant made the

documents and, without the Court saying more, and indeed, discussing the <u>Bin Laden</u> decision, it can hardly be said that the Court of Appeals in <u>Ramirez</u> has effectively "overruled." Gov't. Memorandum, at 29.

Stated differently, the written statements involved in <u>Candella</u> and <u>Ramirez</u> were initiated by the defendants for use in the district to which they were sent. "Use," therefore was part of the <u>defendant's</u> conduct. In contrast, in this case, as in <u>Bin Laden</u>, the "use" of the oral statements was by the Government agency. Manifestly, the "use" by the Government cannot, consistent with the venue guarantee, be the basis upon which venue is determined. It must be a "use" by the defendant. Simply stated, to so expand application of the continuing offense provision, by using the Government agency's conduct, that is, the Government's "use" of the statement, would be an expansion that would collide with the central proposition of the venue clause that venue is determined on the basis of the conduct elements of the offense as they apply to what the defendant has done.

The Government's analysis, therefore, wrenches entirely out of its constitutional context, the "force propelled" statement in <u>Johnson</u> v. <u>United States</u>. The Government's brief obscures the central tenet of venue jurisprudence in criminal cases, namely that prosecution may take place "only in those districts in which an act occurs that the statute at issue proscribes." <u>United States</u> v. <u>Smith</u>, 198 F.3d 377, 384 (2d Cir. 1999).[2]

---

[2] The "force and effect" argument, properly understood, is relevant only insofar as Congress might decide to expand venue, for example as it did through the enactment of §3227, or it does on occasion by adding special venue provisions to criminal statutes. <u>Travis</u> v. <u>United States</u>, 364 U.S. 631, 635 (1961); <u>Armour Packing Co.</u> v. <u>United States</u>,

. . . /. . .

In <u>United States</u> v. <u>Brennan</u>, 183 F.3d 139 (2d Cir. 1999), the Court considered whether the continuing offense statute applied to the mail fraud statute could support venue in a district through which the mailings had traveled, as the Government contended. In <u>Brennan</u>, the mailings had been routed through the Eastern District of New York. The defense asserted, however, that the continuing offense statute, 18 U.S.C. §3237(a) does not apply to mail fraud prosecutions. As characterized by the Court in <u>Brennan</u>, the defense argument rested on "the contention that the mail fraud statute does not proscribe conduct involving "the use of the mails" within the meaning of §3237(a). The Court stated:

> We agree. Though perhaps surprising, this conclusion is strongly supported by consideration of the history and purpose of § 3237(a) and the constitutional protection of defendants' venue rights.

The Court in <u>Brennan</u> remarked that the "[p]assage of §3237(a), however, could not and did not alter the constitutional and policy concerns underlying the Court's restrained view of venue; and it did not affect the general validity of the *Johnson* rule of construction (Supreme Court citations omitted) <u>Brennan</u>, at 147. As stated in <u>Brennan</u>, at 147, "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs". <u>Brennan</u> rejected the Government's argument that the district through which mail was transported could provide a basis for venue in that district.

---

. . . *footnote continued*

209 U.S. 56, 73-75 (1908). Notably, when Congress revised and expanded §1001 in 1996, Pub. L. 104-292, 52, 110 Stat. 3459, Oct. 11, 1996, it added no special venue provision. Noteworthy, in this context particularly, is the placement in Washington, D.C. of Venue by the Southern District of New York in the <u>Kerik</u> prosecution for false statements made there. This is another argument which the Government has not addressed. <u>See</u> Tucker Dec. at pp. 5-6; Vaughn Memorandum at 14, n. 9.

The Court in <u>Brennan</u> rested its holding, therefore, on the same proposition which supported the <u>Bin Laden</u> holding, namely, that the language of the statute which criminalized the conduct did not provide the basis for venue. Thus, while <u>Candella</u> and <u>Ramirez</u> may provide precedential support within the Circuit for application of the continuing offense statute to written false statements, because of the "makes or uses" phrasing in subdivision (3) of §1001, they do not alter the analytical force of the <u>Bin Laden</u> decision nor <u>Brennan.</u>

As to the <u>Mahaffy</u> decision, on which the Government relies, our position is that the case, which is otherwise distinguishable on its specific facts, should not be followed because, as Justice Scalia has stated, it "abstracts from the right its purposes, and then eliminates the right." <u>United States</u> v. <u>Gonzalez-Lopez</u>, 548 U.S. 140, 145 (2006). The Supreme Court, in its recent decisions enforcing the protections of the Sixth Amendment, has made clear that the fair trial rights guaranteed by the Sixth Amendment are not subject to dilution by analyzing whether or not the policies behind the rights have been compromised, in effect, rebalancing the right in individual cases. The Supreme Court stated recently in <u>Gonzalez-Lopez,</u>, a case involving the Sixth Amendment right to counsel guarantee:

> [W]hat the Government urges upon us here is what was urged upon us (successfully, at one time, see <u>Ohio</u> v. <u>Roberts</u>, 448 U.S. 56, (1980)) with regard to the Sixth Amendment's right of confrontation – a line of reasoning that "abstracts from the right to its purposes, and then eliminates the right." <u>Maryland</u> v. <u>Craig</u>, 497 U.S. 836, 862, (1990) (SCALIA, J., dissenting). Since, it was argued, the purpose of the Confrontation Clause was to ensure the reliability of evidence, so long as the testimonial hearsay bore " indicia of reliability," the Confrontation Clause was not violated. See <u>Roberts</u>, <u>supra</u>, at 65-66. We rejected that argument (and our prior cases that had accepted it) in <u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36, (2004), saying that the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." <u>Id</u>., at 61.

In Gonzalez-Lopez, the Court thus rejected the Government's argument that a defendant could be deprived of his choice of counsel so long as the fairness of the trial met the test of Strickland v. Washington, 466 U.S. 668 (1984). The Court continued:

> So also with the Sixth Amendment right to counsel of choice. It commands, not that a trial be fair, but that a particular guarantee of fairness be provided – to wit, that the accused be defended by the counsel he believes to be best. "The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause." Strickland, supra, at 684-685.

One of the "elements" of the Sixth Amendment is the right to venue, and whether a defendant asserts prejudice, as the Court in Ramirez suggests is relevant under the "substantial contacts" test of Reed, should not be a requirement. As it is, Vaughn does claim that the venue in this case is presently unfair to him. The Government's reliance on Mahaffy thus shows how it has misconceived the focus of the venue inquiry, mixing up the order of inquiry so that the "force and effect" language from Johnson, which was the Supreme Court's foreshadowing of the general continuing crime provision in §3237(a), becomes the guidepost by which the court determines the conduct elements of oral false statement charge under 18 U.S.C. §1001.

Moreover, the facts outlined in Mahaffy serve to readily distinguish that case from Vaughn's. In Mahaffy, the oral statements at issue here made by two of the defendants, Nwaigwe and Picone, to the SEC in Manhattan in connection with its investigation. In both instances, these testifying witnesses were told that their testimony would be shared with the United States Attorney's Office for the Eastern District of New York. In the case of Picone, he was also provided with a form statement which stated that the SEC "often makes its files

13

available to other governmental agencies, particularly United States Attorneys and state prosecutors." Mahaffy, at *5-6.

In contrast to Mahaffy, the Government can not, nor does it assert that Vaughn was provided with information comparable to that provided to the defendants in Mahaffy. This absence of articulable facts even goes so far, though it need not, as the absence of any evidence that Vaughn even knew that the IRS summons had come from its New York office.[10] The very best that can be said, and it is far from sufficient, is that IRS summons was issued out of its New York office. Under no conceivable formulation of the "force propelled" statement in Candella, could it be said that the mere happenstance of where a government investigation is located can then foist the location of that venue upon any person who is interviewed or deposed in connection with the investigation, regardless of where that interview might take place.

---

[10] Even Judge Glasser, in Mahaffy, noted that, "Candella has been criticized for its expansiveness; conspicuously absent from the Court's opinion is a statement requiring knowledge or intent on the part of the defendant that the affidavits would be delivered to Manhattan." Mahaffy, at *8. Judge Glasser continued:

> The closest to such a statement was the Court's observation that "[t]he force propelled here by the defendants immediately contemplated Manhattan," Candella, 487 F.2d 1228, which strictly, and somewhat cryptically, says nothing about the defendant's mental state. An expansive interpretation, essentially imposing strict liability for the making of false statements in assessing venue, was apparently confirmed in [Ramirez]

But Candella, as well as Ramirez, were dealing with written statements which are instinct with use at some additional place apart from where they might be initially submitted. Neither Candella nor Ramirez, therefore, can properly be read as imposing "strict liability," and certainly not a liability which transcends the cogent reasoning in Bin Laden and which would undermine the Johnson doctrine of construction.

The Government also relies on the quotation from United States v. Reed, 773 F.2d 477, 480 (2d Cir. 1985), that where "the acts constituting the crime and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue." See Gov't Memorandum at 24. It then argues that because the E&Y promoter penalty audit was centered in the Southern District of New York, the effect on that audit is sufficient to allow for venue in the Southern District of New York. The Government thus urges: ". . . the false statements alleged in Counts Ten and Eleven . . . meet the relevant venue test because they were made in connection with an IRS examination conducted by the Manhattan office of the IRS." Gov't Memo at 27.

To begin, the Second Circuit has never adopted as a constitutional test the idea that venue sufficiently exists in a district in which only the "effects" of conduct committed outside can be demonstrated. As pointed out by Judge Sand in Bin Laden, ". . . there is nothing in Reed [United States v. Reed, 773 F.2d. 477 (2d Cir. 1985) which says that the effects of a crime alone may ever serve as an independent basis for venue when all other considerations properly point to another judicial district." Bin Laden, at 378. Construed otherwise, Reed would be at clear odds with Supreme Court precedent. In that respect, Bin Laden is fully supported by other Second Circuit authority which, consistent with the command of United States v. Johnson, 323 U.S. 273, 276 (1944), has never construed the continuing offense provision in 18 U.S.C. §3237(a) to provide venue solely on the basis of the "effect" of the conduct in a district other than in which the crime was committed. There is nothing in either Candella or Ramirez which alters that formulation. Indeed, the Court in United States v. Saavedra, at 93, noted that the Reed "substantial contacts" test is not a

"formal constitutional test," but merely helpful in "determining whether a chosen venue is unfair or prejudicial to a defendant."

The ability of the Government to argue and even present evidence that criminal conduct confined to one venue, also had an "effect" in another venue, does not alter the settled analysis which the Supreme Court had time and again stated, namely, that the *locus delicti* of the crime, which is determined on the basis of the conduct elements, determines venue. "Conduct" does not include "effects" and Reed, which the Government relies upon, cannot, to be consistent with Supreme Court precedent, including most recently Gonzalez-Lopez, and the text of the venue guarantee, be interpreted otherwise.

This is made clear in United States v. Cabrales, 524 U.S. 1 (1998), where the Supreme Court determined that a defendant charged with money laundering which took place wholly within Florida, could not be charged in Missouri, even though Missouri was where the underlying long activity had taken place. As pointed out in Saavedra, 223 F.2d 90, the Cabrales decision "reasoned that the Missouri venue of the drug trafficking crime 'was of no moment' since 'it is immaterial whether the actor knew where the first crime was committed.' " Id. (quoting Cabrales, 524 U.S. at 9) (internal quotations omitted). That is the crux of Judge Sand's analysis in Bin Laden in which he correctly observed that: "The elements of 18 U.S.C. §1001(a)(2) . . . do not include any requirement that there be proof of the false statement's effect, if any." Bin Laden, at 378. Judge Sand used the word "effect" in this last statement, but an equivalent and equally appropriate word would be "use," for it is the use of a false statement which is its effect.

Moreover, and finally, Judge Leval, writing for the Court in  Brennan, and echoing the Johnson rule of construction, pointed to the "issue of the limits of Congress's power to . . . redefine crimes "in order to extend venue.  Brennan, 183 F.3d at 148.  That is no less the case for Court-made expansion of crimes through redefinition, but that is precisely what the Government is urging upon this Court in its "effects" argument.  Simply put, the "effect" of Vaughn's statements cannot be substituted for the absence of any conduct element of the charged crime that he committed in the Southern District of New York.

## REPLY IN SUPPORT
## OF POINT IV

In its response memorandum, the Government argues that Vaughn's "complaint about a trial in New York rings particularly hollow given that he lives in Louisiana, some 400 miles from the Tennessee district to which he seeks transfer."  Gov't. Memorandum at 34 There is nothing "hollow" about Vaughn's position.  While the district of Vaughn's residence may be some 400 miles from the Middle District of Tennessee, it is over 1,300 miles from the Southern District of New York.

Importantly, if the Court transfers venue to the Middle District of Tennessee, Vaughn will be able to drive home on the weekends to see his family and friends, attend his church, and tend to his start-up business.  Vaughn, of course, would not be able to drive home on the weekends if his trial is held in the Southern District of New York. The Government myopically claims that this fact merely impacts the relative costs of travel. The Government is mistaken: it impacts not only Vaughn's cost to travel home during the trial, but most importantly his ability.

At best, there are only five qualifying flights departing from New York/New Jersey to West Monroe, Louisiana, or its surrounding airports on Fridays in March and April 2009. See Flight Data and Summary Report, Exhibit B to Barrett Reply Declaration. Moreover, the continued availability of these flights is uncertain. As the news media has recently reported, many of the airlines are dropping such regional flights due to the financial crises in the airline industry. See, e.g., Micheline Maynard, *Airlines' Cuts Making Cities No-Fly Zones*, N.Y. TIMES, May 21, 2008 ("Flights seem to be disappearing by the day . . . Almost every major carrier, from American Airlines to Delta Air Lines and US Airways, is crossing cities off its list, leaving passengers with fewer choices than a year ago."), Exhibit C to Barrett Reply Declaration; Marilyn Adams et. al., *Fliers in for Pain as Airlines Pack It In*, USA TODAY, June 3, 2008 ("Small cities won't be spared. [M]idsize airports are seeing double-digit reductions."), Exhibit D to Barrett Reply Declaration. If airline travel to West Monroe is cancelled or substantially cut-back as predicted, Vaughn is likely to be stranded in New York with no opportunity of returning home during the trial.

Additionally, if Vaughn misses one of the few scheduled flights (or one of the connecting flights) due to traffic, security, or flight delays or any of the other myriad of air travel events that are outside Vaughn's control, he would likely miss his opportunity to return home or to return to New York. Despite the Government's bald assertion that "New York . . . [is] easily reachable by air transportation," see Gov't. Memorandum at 42, New York is a travel nightmare. As reported in a recent edition of NEW YORK magazine:

> Flying into or out of New York is the worst it's ever been. In fact, our
> airports are the worst in the country. According to the FAA, Kennedy,
> La Guardia, and Newark hold the three bottom spots in the national
> on-time arrival competition. Newark has the most delayed landings,

> with only 57 percent of flights coming in on time. La Guardia is second
> to last, with 58 percent, and JFK is third worst, with 59 percent.
> Leaving is no picnic, either. JFK boasts the most sluggish takeoffs of
> the nation's 32 major airports: Barely three out of five departing flights
> leave the so-called Gateway to the World on time. (Newark and La
> Guardia don't fare much better on that front, ranking No. 30 and No.
> 25, respectively.)  All in all, over one third of the nation's delays happen
> in the New York metro area.

Michael Idov, *Gridlock at 30,000 Feet, What Went So Catastrophically Wrong*, NEW YORK,

Nov. 5, 2007, Exhibit E to Barrett Reply Declaration. Without a doubt, the first <u>Platt</u> factor

– location of the defendant – weighs in favor of transferring Vaughn's case to the Middle

District of Tennessee.

The difficulties of traveling to and from New York will also negatively impact

Vaughn's numerous fact and character witnesses. While the Government argues in its

response brief that Vaughn has "failed to identify a single witness who would be unable to

testify at trial as a result of the trial taking place in New York" <u>see</u> Gov't. Memorandum at

38, the Rule 21(b) analysis is not limited solely to the ability of witnesses to attend trial in a

particular location, but also considers the convenience of witnesses. <u>See</u> <u>United States</u> v.

<u>Russell</u>, 582 F.Supp. 660, 663 (S.D.N.Y. 1984) ("The availability *and convenience* of [the

defendants'] witnesses, while not a controlling factor, is one that should be given

considerable weight.") (emphasis added). In stark contrast to the cost and difficulty of

traveling to and from New York, most of Vaughn's witnesses could easily and economically

drive to and from Nashville due to their physical proximity to that venue. <u>See</u> Barrett

Declaration, June 16, 2008, submitted for *in camera* review only.

Also, despite the Government's unsupported contention that New York is "equally

accessible . . . [as] Memphis or Nashville", Nashville is far more convenient than New York

19

for most of the witnesses that must travel by airplane because of the ease of travel to and from Nashville Metropolitan Airport. See US Department of Transportation, Bureau of Transportation Statistics, Exhibit F to Barrett Reply Declaration. (Over a five year period of time, 78% of flights arrived on time at Nashville Metropolitan Airport.). Accordingly, the second Platt factor – location of witnesses – and the eighth Platt factor – relative accessibility of trial -- weigh in favor of transfer.

The Government also glosses over the significant hardships that would be imposed on Vaughn if his trial is held in the Southern District of New York. In its response brief, the Government quickly dismisses such hardships, but then complains at length about the hardships that would be imposed on it if trial is held in the Middle District of Tennessee. The Court should reject the Government's double standard, especially in light of the fact that "[o]ne of the purposes of Rule 21(b) [is] to protect a defendant against abuses arising from indictment by the Government in a jurisdiction far removed from his home . . . ." United States v. U.S. Steel Corp., 226 F.Supp. 152, 156 (D.C.N.Y. 1964); see also United States v. Martino, 2000 WL 1843233, at *6 (S.D.N.Y. 2000) United States v. Hanley, 1995 WL 60019, 2 (S.D.N.Y. 1995). Furthermore, "the situation the Government now faces [i.e. possibility of multiple litigation] was brought about by its own questionable decision to prosecute this case in a district remote from most of the events and persons involved." United States v. Clark, 360 F.Supp. 936, 946 (S.D.N.Y. 1973).

For the foregoing reasons, and the reasons stated in Vaughn's Memorandum in Support of his Rule 21(b) Motion, the majority of the Platt factors weigh in favor of

transferring the counts against Vaughn in the Superseding Indictment to the Middle District of Tennessee.

## REPLY TO THE GOVERNMENT'S RESPONSE TO THE POTENTIAL VIOLATION OF 26 U.S.C. §6103

### A.    Substantial Facts Suggest a Violation of 26 U.S.C. §6103, Warranting Further Disclosure

The Government ignores the actual issue of improper disclosure under 26 U.S.C. §6103 ("6103") by simply repeating, from the affidavit of Assistant United States Attorney Shirah Neiman, that prior to the tax grand jury investigation into Enrst & Young being "authorized", the Government did not conduct a tax investigation of Ernst & Young. Gov't. Memorandum at 64. This sheds no light, however, on the central question of whether the IRS disclosed return information[11] to the DOJ before "the Secretary [of the Treasury] has

---

[11]  26 U.S.C. §6103(b)(2) provides, in part:

    (2) Return information.--The term "return information" means--

        (A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

referred the case to the Department of Justice." 26 U.S.C. §6103(h)(2). Internal IRS

communications disclosed in Stein suggest such an improper disclosure.[12]

According to a March 2003 internal IRS email, two attorneys from the DOJ Tax

Division met with the IRS to "gather some facts" regarding the criminal investigation into

KPMG, despite the fact that any disclosure of return information at that point would have

been illegal. Smith Memorandum at 8; Neiman Aff. ¶ 5, Exhibit R to Tucker Dec. (stating

that the KPMG case was not referred until February 2004). An IRS participant in the

meeting noted in a follow-up email that "the DOJ criminal enforcement division may be

requesting additional information or documents related to the basis shift transactions and

other KPMG transactions." Smith Memorandum at 9. The Defense counsel in the Stein case

were not the only ones disturbed by this meeting. Upon learning of it, Roland Barral, the IRS

Counsel charged with conducting promoter penalty negotiations with KPMG, noted that he

found it "alarming that activity such as this can proceed to this advanced level without our

prior knowledge" and demanded to be provided "with more information on how this

---

[12] The Government rejects the assertion that Vaughn should be placed on the same footing as the defendants in Stein as "utterly specious" because, in that case, Judge Kaplan "has not required the Government to produce any documents or records relating to the defense." Gov't. Memorandum at 65. However, Judge Kaplan never ordered the production of such communications because the Government provided them during initial discovery productions. "The Government provided in discovery around 3,900 emails originating from the "Outlook" email folders of Drita Tonuzi, an IRS agent who was assigned to the KPMG tax shelter promoter penalty audit . . . " See Appendix B, annexed hereto, United States v. Stein, S1 05 Cr 0888 (LAK), Reply Memorandum of Richard Smith In Further Support of Defendants' Motion to Dismiss the Indictment at p. 5, n. 5, Docket Item #1075 ("Smith Memorandum"), annexed hereto as Appendix B. In the Stein case, internal communications detailing IRS and DOJ meetings were produced, but in this case, asking for the same information is labeled a "fishing expedition." Gov't. Memorandum at 56.

meeting came about and how you heard of it." Smith Memorandum at 9. Notably, Kevin

Downing, one of above referenced DOJ attorneys, was also involved in investigating Ernst

& Young in this case.  See Tucker Dec. ¶ 29, n. 11. This is not the first suggestion that the

IRS was haphazard in protecting return information during these tax shelter investigations.

See Amy Hamilton and Sheryl Stratton, Taxpayer Confidentiality: Civilian Casualty in War

on Shelters? 2002 TNT 140-1 (July 19, 2002), copy annexed hereto as Appendix C.[13]/

     The Government's position that the DOJ engaged in benign pre-referral

"conversations" that were "an expected course of action", Gov't. Memorandum at 65-66, is

undermined by further email communications disclosed in the Stein case. On June 10, 2003,

well before this case was referred to the DOJ, see Neiman Aff. ¶ 4, Sharon Katz-Pearlman, a

KPMG partner participating in the promoter penalty negotiations, wrote an email to KPMG

personnel relating Barral's impression of the current state of the negotiations:

> [Barral] said the reason things had "slowed" a bit, was because another
> promoter case had come to the foreground – and they were addressing
> some issues arising from input from other agencies (Justice, SDNY,
> CID). [Barral] said these issues keep recurring and he spends a lot of
> time getting them to back off.

---

[13]/ "It is one thing if the information is disclosed in courthouse filings as a matter of
necessity and in due course, [Roger M. Olsen, former Attorney General for the
DOJ's Tax Division] pointed out. It is another when the IRS and Justice Department
hand the information over the press in CD form and hold private meetings with the
press contemporaneous with the filing of this information, so that it is the focus of
front-page articles the next morning. 'This flouts the rules of taxpayer confidentiality
and raises ethical and public policy concerns.' " See Appendix C, at 6.

Smith Memorandum at 10 (emphasis in original). This "other" promoter penalty case is the "other" case described in the Neiman Affidavit – almost certainly Ernst & Young.[14] This June 10, 2003 email is inconsistent with the Government's description of placid, routine, "conversations" between the IRS and the DOJ, but instead suggests that the DOJ was demanding to the point where Barral was consumed with "getting them to back off". Id.

### B. Suppression of Evidence And Dismissal of The Indictment Are Both Potential Remedies For a §6103 Violation

The Government's position is that there is nothing remotely outrageous about IRS and DOJ personnel committing a "five-year felony", Gov't. Memorandum at 59, potentially systematically and repeatedly, in gathering evidence against an individual.

Admittedly, 6103 itself does not provide for suppression of evidence or dismissal of the indictment. However, illegal or outrageous conduct on the part of the Government may impinge a defendant's Fifth Amendment due process rights, warranting dismissal because "ensuring that the government does not trample in an unconscionable manner on individual dignity is a bed-rock duty of judicial officers." United States v. Schmidt, 105 F.3d 82, 91 (2d Cir. 1997); See United States v. Guzman, 282 F.3d 56, 59 (1st Cir. 2002) ("In rare and extreme circumstances, a federal court has the authority to dismiss criminal charges as a sanction for government misconduct."); United States v. Lard 734 F.2d 1290, 1296 (8th Cir. 1984) (dismissing indictment as violative of defendant's Fifth Amendment due process rights

---

[14] The Government does not contest that, for purposes of this motion, Ernst & Young is the unnamed "promoter" in the Neiman Affidavit, Gov't. Memorandum at 65, as we have previously asserted. See Tucker Dec. at p. 17, ¶ 35.

where "overzealous" Government agents engaged in "extreme and questionable" conduct). Similarly, obtaining evidence through mere trickery and deceit, not to mention outright criminal conduct, can violate a defendant's Fourth Amendment rights. United States v. Tweel, 550 F.2d 297, 300 (5th Cir. 1977) (suppressing tax returns produced by defendant as violative of the defendant's Fourth Amendment rights where he was deceived into producing them and noting that "[o]ur revenue system is based upon the good faith of the taxpayers and the taxpayers should be able to expect the same from the government in its enforcement and collection activities.") It is difficult to imagine conduct more outrageous, extreme, and questionable than that which society has deemed punishable by five years of incarceration, because "[t]he criminal law defines a discrete category of conduct for which society has reserved its greatest opprobrium and strictest sanctions." Foucha v. Louisiana 504 U.S. 71, 95 (1992) (Kennedy, J.) (dissenting).

The Government's reliance on United States v. Barnes, 604 F.2d 121 (2d Cir. 1979) is misplaced. In Barnes, the defendant asserted that the proper interpretation of 26 U.S.C. §6103(i)(1)[15/] entitled him access to orders by the Court relating to his return information. Id at 46 (the defendant "would have the statute construed" to entitle him to the order under 6103(i)). There, where the defendant argued that 6103(i) was analogous to a federal wiretap statute, the Court simply held that "the procedures are governed by different statutes." Id.

---

[15/]  The provisions of §6103(i) are inapplicable in this case, as conceded by the Government. Gov't Memorandum at 60. Section 6103(h), the relevant provision because it applies to "tax matters," required disclosure procedures separate from 6103(i). See 26 U.S.C. §6103(h), (i).

Here, the question is simply not one of statutory interpretation, but what the proper remedy should be for the infringement of a defendant's constitutional rights by the commission of a "five-year felony" committed by IRS and DOJ personnel during their investigation of this case. United States v. Michaelian, 803 F.2d 104 (9th Cir. 1986), is distinguishable on similar grounds. There, the sole question before the Court was whether 6103 "provides a particular remedy." Id at 1049. The Court did not need to reach the larger constitutional implications because "bad faith and flagrant government overreaching" was absent in the case. Id. That logic applied to this case is absurd – the requested information is exactly that which would shed light on any "flagrant government overreaching. Put another way, New York Penal Law §120.10 ("Assault in the first degree") does not provide for suppression of evidence or dismissal of an indictment as a remedy, but few would argue that evidence obtained by a violation of the statute, such as assaulting a defendant to coerce a confession, would not require suppression.

With the allegations of unlawful 6103 disclosures that have followed the Government through Stein and this case, it is surprising that the Government would not want to affirmatively dispel them, once and for all, by volunteering the requested information, rather than expend its considerable resources constantly justifying its decision to keep the information secret.

## CONCLUSION

**COUNT TEN OF THE SUPERSEDING INDICTMENT
SHOULD BE DISMISSED; IN THE ALTERNATIVE, THE
VENUE FOR COUNT TEN AND THE ENTIRETY OF THIS
PROCEEDING SHOULD BE TRANSFERRED TO THE
MIDDLE DISTRICT OF TENNESSEE; TOGETHER WITH
AN ORDER DIRECTING THAT THE ADDITIONAL
RELIEF REQUESTED IN THE NOTICE OF OMNIBUS
PRETRIAL MOTION BE GRANTED**

Dated:    Jackson, Mississippi
          June 17, 2008

                              Yours, etc.

                              BUTLER, SNOW, O'MARA,
                                STEVENS & CANNADA, PLLC

                    By:  _Peter H. Sewett, by PHB_
                         PETER H. BARRETT, ESQ. (3612)
                         Attorneys for Brian Vaughn
                         P.O. Box 22567
                         210 E. Capitol Street, 17th Floor
                         AmSouth Plaza Building
                         Jackson, MS 39225-2567
                         Tel. No.: (601) 985-4544
                         Fax No.: (601) 985-4500
                         Email: peter.barrett@butlersnow.com


                         PAUL B. BERGMAN, P.C.

                         _[signature]_
                         PAUL B. BERGMAN, ESQ. (0502)
                         Attorney for Brian Vaughn
                         950 Third Avenue
                         New York, NY 10022
                         Tel. No.: (212) 355-7711
Of Counsel:              Fax No.: (212) 755-5509
                         Email: berglaw@mindspring.com

    James B. Tucker, Esq.
    Peter H. Barrett, Esq.
    Amanda B. Barbour, Esq.
    Paul M. Ellis, Esq.
    Paul B. Bergman, Esq.
    Brian C. Danahy, Esq.