# APPENDIX B

CAROLINE RULE (CR-6503)
ROBERT S. FINK (RSF-7924)
Kostelanetz & Fink, LLP
530 Fifth Avenue
New York, New York 10036
(212) 808-8100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
UNITED STATES OF AMERICA,                                    :
                                                             :
    - against -                                              :     S1 05 Cr. 888 (LAK)
                                                             :
JEFFREY STEIN, *et al.*,                                     :
                                      Defendants.            :
-------------------------------------------------------------X

## REPLY MEMORANDUM OF RICHARD SMITH IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE INDICTMENT

KOSTELANETZ & FINK, LLP
530 FIFTH AVENUE
NEW YORK, NEW YORK 10036

## TABLE OF CONTENTS

Table of Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Federal Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Other Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I. KPMG'S FAILURE TO FINALIZE THE RETENTION AGREEMENT, AND MR. SMITH'S TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. VIOLATIONS OF 26 U.S.C. § 6103 ARE ADDITIONAL EVIDENCE OF THE OUTRAGEOUSNESS OF THE GOVERNMENT'S CONDUCT . . . . . . . . . . . . . . . . . . . . 4

A. Department of Justice Attorneys Unlawfully Obtain Information From the IRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B. Improper Disclosure of "Return Information" In A Third-Party Taxpayer Suit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

C. Unauthorized Disclosure of Return Information to the Senate . . . . . . . . . . . . . . . 14

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## TABLE OF CASES

| Case(s) | Page(s) |
| --- | --- |

*Lehrfeld v. Richardson*, 132 F.3d 1463 (D.C. Cir. 1998),
*aff'g*, 945 F. Supp. 9 (D. D.C. 1996) .................................................. 6

*Schneider Interests v. Comm'r, U.S. Tax Court*, Docket No. 200-02, filed Jan. 8, 2002 ....... 12

*SEC v. ESM Gov't Securities, Inc*, 645 F.2d 310 (5th cir. 1981) ............................. 6

*U.S. v. Chemical Bank*, 593 F.2d 451 (2d Cir. 1979) ....................................... 6

*United States v. Carriles*, F. Supp.2d, 2007 WL 1433458 (W. D. Tex. May 8, 2007) .......... 6

*United States v. Cyprian*, 23 F.3d 1189 (7th Cir.), *cert. denied*, 513 U.S. 879 (1994) ........... 7

*United States v. King*, 200 F.3d 1207 (9th Cir. 1999) ....................................... 7

*United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991) ........................... 4

*United States v. Michaelian*, 803 F.2d 1042 (9th Cir. 1986) ................................ 6

*United States v. Orlando*, 281 F.3d 586 (6th Cir.),
*cert. denied*, 537 U.S. 947 (2002) ..................................................... 6

*United States v. Scrushy*, 366 F. Supp.2d 1134 (N.D. Al. 2005) ........................... 14

*United States v. Stein*, 435 F. Supp.2d 330 (S.D.N.Y.) ............................... *Passim*

*United States v. Stringer*, 408 F. Supp. 2d 1083 (D. Or. 2006) ............................ 11

## STATUTES

|  | Page(s) |
|---|---|
| 26 U.S.C. § 6103 | *Passim* |
| 26 U.S.C. § 7213 | 6 |
| 26 U.S.C. § 7214 | 6 |
| 26 U.S.C. § 7431 | 7 |

## OTHER AUTHORITIES

| | |
|---|---|
| Department of Justice, Criminal Tax Manual 2.00 § 6-4-110 | 8 |
| Department of Justice, Criminal Tax Manual 2.00 § 6-4-120 | 7, 8, 9 |
| Department of Justice, Criminal Tax Manual 42.04[1] | 6 |
| Department of Justice, Criminal Tax Manual 42.05[3][a] | *Passim* |
| Internal Revenue Manual § 38.2.2.2 | 7 |
| Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976 (Blue Book) § 2.a. | 5 |
| Joint Committee on Taxation, Study of Present-Law Taxpayer Confidentiality and Disclosure Provisions as Required By Section 3802 of the Internal Revenue Service Restructuring and Reform Act of 1998 (JCS-1-00, Volume 1) (Jan 28, 2000) | 5 |
| T. Feld, *Taxpayer Privacy at Risk* 2003 TNT 179-71 (Sep. 16, 2003) | 5 |

CAROLINE RULE (CR-6503)
ROBERT S. FINK (RSF-7924)
Kostelanetz & Fink, LLP
530 Fifth Avenue
New York, New York 10036
(212) 808-8100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
UNITED STATES OF AMERICA,                                  :
                                                           :
     - against -                                           :     S1 05 Cr. 888 (LAK)
                                                           :
JEFFREY STEIN, et al.,                                     :
                              Defendants.                  :
-----------------------------------------------------------X

### REPLY MEMORANDUM OF RICHARD SMITH IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE INDICTMENT

Richard Smith respectfully submits this reply memorandum in response to the Government's Opposition to Defendants' Renewed Motion to Dismiss the Indictment, filed on June 22, 2007 ("G. Br.").

I.  KPMG'S FAILURE TO FINALIZE THE RETENTION AGREEMENT, AND MR. SMITH'S TERMINATION

The government tries to argue that there is no evidence that its conduct caused KPMG to renege on its oral agreement to consummate a Retention Agreement with Mr. Smith. (G. Br. p. 28.) That contention is risible; there is only one inference that can be drawn from the fact that, *two days* after KPMG heard from the government that its payment of "legal fees" and "[s]everance" would not be viewed as cooperation under the Thompson Memorandum – and Greg Russo of KPMG immediately noted, "Severance a problem (Smith's pending agreement)" (KPMG-17(c)-112706-0170014-15, Obeid Dec.[1] Ex. A) – the Chairman of KPMG told Mr. Smith that he could not sign the Retention Agreement during the pendency of the government's investigation. There could hardly be a clearer instance of "but for" causation; but for the government's threats, KPMG would have signed the Retention Agreement. It does not matter that the government may not have known that there was a draft agreement in existence between Mr. Smith and KPMG. The government threatened KPMG that, if it followed its usual practice of paying all of an employees' legal fees, and if it made severance payments, the government would consider this

---

[1] The Declaration of Fran Obeid submitted previously with the Memorandum of Richard Smith in Further Support of Defendant's Motion to Dismiss the Indictment will be cited as "Obeid Dec."

a factor in favor of indicting KPMG. The Retention Agreement required both payment of Mr. Smith's fees and a "retention bonus" (which would surely have been indistinguishable in the government's eyes from a severance payment); consequently KPMG did not risk finalizing the agreement. The government is thus responsible for depriving Mr. Smith of substantial funds, both in un-capped legal fees and a 7-figure bonus.

The government's rhetoric that there is "certainly" no evidence that its conduct was "directed personally at Richard Smith," G. Br. p.27, ignores the many times the government mentioned Mr. Smith by name during its negotiations with KPMG. Indeed, at its very first meeting with KPMG's counsel, the government asked to be informed about Mr. Smith's status, whether he was still at KPMG, and/or where he had been reassigned. (*See* KPMG-17(c)-112706-017006, Obeid Dec. Ex. B.)

Before Mr. Smith was fired, during a group meeting of KPMG attorneys and prosecutors, the government engaged in a lengthy discussion of Mr. Smith, and concluded that it had "serious concerns" about him (KPMG-17(c)-112706-0170125-39, Obeid Dec. Ex. G); then, in a one-on-one meeting between a Skadden lawyer and AUSA Weddle, "Weddle appear[ed] to have particular concerns about Smith," and essentially directed that, "you fire him" (KPMG-17(c)-112706-0170141-42, Obeid Dec. Ex. I). There is another example not mentioned in our opening memorandum. Notes of an August 4, 2004 meeting between prosecutors and KPMG attorneys record Robert Bennett of Skadden as stating:

> Do I believe SE, JS engaged in tax shelters, yes. Bob Bennett thinks so. But don't believe ... there is evid. they committed a crime.

Later, the same notes document a remark by Shira Neiman of the United States Attorney's Office for the Southern District of New York ("USAO"):

> .... Isn't the Senate report enough[?] There is a pt. where you say send a message to senate, IRS all of our employees. One of the hallmarks of effective compliance is rewarding good behavior and punishing bad behavior.

It is not clear whether it is Mr. Bennett or Ms. Neiman who then says: "We want to see what to do about Smith as a result of this inv." (KPMG-17(c)-112706-0170048; Rule Dec.[2] Ex. A.). It is not necessary to know who the speaker was, however, to understand that Mr. Smith featured large during the government's discussions with KPMG.

---

[2] The Reply Declaration of Caroline Rule on Behalf of Richard Smith in Further Support of Defendant's Motion to Dismiss the Indictment will be cited as "Rule Dec."

Then, after KPMG fired Mr. Smith, it tried repeatedly to get credit from the prosecution for having done so, obviously because it believed, as a result of what the government had told it, that the government would look favorably on Smith's dismissal. (KPMG-17(c)-112706-0170257-58, Obeid Dec. Ex. M; KPMG-17(c)-112706-0170261, Obeid Dec. Ex. M.)

Of course "KPMG acted to further its own interests," when it fired Mr. Smith. (G. Br. p. 29.) That is precisely the point; KPMG felt it needed to fire Mr. Smith in order to placate the prosecution. The government's argument that it was merely pointing out an inconsistency in KPMG's claim to have "cleaned house" when it told KPMG that Mr. Smith should no longer be employed backfires – obviously, by pointing out this supposed inconsistency in KPMG's pleas for lenience, the government coerced KPMG into firing Mr. Smith.

And, as discussed in our opening brief, the government did so without letting KPMG make its own full investigation of all the facts, which would have included interviewing Mr. Smith. The portion of the KPMG "Whitepaper" recently ordered produced by the Court confirmed:

> Importantly, as a result of restrictions imposed by the U.S. Attorney, KPMG has not had an opportunity to investigate the conduct at issue here . . . . Accordingly, the firm cannot make a determination whether specific individuals acted with corrupt intent.

KPMG-17(c)-112706-0140226-27.

There is no ultimate contradiction in Mr. Smith's contention that, when the tax shelter issue began to blow up, KPMG's Board of Directors and outside counsel reviewed Mr. Smith's conduct and determined to retain his services, Memorandum of Richard Smith in Further Support of Defendant's Motion to Dismiss the Indictment at p. 9 n.15, and yet KPMG was unable, when it came under more and more pressure from the government to fire Mr. Smith, to undertake the kind of fully comprehensive review that is warranted before someone is dismissed. As Sven Holmes testified later:

> So you really couldn't do something where you called up people, be with them, sit down and find out what they did. They had been expressly placed off limits by the Southern District.
>
> So the best we could do or the best I could do under the circumstances was to meet with counsel and ask them to identify individuals, identify documents, to construct a framework that we could proceed against this within the limitations we had.

\*    \*    \*

> ... [I]t was only cold documents. There was no opportunity for ten questions.

(Obeid Dec. Ex.N pp. 50-51.) After conversations with the government, KPMG was:

> focused to be able to say and reach a point consistent with the Thompson Guidelines that wrongdoers, those responsible for wrongdoing or having some failure of responsibility to the firm, that they have been separated from the firm as part of the Thompson Guidelines requirement.

(*Id.* at p. 66.) According to Judge Holmes:

> I was the guy who knew nothing about it, but we didn't have time for me to become expert on it. So it failed to – all I know for sure is that we ultimately reached a point of undertaking to bring the matter to final resolution that it was critical that the firm be in full compliance with the Thompson Guidelines.

(*Id.* p. 74.) He testified that "the United States at this time was making it abundantly clear to us that they thought serious sanctions were appropriate. So ... communications [with the United States] were merely indicative in the fact that there had been no – this matter had not been addressed and resolved." (*Id.* pp. 78-79.) As part of its attempt to save itself from a "death spiral," KPMG felt it had to fire Mr. Smith, even though "the universe of information available to [Judge Holmes] was this narrow band of records that were maintained by counsel, which they reviewed and identified in that with respect [sic] select individuals and select documents." (*Id.* p 82.) There is no getting around it: The government forced KPMG to fire Mr. Smith, thus causing him substantial economic harm.

II. VIOLATIONS OF 26 U.S.C. § 6103 ARE ADDITIONAL EVIDENCE OF THE OUTRAGEOUSNESS OF THE GOVERNMENT'S CONDUCT [3]

The government argues strenuously that the defendants "cannot possibly establish that the Government's conduct in this case constitutes such outrageous behavior as to "shock the conscience." G. Br. p. 9. That is not so. To further evidence the government's outrageous misconduct, we discuss here violations of 26 U.S.C. ("IRC") § 6103, which did indeed, in the government's words "infect[] every part of the investigation and prosecution." G. Br. p. 9 (citing *United States v. Marshank*, 777 F. Supp. 1507, 1523 (N.D. Cal. 1991).) Just today, the government, in a sworn Declaration of Kevin Downing, Senior Trial Attorney at the Department of Justice Tax Division Criminal Enforcement Section ("Downing Dec."), *admitted* to at least one of the violations discussed herein. (Mr. Downing has appeared for the government

---

[3] Co-defendant Larry DeLap joins in this section of this Memorandum.

in this matter as a Special Assistant United States Attorney.)

The rules of 26 U.S.C. ("IRC") § 6103, which circumscribe the IRS' authority to disclose information it gathers when investigating a taxpayer, are born out of the Watergate era when President Nixon threatened to acquire tax information of United States citizens from the IRS and use it against his political adversaries. Congress recognized that this would be a danger to the United States' voluntary tax system and passed section 6103.[4] Congress also provided some sharp teeth with which to enforce section 6103, with criminal and civil sanctions for violations of its rules. *See* discussion *post*. The importance of 6103 is drilled into IRS employees, and its tenets are at the forefront of their thinking.[5]

The government's apparent willful violations of section 6103 during its investigation of this matter and in the process of bringing this case are stunning. While some of these violations have been buried in the unmanageable government document production (and others may yet remain so obscured), the extent of the violations came to light most recently in documents produced by KPMG, as discussed in the Amended Declaration of Diana Parker in Support of Defendants' Motion to Dismiss ("Parker Am'd Dec."), and in the Declaration filed today by Mr. Downing in response to Ms. Parker's Declaration. This

---

[4] "The Watergate Committee hearings revealed that former White House Counsel John Dean had sought to use the IRS to harass political 'enemies.' . . . White House Staff requested information and income tax audits from the IRS and IRS personnel complied with such requests. . . . Against this backdrop, in 1976, Congress re-examined the issue of taxpayer confidentiality and prescribed by statute rules regarding access to returns and return information. With the revision of section 6103 in 1976, Congress removed control over the dissemination of returns and return information from the Executive Branch." Joint Committee on Taxation, Study of Present-Law Taxpayer Confidentiality and Disclosure Provisions as Required By Section 3802 of the Internal Revenue Service Restructuring and Reform Act of 1998 (JCS-1-00, Volume 1) at ¶ 775 (citations omitted) (available at 2000 TNT 21-9 (Jan 28, 2000)). *See also* T. Feld, *Taxpayer Privacy at Risk*, 2003 TNT 179-71 (Sep. 16, 2003) ("In 1976, partly in response to the abuses of the Nixon administration, Congress changed section 6103 from a disclosure statute – which authorized limited public inspection of return information – into a statute that mandated tax return confidentiality."); Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976 (Blue Book) § 2.a. *Reasons for change* ("Apparently, tax information had been obtained by the White House pertaining to a number of well known individuals for use for non-tax purposes. . . . This . . . raised the question of whether the public's reaction to this possible abuse of privacy would seriously impair the effectiveness of our country's very successful voluntary assessment system, which is the mainstay of the Federal tax system.")

[5] The government provided in discovery around 3,900 emails originating from the "Outlook" email folders of Drita Tonuzi, an IRS agent who was assigned to the KPMG tax shelter promoter audit, *see United States v. Stein*, 435 F. Supp.2d 330, 338 & n.1. (Rule Dec. ¶ 19 & Ex. R.) In those emails, section 6103 is cited over 500 times in over 100 emails. (*See Id.*) *See also* A. Hamilton, *Was DOJ Attorney Unfairly Maligned in Release of KPMG Client Names?*, 2002 TNT 160-2 (Aug. 19, 2002) (discussing release of KPMG's clients names in the summons enforcement action by DOJ Tax Division Civil Section senior trial attorney Stuart Gibson (*see* Downing Dec. ¶ 2), as a violation of section 6103 (noting one commentator's opinion that this had to have been deliberate) and reporting that the DOJ Office of Professional Responsibility had opened an investigation into the release).

most current discovery, revealed in papers filed this very week, including today, tips the balance of the government's combined violations of section 6103 firmly into the category of "outrageous" conduct. Consequently, we raise now all the section 6103 violations that we have so far discovered in order to refute the government's contention that it has never acted outrageously. When viewed in conjunction with the government's actions in causing KPMG to refuse to pay the KPMG defendants' legal fees, to refuse to consummate Mr. Smith's Retention Agreement, and to fire Mr. Smith – *as well* as the government's other malfeasance discussed in the Defendants' joint papers filed by counsel for Mr. Stein – the section 6103 violations are confirmation that this prosecution went awry even before it officially started and is thus structurally defective, warranting dismissal of the Indictment.

Section 6103 generally prohibits any officer or employee of the United States from disclosing "return information" obtained by him in any manner in connection with his service as such an officer or employee . . . ." IRC § 6103(a). Documents produced to the IRS by KPMG were return information.[6]

IRC §§ 7213(a)(1) and 7213A provide criminal penalties for the willful unauthorized *disclosure or inspection*, respectively, of return information. The former is a felony; the latter a misdemeanor, but any federal employee who is convicted of either offense must be dismissed. *See* IRC §§ 7213(a)(1), 7213A(b)(2).[7] Other criminal sanctions may also apply. *See, e.g.,* IRC § 7214. In addition, there is a

---

[6] "Return information" is broad, consisting of, *inter alia*, a taxpayer's identity and any information "received by, recorded by, prepared by, furnished to, or collected by" the IRS "with respect to . . . the determination of the existence or possible existence, of liability . . of any person . . . for any tax, penalty interest, fine, forfeiture, or other imposition or offense." IRC § 6103(b)(2)(A). *See also* Department of Justice, Criminal Tax Manual 42.04[1] ("In short, this category includes all information about a taxpayer and his or her liability in the possession of the IRS.") *See also Lehrfeld v. Richardson*, 132 F.3d 1463 (D.C. Cir. 1998), *aff'g*, 945 F. Supp. 9 (D. D.C. 1996) (documents produced to IRS by organization seeking tax exempt status constituted return information).

[7] We acknowledge that, in the run-of-the-mill case, where there is no constitutional violation by the government, a breach of section 6103 is not grounds for a judicial remedy such as suppression of evidence or dismissal of the Indictment. *United States v. Orlando*, 281 F.3d 586, 595-96 (6th Cir.), *cert. denied*, 537 U.S. 947 (2002) ("Congress has provided civil and criminal penalties for violations of § 6103 . . . [and w]here Congress has provided a particular remedy for the violations of a statute, that remedy, and not judicially imposed remedies, should apply *in the absence of a constitutional violation*") (emphasis added); *United States v. Michaelian*, 803 F.2d 1042, 1049 (9th Cir. 1986) (same). *But see U.S. v. Chemical Bank*, 593 F.2d 451, 458 (2d Cir. 1979) (suggesting that suppression of evidence obtained through § 6103 violation might be appropriate remedy); *United States v. Carriles*, ___ F. Supp.2d ___, 2007 WL 1433458 at *17, 21 (W. D. Tex. May 8, 2007) (stating that "to declare that the government may commit crimes in order to secure the conviction of a private criminal[,] would bring terrible retribution," *citing SEC v. ESM Gov't Securities, Inc*, 645 F.2d 310, 316-17 (5th cir. 1981), and dismissing indictment after government tricked defendant into giving inculpatory statements at sham citizenship

private right of action against the United States for damages for wrongful disclosures. IRC § 7431.

A.     Department of Justice Attorneys Unlawfully Obtain Information From the IRS

No later than March of 2003, members of the DOJ Tax Division Criminal Section began to meet with the IRS about the KPMG investigation, and to review return information. (*See* Parker Am'd Dec. ¶¶ 7, 8 & Exs. 4, 5; Rule Dec. Exs. B & C.). Mr. Downing's Declaration admits as much.

IRC § 6103(h)(2) permits disclosure of return information to employees of the Department of Justice for use in proceedings before a Federal Grand Jury, or a Federal court, in a matter involving tax administration,[8] but *only* if the IRS has referred the case to the Department of Justice, IRC § 6103(h)(3)(A),[9] or has received a written request from the Attorney General, Deputy Attorney General or Assistant Attorney General, IRC § 6103(h)(3)(B).[10] Here, the IRS did not refer the case to the DOJ for criminal investigation until February 5, 2004. *See Stein I*, 435 F. Supp.2d at 339 & n.26; *see also* testimony of AUSA Okula at the May 8th Hearing before this Court, Tr. pp 52-53. And, there has been no evidence disclosed, nor any mention made in documents we have reviewed, of any written request for information from the Attorney General, Deputy Attorney General or Assistant Attorney General. (The fact that the IRS referred the case *to* the DOJ for investigation certainly suggests that there was no prior written

---

interview (and other cases cited therein)).

This is no ordinary case, and this Court has already held that the prosecution has violated the defendants' constitutional rights. The government's violations of section 6103 serve to underscore the cavalier attitude taken towards this investigation since its inception, not only by the USAO, but also by other investigatory branches of the government. It does not detract from the cumulative effect of the section 6103 violations discussed herein that certain disclosures may not have been made by the USAO, but by the IRS or the DOJ. "A district court may dismiss an indictment where *the government's investigatory or prosecutorial conduct* violates a defendant's due process rights." *United States v. King*, 200 F.3d 1207, 1213 (9th Cir. 1999) (emphasis added); *cf. United States v. Cyprian*, 23 F.3d 1189, 1197 (7th Cir.), *cert. denied*, 513 U.S. 879 (1994) ("A defendant has "the right to challenge [as outrageous] government conduct causally related to his conviction. . . .").

[8]"Tax Administration" means, *inter alia*, "the administration, conduct, direction, and supervision of the execution and application of the internal revenue laws . . ." IRC § 6103(b)(4)(A)(i).) (In criminal investigations which do not involve tax administration, disclosure of return information by the IRS is only permitted pursuant to an *ex parte* order of a Federal district judge. IRC § 6103(i).)

[9]*See also* Department of Justice, Criminal Tax Manual 2.00 § 6-4-120 ("Although a federal grand jury is empowered to investigate both tax and nontax violations of federal criminal laws, use of the grand jury to investigate criminal tax violations must first be approved and authorized by the Tax Division.") (citing IRC § 6103(h)). *See generally* Internal Revenue Manual § 38.2.2.2 – Referrals for Grand Jury Investigation.

[10]The authority to request information may not be delegated. *See* Department of Justice, Criminal Tax Manual 42.05[3][a].

request for information *from* DOJ Tax officials, *see* Department of Justice, Criminal Tax Manual 42.05[3][a] ("[i]n those cases where no 'referral' has been made, DOJ may obtain information [pursuant to section 6103(h)(3)(B)]," thus suggesting that the two procedures are mutually exlusive. ).

A March 18, 2003 internal IRS e-mail produced by the government records that a meeting took place at the DOJ between IRS personnel, attorneys from the DOJ Tax Division Civil Section who represented the IRS in its summons enforcement action against KPMG (*see Stein I* at p. 338 & n.1), and two attorneys from the DOJ Tax Division Criminal Section, Kevin Downing and Tom Krysa, at which "the mechanics" of one of the tax shelter transactions at issue here were discussed.[11] (Rule Dec. Ex. B.) Mr. Downing admits that he and Mr.Krysa met with the Civil Section attorney to "gather some facts." (Downing Dec. ¶ 2.) and that he reviewed KPMG return information (*id.* ¶ 3.). Thus, DOJ prosecutors began to meet with, and gather return information from, the IRS and DOJ Tax Division Civil Section, nearly a year before the IRS referred the case to the DOJ on February 5, 2004, only *after* which date would they in fact have been authorized to inspect KPMG's return information.

Mr. Downing met with Stuart Gibson, a senior trial attorney with the DOJ Tax Division Civil Section, one of the DOJ civil attorneys handling the summons enforcement action.[12] (Downing Dec. ¶ 2.). While Mr. Gibson was authorized to review KPMG return information, Mr Downing and Mr. Krysa were not. IRC § 6103(h)(2) permits disclosure of return information to employees of the Department of Justice after referral from the IRS (if the information meets certain standards of relevance, § 6103(h)(2)(A)-(C)), but only when those DOJ employees are "personally and directly engaged in, and solely for their use in, any proceeding before a Federal grand jury or preparation for any proceeding (or investigation which may result in such a proceeding) before a Federal grand jury or any Federal or State tax court." *See* Department

---

[11] Apparently, the meeting was convened because an "informant" approached Mr. Gibson, and DOJ criminal attorneys wanted to be better informed when interviewing the informant. (Downing Dec. ¶ 2; Rule Dec. Ex. B.) (In fact, Mr. Gibson should not have passed the informant on to the DOJ criminal attorneys for interview; rather he should have referred the informant to the IRS internal Criminal Investigation Division. *See* Department of Justice, Criminal Tax Manual 2.00 § 6-4-110 (CID is responsible for investigating violations of the criminal provisions of the internal revenue laws, and then referring the matters, if warranted, to the DOJ or, in certain cases, directly to a United States Attorney). )

[12] "Referral" for section 6103 purposes means either referral to the DOJ Tax Division Civil Section for litigation of, for instance, a summons enforcement action, or referral to the DOJ Criminal Division for grand jury investigation or criminal prosecution. Department of Justice, Criminal Tax Manual 42.05[3][a].

of Justice, Criminal Tax Manual 42.05[3][a] (disclosure after referral is limited to "the Department attorneys responsible for the case.") Neither Mr. Downing nor Mr. Krysa, as criminal attorneys, could in any sense have been "personally and directly" engaged in the summons enforcement action; they, as criminal prosecutors, were simply not the DOJ attorneys responsible for the civil summons enforcement proceeding. Thus, despite Mr. Downing's vague reference to providing Mr. Gibson with legal advice,[13] he violated section 6103; *see also id.* ("disclosure is made to those attorneys who are 'personally and directly' involved in the litigation, *and not to the Department of Justice itself.* Thus, the individual prosecutors or attorneys handling a case or matter are responsible for controlling and managing the returns and return information and for any subsequent disclosures.") (emphasis added).)

In response to the email detailing this meeting, Roland Barral, IRS counsel, asked the sender to "provide me . . . with more information on how this meeting came about and how you heard of it." Not surprisingly, Barral found it "alarming that activity such as this can proceed to this advanced level without our prior knowledge." (*Id.*)

That same day, one of the IRS participants in the meeting sent a follow-up email to others at the agency informing them of the meeting, and stating:

> [T]he DOJ criminal enforcement division may be requesting additional information and/or documents related to the basis shift transactions and other KPMG transactions.

(Rule Dec. Ex. C) Indeed, Mr. Downing did come back for more. He details that later, in the fall of 2003, he reviewed "some of the documents" that the IRS had provided to Mr. Gibson, including Mr. DeLap's confidential deposition, and "perhaps other" depositions as well.[14] (*See* Parker Am'd Dec. ¶¶ 7-

---

[13]Even if providing such advice were authorized under section 6103, which, as demonstrated, it was not, it seems dubious that Mr. Downing, a criminal attorney, would have continued to provide Mr. Gibson, a senior civil trial attorney, with "legal advice" about a civil summons enforcement action for a period of around six months. ("Downing Dec. ¶¶ 2, 3 (describing meeting in March of 2003, and examining DeLap deposition in fall of 2003.)

[14]The follow-up email stated that "[f]or disclosure purposes, we are covered under IRC Section 6103(h)(2) for disclosures to DOJ" (Rule Dec. Ex. C), but that is patently not true that disclosures were permitted. Regardless of whether the KPMG return information fell within any of the provisions of section 6103(h)(2), disclosure would only have been lawful if the requirements of section 6103(h)(3) were met, *see* Department of Justice, Criminal Tax Manual 42.05[3][a], and, as discussed in the text, *ante,* they were not. Consequently this statement appears to be an after-the-fact attempt to rationalize a violation that had already taken place.

The disregard for section 6103 among senior IRS officials is evident in the very next paragraph of this same email. It states, in part: "We have no authority to disclose anything to the SEC. When [the SEC] calls [the

-9-

13 for discussion of how KPMG provided these depositions to the IRS under pressure, despite the depositions having been designated as confidential in non-IRS civil litigation.) Confidential depositions not publicly available became KPMG "return information" once they were produced to the IRS. *See* n. 6, *ante*. Mr. Downing thus violated section 6103. His averment that he did not share the return information he illegally reviewed with the USAO until after the IRS referral for criminal investigation (Downing Dec. ¶ 4) does not ameliorate the government's misconduct. Mr. Downing is a prosecutor, and, long before he was authorized to do so, he reviewed return information that underlies this criminal case in which he has since continued to play a significant role.

In 2003, KPMG was engaged in intense negotiations with the IRS over a possible civil settlement of the IRS's investigation of KPMG's tax shelter activities. Sharon Katz-Pearlman, a KPMG partner, was deputized as part of KPMG's Office of General Counsel to take part in those negotiations.[15] Proposed Government Exhibit I-509 ("GE I-509") consists of voluminous notes taken by Ms. Katz Pearlman during that period.[16] She also authored various emails about the IRS matter. In a June 10, 2003 email to Mr. Smith and others, she reports that she has just spoken to "Roland," i.e. Roland Barral, about the progress of negotiations:

> Roland . . . said the reason things had "slowed" a bit, was because another promoter case had come to the foreground – *and they were addressing some issues arising from input from other agencies (Justice, SDNY, CID). Roland said that these issues keep recurring and he spends a lot of time involved getting them to back off.*

(Rule Dec Ex. E (Emphasis added).) Katz-Pearlman's handwritten notes from which she prepared this

---

IRS], we will refer him to Stu Gibson at DOJ." In essence, the IRS had no compunction about violating section 6103 if it did so less directly than itself releasing return information to unauthorized persons. Section 6103 is not so loosely tailored, however. Mr. Gibson, an attorney at the DOJ Tax Division Civil Section who was involved in the KPMG summons enforcement action (*see* Downing Dec. ¶ 2), was also prohibited by section 6103 from passing along KPMG return information to the SEC. Any officer or employee of the United States who is privy to return information may use it "solely" in connection with an investigation or proceeding in which he or she is "personally and directly engaged." IRC § 6103(h)(2); Department of Justice, Criminal Tax Manual 42.05[3]. He may not broadcast it to other investigatory bodies.

[15]*See* 3500 material, Katz-Pearlman 3533-B (Memorandum of Interview) at ¶¶ 14, 21, 32 (Rule Dec. Ex. G.)

[16]*See* "Stein et al – Listing of Government Trial Exhibits" produced by government, which identifies Ex. I-509 as "Katz-Pearlman's Notes." *See also* 3500 material, Katz-Pearlman 3533-B (Memorandum of Interview) at ¶ 54 (recording her statement that she found at her home 3 notebooks that contain, *inter alia*, "IRS and Client information," and notes of her meetings with Roland Barral of the IRS).

email are more expressive of the fact that the DOJ, *including the SDNY*, was already involved in this matter in 2003, and clearly contemplated prosecution despite not having received an IRS referral. She wrote:

- SDNY pop up periodically –
- AUSA – /CI agents calling –
- Refer this for Grand Jury.
- And he [i.e. Barral] has had to put them to sleep.

(GE I-509/139, Rule Dec. Ex. F.). Thus, quite the opposite of what the government argues is true: The government's actions are just like those held to warrant dismissal of the indictment in *United States v. Stringer*, 408 F. Supp. 2d 1083, 1087 (D. Or. 2006), in which, in the government's own words, "the prosecution used a long-term civil [here IRS rather than SEC] investigation to gather evidence for a criminal case that it had already decided to bring." G. Br. p. 13. But the government's *admitted* misconduct here goes beyond that in *Stringer*. The government violated one of the cornerstones of the tax system, taxpayer confidentiality, and thereby jeopardized the integrity of that system. As the deceased former-Chairman of KPMG said, "There's no justice here with the justice department. It's about power." (KPMG-17(c)-112706-0170162; Obeid Dec. Ex. K.)

B. Improper Disclosure of "Return Information" In A Third-Party Taxpayer Suit

Something went awry in the IRS/KPMG negotiations in late June or early July of 2003. Katz-Pearlman's notes dated July 8, 2003 record Barral as asking, "What happnd? [sic] IRS. Artcl. NYT." (GE I-509/164, Rule Dec. Ex. F.) Her notes from the same date indicate that the Commissioner of Internal Revenue ["CIR"] was meeting privately with the Department of Justice. (GE I-509/165; Rule Dec. Ex. F.). These notes also record that Barral "asked to be removed from case bc/ so upset[.]" (*Id.*) Indeed, Katz-Pearlman records that Barral and others were so concerned with the turn of events that "counsel has gone on record" that they "would even refer to TIGTA."[17] She noted "[Barral] is very concerned. . . . .

---

[17]The TIGTA is the Treasury Inspector General for Tax Administration. *See* website http://www.treas.gov/tigta/ (last visited June 26, 2007) ("The Treasury Inspector General for Tax Administration (TIGTA) was established under the IRS Restructuring and Reform Act of 1998 to provide independent oversight of IRS activities. TIGTA promotes the economy, efficiency, and effectiveness in the administration of the internal revenue laws. It is also committed to the prevention and detection of fraud, waste, and abuse within the IRS and related entities.")

-11-

Not dead – we are not stringing along[18] – they will go to TIGTA." (*Id.*)

While we may not be sure about what had caused Mr. Barral to be so agitated, it is clear that there was dissension and grave concern within the IRS. A startling misdeed that took place in June of 2003 – and which might have triggered Mr. Barral's disapproval – was the public disclosure of an email from Mr. Stein to others at KPMG (in the form of a rather long memorandum about FLIP/OPIS) which email constituted KPMG "return information." This email made its way into the public domain through the machinations of attorneys with the IRS and the DOJ Tax Division Civil Section, who represented the IRS before the Tax Court when the estate of a taxpayer/investor in FLIP contested an adjustment of partnership tax items issued by the IRS. *Schneider Interests, LP., v. Comm'r*, U.S. Tax Court, Docket No. 200-02, filed Jan. 2, 2002. (Rule Dec. Ex. H.) The respondent, i.e. the IRS, issued Requests for Admission on June 16, 2003, to which it attached the email. (Rule Dec. Ex. I.)[19] The Requests were entirely disingenuous from a litigation stand-point; the petitioner, the tax matters partner of a partnership which had no relation to KPMG other than as an investor in an alleged tax shelter, could not possibly have admitted the authenticity of the internal KPMG e-mail.[20] The only possible inference is that this filing was made in order to make this email public.[21]

This email was particularly inflammatory. *See* PSI report p. 186. It was the subject of a Wall Street Journal article on June 25, 2003, which suggested that "KPMG . . knew about possible flaws

---

[18]Katz-Pearlman notes from July 23, 2003 also indicate that Barral believed a civil settlement was still possible, i.e. that he, at least, was not stringing KPMG along. As with all civil IRS settlements, that settlement would "leave[] open the poss of crim case being convened[.]" (GE 1-509/169, Rule Dec. Ex. F.) Katz-Pearlman's notes record that Barral, however, did "not think [a criminal case] would happen," but go on to quote his mention of a "rogue AUSA." *Id.* Unfortunately for KPMG and Mr. Smith, Barral turned out to be wrong about the unlikelihood of a criminal case, but apparently right about a "rogue AUSA."

[19]*See also* PSI Report p. 186 n.117.

[20]Of course, the petitioner "[d]enied for lack of knowledge," and stated that it could not "based on information known or readily available to it, verify the accuracy of the copy, or that it is an authentic e-mail from Jeff Stein of KPMG dated March 14, 1998 to [various]." (Rule Dec. Ex. J.)

[21]Indeed, an email from Ken Jones of KPMG to John Chopak and Mr. Gremminger of KPMG reports that the DOJ attorney had told the petitioner's counsel that he had filed his requests to admit solely to get the email into the media. (Rule Dec. Ex. M; *see also* Rule Dec. Ex. N.)

-12-

in its tax shelter products as early as the fall of 1997." (Rule Dec. Ex. K.)[22] (Perhaps this is the "Artcl. NYT" referred to in Katz-Perlman's notes, (GE I-509/164, Rule Dec. Ex. F), although it appeared in the Wall Street Journal, not the New York Times.)

KPMG sought the advice of outside counsel, Kronish Lieb Weiner & Hellman, LLP, about whether this disclosure violated section 6103. Kronish Lieb concluded that it likely had, and that KPMG could probably recover civil damages from the IRS. (Rule Dec. Ex. L.)

Despite the email disclosure, Barral continued to believe that a civil settlement was possible. Katz-Pearlman wrote to Mr. Smith on July 31, 2003 that:

> I spoke with Roland Barral earlier today. . . . Roland also said that Emily Parker (the new Acting Chief Counsel [of the IRS]) is in the process of preparing a memo to Lee O'Connor at DOJ, outlining all of KPMG's violations and presenting the worst case scenario, though ultimately concluding that there has been no criminal activity. . . . Roland said that everyone is now focusing on getting to resolution, and that he thinks that a "closing ceremony" date could be set by the end of next week, with a possible closing the following week.

(*See* Rule Dec. Ex. O (second 2 pages).)[23] An undated (because redacted) part of Katz-Pearlman's notes, which falls between entries for July 31, 2003 and August 19, 2003, states, however: "Big Prob. in Justice starting w/ docket attorney . . . one prob w/ DJ atty – rogue." GE I-509-46.[24] The IRS never reached a civil settlement with KPMG, of course, and referred the case for criminal prosecution six months later.

---

[22] The article describes the "case in which the e-mails surfaced." (Rule Dec. Ex. K.) It is highly unlikely that a newspaper reporter was following one of the thousands of petitions challenging IRS determinations that are filed in Tax Court; obviously the reporter was directed specifically to the *Schneider* case Requests for Admission.

[23] It is curious that this document was not originally produced to the defense. It surfaced in a Wall Street Journal article of September 20, 2006 (Rule Dec., Ex. P) after which we wrote to the government, on October 15, 2006, asking why the email had not appeared in government discovery. We also asked for a copy of Emily Parker's memorandum referenced in the email. (Rule Dec. Ex. O (first two pages).) The government later explained in a declaration to the Court that the email, along with other documents, had not been produced by KPMG because of a software problem encountered in reviewing Mr. Smith's electronic files. Declaration of AUSA John M. Hillebrecht regarding the state of government discovery production, dated December 4, 2006, at ¶ 9. (Rule Dec. Ex. Q.) It seems that the email should also have been found in the electronic files of Ms. Katz-Pearlman, which have yielded numerous documents in the government discovery. [RS – is this so?] The government has never produced Emily Parker's memorandum. (Rule Dec. ¶ 16.)
Handwritten notes from July 31, 2003 similarly state: "Emily Parker – writing to Lee O'Connor dis'g pot. violation. & worst case scenario – concl that nothing is criminal," and record the hope that "next week have a final mtg." (GE I-509/42, Rule Dec. Ex. F.)

[24] We note, too, a June 20, 2003 internal IRS email which records that Mr. Gibson met with "the AG," and reported that, "the AG wants that damaging memo brought before a judge." (Rule Dec. Ex. R.)

C. <u>Unauthorized Disclosure of Return Information to the Senate</u>

Disclosure of "return information" may be made to specified Congressional Committees, i.e. the House Committee on Ways and Means, Senate Committee on Finance, and Joint Committee on Taxation. IRC § 6103(f)(1). The PSI investigation was, however, conducted by the Senate Committee on Governmental Affairs. (Other congressional committees may obtain information upon a congressional resolution, IRC § 6103(f)(3), but there was no such resolution here.)

As early as October of 2002, the PSI asked the IRS for information on the KPMG summons enforcement action. (Rule Dec. Ex. S.) At that time, the IRS intended only to give a "low key briefing" to the PSI, and "hope this will satisfy them." (*Id.*) The PSI did eventually obtain KPMG return information in violation of section 6103, however. This fact is uncovered by a fluke: KPMG mistakenly included the name of a Mr. Pobiak on a list of taxpayer investors in its tax shelter transactions that it provided to the IRS. Mr. Pobiak in fact never did engage in any such transaction. (Rule Dec. Ex. T.) When counsel for Presidio received an Information and Document Request ("IDR") from the PSI seeking information about its taxpayer clients (*see* Rule Dec. Ex. U), however, that IDR requested information about Mr. Pobiak. The only conclusion that KPMG could reach at the time (and the only conclusion to be reached now) is that the IRS and/or DOJ had provided to the PSI the investor list that included Mr. Pobiak's name. (Rule Dec. Ex. T.) (*See also* Rule Dec. Ex. V (KPMG employee writing to private counsel that "[t]he real question is where did [the PSI] get the [taxpayer/investor] names?").)

Thus, there was a third violation of section 6103, in connection with what should have been a confidential IRS matter, but which, instead turned into a virtual free-for-all, with the DOJ Tax Division Criminal Section attorneys, like Downing, the IRS, and, apparently, the "SDNY" and an "AUSA", wrongfully using taxpayer return information, without authority pursuant to IRC § 6103(h)(2) and (3), to undermine the IRS civil examination of KPMG and to boast that they had initiated the biggest tax prosecution in United States history. The government's entanglement with the PSI again trampled on the non-disclosure rules of section 6103, and KPMG return information was used in the PSI report to rile up public reaction. *See, e.g.*, PSI Report p. 186. In this case, as in *United States v. Scrushy*, 366 F. Supp.2d 1134, 1137 (N.D. Al. 2005), the government's civil and criminal investigatory functions "improperly

merged" (one need only read Mr. Downing's declaration regarding his meeting with Mr. Gibson and review of return information to confirm this) requiring that the affected charges (here the entire Indictment) be dismissed.

The government tried to cover up its wrongdoing. The undated July/August Katz-Pearlman notes record that "6103 – Still issue" (GE I-509/45, Rule Dec. Ex. F), and that the Department of Justice would "*insist*," as a condition of the DOJ withdrawing the summons enforcement action and giving clearance for a civil settlement (GE I-509/47, Rule Dec. Ex. F), that KPMG "waive 6103 in Senate" (GE I-509/46, Rule Dec. Ex. F.). Given the pattern of section 6103 offenses in this case, it is not surprising that the Department of Justice should have been so concerned about concealing its misdeeds – through its repeated and forceful demands for KPMG to waive its right to non-disclosure of its "return information"– in a gambit to obtain absolution from KPMG. KPMG never did waive its section 6103 rights, however.

With the involvement of the IRS, DOJ, "AG" (*see* Rule Dec. Ex. R.), Commissioner of Internal Revenue, the Senate PSI Committee and others, the implications of these section 6103 abuses reach far beyond this case. It is in the context of this case, however, that the harm caused by this outrageous government misconduct is most evident and egregious.

## Conclusion

For the reasons stated herein, the reasons set forth in the our opening memorandum, and the reasons discussed in the memoranda filed by counsel for Mr. Stein on behalf of all defendants, we respectfully request that this Court dismiss the Indictment with prejudice.

Dated: New York, New York
       June 29, 2007

Respectfully submitted,

KOSTELANETZ & FINK, LLP

By: _____
Caroline Rule (CR-6503)
Robert S. Fink (RSF-7924)
Fran Obeid (FO-1928)
530 Fifth Avenue
New York, New York 10036
(212) 808-8100

Attorneys for Defendant Richard Smith